**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ADRIAN ARRINGTON, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | No. |
| v. | ) ) ) | **JURY TRIAL DEMANDED** |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, and NCAA FOOTBALL, | ) ) ) ) | |
| Defendants. | ) | |

## CLASS ACTION COMPLAINT

Plaintiff Adrian Arrington ("Arrington" or "Plaintiff") brings this class action complaint against Defendants National Collegiate Athletic Association and NCAA Football (collectively, the "NCAA"), on behalf of himself and all others similarly situated, and complains and alleges upon personal knowledge as to himself and his own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

## I.  NATURE OF THE ACTION

1.      For over 30 years, the NCAA has failed its student-athletes – choosing instead to sacrifice them on an altar of money and profits.  The NCAA has engaged in a long-established pattern of negligence and inaction with respect to concussions and concussion-related maladies sustained by its student-athletes, all the while profiting immensely from those same student-athletes.

2.      Specifically, the NCAA has failed to address and/or correct the coaching of tackling methodologies that cause head injuries; the NCAA has failed to implement system-wide "return to play" guidelines for student-athletes who have sustained concussions; the NCAA has

failed to implement system-wide guidelines for the screening and detection of head injuries; the NCAA has failed to implement legislation addressing the treatment and eligibility of student-athletes who have sustained multiple concussions in the course of play; and the NCAA has failed to implement a support system for student-athletes who, after sustaining concussions, are left unable to either play football or even lead a normal life.

3.     On average, the NCAA makes over $740 million in revenue each year. Unlike professional sports organization, the NCAA does not use revenues to pay its athletes, nor does the money go towards pension or medical benefits for post-collegiate athletes. The NCAA gives no medical or financial support to post-collegiate student-athletes who sustained concussions while playing an NCAA sport and who then cope with the costs and care needed resulting from their injuries.

4.     The NCAA's conduct is particularly egregious in light of the fact that its policies and procedures – or lack thereof – leave student-athletes like Plaintiff and members of the below-defined Classes inadequately protected from sustaining, monitoring and recovering brain injuries at a particularly early and vulnerable point in their lives. Unlike professional athletes, who at least have resources to pay for medical care necessitated by head injuries caused during their professional careers, collegiate players typically range in age from 18-23 and are just beginning their adult lives. For such NCAA student-athletes, including Plaintiff and the putative Classes, these injuries have long-term, debilitating effects, ranging from an inability to finish their education, to loss of memory, to depression, and early-onset dementia.

5.     Accordingly, this nationwide class action seeks medical monitoring and financial recovery for the long-term and chronic injuries, financial losses, expenses and intangible losses

suffered by the Plaintiff and members of the Classes as a result of the NCAA's carelessness, negligence, and concealment of information.

## II.  JURISDICTION AND VENUE

6.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2).   In the aggregate, Plaintiff's claims and the claims of the other members of the Class exceed $5,000,000 exclusive of interest and costs, and there are numerous class members who are citizens of states other than the NCAA's states of citizenship.

7.     Venue is proper in this district pursuant to 28 U.S. C. § 1391(b)(1), (2) and 1391(c) as: the NCAA is deemed to reside in this judicial district because it is subject to personal jurisdiction here; and a substantial part of the events and/or omissions giving rise to the claims emanated from activities within this jurisdiction and the Defendants conduct substantial business in this jurisdiction.

## III. PARTIES

*Plaintiff*

8.     Arrington is a natural person and a citizen of the State of Illinois.

*Defendants*

9.     Defendant National Collegiate Athletic Association is an unincorporated association that acts as the governing body of college sports. Its principal office is located in Indianapolis, Indiana.  According to its website, the NCAA oversees 88 championships in 23 sports. There are more than 400,000 student-athletes competing in three divisions at over 1,000 colleges and universities within the NCAA.  Through various licensing programs, the NCAA takes in, on average, over $740 million in revenues each year.

10.     Defendant NCAA Football is a 501(c) (4), not-for-profit corporation that purports to serve as the collective voice to promote college football.  According to its website, "NCAA Football represents a coalition of the American Football Coaches Association (AFCA), the Collegiate Commissioners Association (CCA), the Football Bowl Association (FBA), the National Association of Collegiate Directors of Athletics (NACDA), the National Collegiate Athletic Association (NCAA) and the National Football Foundation (NFF), which are the stakeholders for college football."[1]

## IV. <u>FACTUAL BACKGROUND</u>

*The NCAA's Inadequate Rules and Policies*

11.     In the early 1970s, rule-makers in the NCAA recognized that the use of the helmeted-head as an offensive weapon was dangerous and was increasing the rate of concussions.  In 1976, the NCAA passed a rule prohibiting initial contact of the head in blocking and tackling.

12.     Even after the regulations of the 1970s were passed, however, student-athletes continued to be coached and trained to use all portions of their helmets to block, tackle, butt, spear, ram and/or injure opposing players by hitting with their helmeted heads. While these techniques were *publicly* condemned by the NCAA, on a private level they were not meaningfully condemned by the NCAA**.**  To date, the harshest penalty imposed on coaches whose players were found to use the helmeted head to tackle was a letter of reprimand.

13.     At the individual level, the penalties for student-athletes who make dangerous helmet-based tackles include being either ejected or suspended from play.  But at the *team* level, teams are assessed only a 15-yard penalty for dangerous tackling.  What is more, the stated

---

[1] Henceforth, Defendants National Collegiate Athletic Association and NCAA Football will again be referred to collectively as the "NCAA."

rationale behind these penalties has consistently been to protect *the player being tackled* without regard for the player *using* the helmet to make the tackle – as he was coached to do.

14.     Despite its awareness of these dangerous practices and the increased risk of head injury to the players, during the 1970s, 1980s, 1990s and 2000s, the NCAA turned a blind eye to the players being coached and trained to use all portions of their helmet to block, tackle, butt, spear, ram and/or injure opposing players by hitting with their helmeted heads, and instead elevated its financial self-interest above the physical safety of its student-athletes.

***Studies Ignored by the NCAA***

15.     Since the early 1970s, the high incidence of concussions among student-athletes has been well known to the NCAA.  Further, based on studies that the NCAA *itself* paid for (as explained in detail below), the NCAA has been aware that a history of multiple concussions has been associated with greater risk of future brain defects in student-athletes, including symptoms of post-traumatic brain injury such as headaches, dizziness, loss of memory, impulse control problems, and Chronic Traumatic Encephalopathy.

16.     Moreover, in the early 2000s, the NCAA specifically became aware of the correlation between concussions and depression, dementia, and early on-set Alzheimer's disease. Despite this knowledge, the NCAA failed to act reasonably by developing appropriate means to identify at-risk players and guidelines or rules regarding return to play criteria. The NCAA's inaction increased the risk of long-term injury and illness in student-athletes.

17.     In 2003, the University of North Carolina, Chapel Hill, published a study, funded in part by the NCAA, which concluded that NCAA football players required an average of five

to seven days after concussion for their cognitive functioning to return to normal.[2]  The study concluded that ***athletes required a full seven days after a concussion before completely regaining their pre-concussion abilities***.  Despite this knowledge, the NCAA continues to allow student-athletes to return to play the very next calendar day after sustaining a concussion.  In practice, this means that a student athlete can be back on the field less than 24 hours after sustaining a serious brain injury – thereby placing the student-athlete in serious medical jeopardy.

18.     In another 2003 UNC-Chapel Hill study, again partially funded by the NCAA, the affects of multiple concussions sustained by a single athlete were examined.[3]  The study found that NCAA football players who had a history of concussions are at an increased risk of sustaining additional future concussions, and that those student-athletes who had three previous concussions were at a three-fold greater risk of future concussions.  The study recommended that athletes with a high cumulative history of concussions should receive more information about the increased risk of repeat concussions before deciding whether to continue to play football.

19.     The study also concluded that the use of standardized assessment tools would assist medical staff in better determining how long student-athletes should rest before returning to play.  Despite this knowledge, the NCAA has failed to implement any guidelines or rules pertaining to repeat concussions and failed to implement an educational program for athletes with a history of concussions who profess a desire to continue playing football.

---

[2] McCrea, et al., *Acute Effects and Recovery Time Following Concussions in Collegiate Football Players, The NCAA Concussion Study*, JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, Vol. 290, No. 19, November 19, 2003, at 2561.

[3] Guskiewicz, et al*., Cumulative Effects Associated With Recurrent Concussion in Collegiate Football Players, The NCAA Concussion Study*, THE JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, Vol. 290, No. 19, November 19, 2003, at 2549.

20.     But there is more.  In 2005 UNC-Chapel Hill published a study that found a clear link between previous head injuries and the likelihood of developing mild cognitive impairment (MCI) and early-onset Alzheimer's disease.[4]  In fact, the study found that players with three or more reported concussions were five times more likely to develop MCI, three times more likely to develop significant memory problems, and possessed an overall higher likelihood of developing early on-set Alzheimer's disease.  The NCAA did not even acknowledge the study, let alone act on it or even alert its student-athletes of these known risks.

21.     Two years later, the NCAA ignored yet another UNC-Chapel Hill study, which found that recurrent concussions were linked to a heightened risk of depression in former football players.[5]  The results of that study showed that former football players who sustained three or more concussions were three times more likely to be diagnosed with depression.  Those with two or more concussions were one and one-half times more likely to be diagnosed with depression.  Consistent with the pattern described herein, the NCAA chose to ignore the fact that the mental health of student-athletes was at risk, implementing no policy or educational stance that would properly protect and/or inform the football players at risk.

22.     Finally, in August 13, 2010, the NCAA passed legislation requiring its member schools to have a Concussion Management Plan (CMP) in place.  Prior to that date, the decision of whether to address concussion management with staff or athletes was the prerogative of individual schools.  Even with the passing of the CMP legislation, however, the NCAA continued its pattern of failing to address important issues such as the tackling methodology being taught by football coaches; the effects and prevention of multiple concussions; and long-

---

[4] Guskiewicz, et al., *Association between recurrent concussions and late-life cognitive impairment in retired professional football players*, NEUROSURGERY, Vol. 50, October 2005, at 719.

[5] Guskiewicz, et al., *Recurrent concussions and risk of depression in retired professional football players,* MED. SCI. SPORTS EXERC., Vol. 39, June 2007, at 903.

term problems such as headaches, dizziness, dementia and/or Alzheimer's disease that many players have experienced.

23.     Rather than creating a system-wide policy that focused on the best interest of the student-athletes, the NCAA's so-called "plan" relies on member schools to self-police their return-to-play policies.  Further, the NCAA's plan put the onus of concussion management on the student-athletes by requiring that they "sign a statement in which they accept the responsibility for reporting their injuries and illnesses to the institutional medical staff, including signs and symptoms of concussions."[6]

24.     Boiled down to its essence, the plan rejects any measure of responsibility for the NCAA, its member schools, and the coaching staff of individual teams; and instead, puts the burden squarely on the shoulders of student-athletes – *the same student-athletes who have just sustained fresh head trauma* – to seek out medical attention, or decide whether to seek it in the first place.

*Facts Pertaining to Plaintiff Arrington*

25.     Arrington is 25 years old.  Arrington currently attends Eastern Illinois University ("EIU"), an NCAA member school, where he formerly competed on the EIU football team.

26.     Before attending EIU, Arrington was named All-State for the Illinois Football Coaches Association Class 6A; he received a special All-State mention by the Chicago Tribune and Champaign News-Gazette; he was a three-time Illinois 6A State runner-up; he was named the WJBC Player of the Year; he was Big 12 Conference Defensive MVP and team MVP; and he competed in the summer Shrine All-Star game.

27.     Arrington continued to shine as a member of the EIU football team.  From 2006-2009, he was a Strong Safety and was the captain of the EIU football team during the 2009

_____

[6] NCAA Rule 3.2.4.17 (*available at* http://www.ncaapublications.com/productdownloads/D112.pdf).

season.  In 2007, he earned a starting position and led the team with 48 solo tackles. Arrington finished his career with an impressive 154 total tackles.

28.     During his time on the team, however, Arrington suffered numerous and repeated concussions during football games.  In each instance after he sustained his first three concussions, the EIU team doctor told Arrington he could return to play the very next day.

29.     After his third concussion, Arrington started experiencing memory loss unrelated to a specific traumatic event.  Around the same time, Arrington also began experiencing seizures. Only after these symptoms started to manifest did EIU finally send Arrington to a neurologist for testing.

30.     At no time was Arrington coached on how to make safer tackles.  In fact, at all times the message from EIU was to "play hard and play fast" without regard to safety, and that those who did not play in that manner would be summarily cut.  Arrington was also never given literature or lectures about concussion or other head injury prevention.

31.     Arrington sustained two additional concussions before finally leaving the football team to focus on matriculating from EIU.  That has proved difficult, however, as Arrington had to drop out of a number of his classes due to the memory loss, depression and the almost-daily migraines he continues to experience as a result of his head injuries.

***Discovery of the Cause of Action and the NCAA's Fraudulent Concealment***

32.     Prior to passage of the NCAA CMP on August 13, 2010, Plaintiff and the Classes were unaware that the conduct of the NCAA may have caused them to be at an increased risk for developing chronic brain injury symptoms, including but not limited to dementia and/or Alzheimer's disease.

33.     Until at least August 13, 2010, Plaintiff and the Classes did not have a reasonable basis to know or believe that the aforementioned harm was caused by the concealment, neglect and/or misconduct of the NCAA.

34.     Leading up to August 13, 2010, and over the past four decades, the NCAA has actively concealed any correlation between on-field concussions, its return-to-play policies and the chronic mental illnesses and maladies suffered by former student-athletes, including the Plaintiff and the Classes.

35.     Even today, by failing to implement appropriate policies to prevent, manage, mitigate and remedy head injuries and concussions sustained by its student-athletes, the NCAA continues to ignore and actively conceal the repeated warnings and patterns of injury of which the NCAA has actual knowledge.

***Medical Monitoring***

36.     Although the debilitating effects of concussions and other head injuries have already manifested for many former student-athletes, there are many others who have sustained such injuries as a direct result of the NCAA's failures and inactivity described above, but whose symptoms have only partially manifested or not yet manifested at all.

37.     The NCAA has failed to establish a proper and adequate methodology to monitor and detect when players suffer concussive or sub-concussive injury in practice or game play. This has increased the risk of injury that will materialize in the future.

38.     As a result, Plaintiff and the Classes require medical monitoring to detect the manifestation of post-injury symptoms.

## V. **CLASS ACTION ALLEGATIONS**

39.     Plaintiff brings Counts I-II, as set forth below, on behalf of himself and as a class action, pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class defined as:

> All former NCAA football players who sustained a concussion(s) or suffered concussion-like symptoms while playing football at an NCAA school, and who have, since ending their NCAA careers, developed chronic headaches, chronic dizziness or dementia or Alzheimer's disease and/or other physical and mental problems as a result of the concussion(s) suffered while a player (the "Class").

Excluded from the Class are the NCAA and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the judge to whom this case is assigned and any immediate family members thereof.

40.     Plaintiff brings Counts II-III, as set forth below, on behalf of himself and as a class action, pursuant to the provisions of Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure on behalf of a class defined as:

> All former and current NCAA football players who suffered a concussion or concussion-like symptoms while playing football at an NCAA school (the "Medical Monitoring Class").

Excluded from the Medical Monitoring Class are the NCAA and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Medical Monitoring Class; governmental entities; and the judge to whom this case is assigned and any immediate family members thereof.  The Class and Medical Monitoring Class are collectively referred to as the "Classes," unless specifically indicated otherwise.

41.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

42.     **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The members of the Classes are so numerous that individual joinder of all members of the Classes is impracticable. On information and belief, there are thousands of student-athletes who have been damaged by the NCAA's wrongful conduct as alleged herein.  The precise number of members of the Classes and their addresses is presently unknown to Plaintiff, but may be ascertained from the NCAA's books and records.  Members of the Classes may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

43.     **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).**  This action involves common questions of law and fact, which predominate over any questions affecting individual members of the Classes, including, without limitation:

      a.      whether the NCAA engaged in the conduct as alleged herein;

      b.      whether Plaintiff and the Classes are entitled to compensatory or other forms of damages, and other monetary relief and, if so, in what amount(s); and

      c.      whether Plaintiff and the Classes are entitled to equitable relief, including but not limited to medical monitoring and other injunctive relief.

44.     **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the claims of the other members of the Classes because, among other things, all members of the Classes were comparably injured through the uniform misconduct described above.

45.     **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate representative of the Classes because his interests do not conflict with the interests of the members of the Classes he seeks to represent; he has retained counsel competent

and experienced in complex commercial and class action litigation; and Plaintiff intends to prosecute this action vigorously. The interests of the Classes will be fairly and adequately protected by Plaintiff and his counsel.

46. **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** The NCAA has acted or refused to act on grounds generally applicable to Plaintiff and the members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below.

47. **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and members of the Classes are relatively small compared to the burden and expense that would be required to individually litigate their claims against the NCAA, so it would be impracticable for members of the Classes to individually seek redress for the NCAA' wrongful conduct. Even if members of the Classes could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VI.  CLAIMS ALLEGED

### COUNT I
### Negligence
### (On behalf of the Class)

48.     Plaintiff adopts and incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

49.     At all relevant times, the NCAA had a duty toward Plaintiff and the Class to supervise, regulate, monitor and provide reasonable and appropriate rules to minimize the risk of injury to the players.

50.     The NCAA acted carelessly and negligently in its position as the regulatory body for college teams and its student-athletes, including Plaintiff and the Class. The NCAA knew or should have known that its actions or its inaction in light of the rate and extent of concussions reported and made known to the NCAA would cause harm to players in both the short- and long-term.

51.     The NCAA was careless and negligent by breaching the duty of due care it assumed for the benefit of the Plaintiff and the Class, both generally and in the following particular respects:

  a.  Failing to warn of the risk of unreasonable harm resulting from repeated concussions;

  b.   Failing to disclose the special risks of long-term complications from repeated concussions and return to play;

  c.  Failing to disclose the role of repeated concussions in causing chronic life-long cognitive decline;

  d.  Failing to promulgate rules and regulations to adequately address the dangers of repeated concussions and a return-to-play policy to minimize long-term chronic cognitive problems;

e. Misrepresenting pertinent facts that players needed to be aware of to make determinations of the safety of return to play;

f. Concealing pertinent facts;

g. Failing to adopt rules and reasonably enforce those rules to minimize the risk of players suffering debilitating concussions; and

h. Other acts of negligence or carelessness that may materialize during the pendency of this action.

52.     The Plaintiff individually and the Class members have each sustained past medical expenses and will in all likelihood incur future medically-related costs associated with the harm suffered and injuries and disability referenced above.

53.     The Plaintiff individually and the Class members have suffered a loss of earnings and may in the future suffer a loss of earnings capacity associated with the harm suffered and the injuries and disability referenced above.

54.     The Plaintiff individually and the Class members have in the past experienced, and they may in the future suffer, from an assortment of problems associated with the harm and injuries described including, but not limited to, headaches, dizziness, loss of memory, depression, impulsivity to anger, cognitive dysfunction, employment impairment, limitations in physical activities, embarrassment, and loss of the pleasures of life, among other things.

55.     As a result of the foregoing, the Plaintiff and the Class have suffered damages and will in the future suffer damages caused by the misconduct of the Defendant.

56.     The Plaintiff and the Class are entitled to damages in an amount to be determined at trial, and injunctive relief requiring the NCAA, among other things, to adopt corrective measures regarding: the coaching of tackling methodologies that cause head injuries; the implementation of system-wide "return to play" guidelines for student-athletes who have sustained concussions; the implementation of system-wide guidelines for the screening and

detection of head injuries; and the implementation of legislation addressing the treatment and eligibility of student-athletes who have sustained multiple concussions in the course of play.

**COUNT II**
**Fraudulent Concealment**
**(On behalf of the Classes)**

57.     Plaintiff adopts and incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

58.     The NCAA concealed facts and information which caused Plaintiff and the Classes to become exposed to the harm referenced above.

59.     As a proximate cause of the NCAA's concealment, Plaintiff and the Classes suffered harm described above, and/or will suffer future injuries and damages that have not yet fully manifested.

**COUNT III**
**Medical Monitoring**
**(On behalf of the Medical Monitoring Class)**

60.     Plaintiff adopts and incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

61.     The Medical Monitoring Class has been exposed to a greater risk of concussions and sub-concussions, which have created an increased risk of long-term injury and the illnesses as described above.

62.     The members of the Medical Monitoring Class have not yet fully manifested the long-term physical and mental effects of the NCAA's misconduct, and require specialized testing that is not generally given or available to the public at large for the early detection of the long-term effects of concussions and sub-concussions.

63.     Medical monitoring is reasonably necessary according to contemporary scientific principles within the medical community that specialize in close head injuries and their connection to memory loss, early onset dementia, CTE and Alzheimer-like syndromes.

64.     By monitoring and testing former (and current) NCAA football players who are believed to have suffered a concussion or sub-concussion while playing or practicing, the risk of each such player suffering long term injuries, disease and losses as described above will be significantly reduced.

65.     Because the NCAA has failed to properly, reasonably and safely monitor, test or otherwise study whether and when a player has suffered a concussion or sub-concussion to minimize the risk of long-term injury or illness, medical monitoring is the most appropriate method by which it can be determined whether a particular individual is now at risk for long-term injury or illness from a concussion or sub-concussive event.

66.     Accordingly, the NCAA should be required to establish a medical monitoring program that includes, among other things:

   a.   Establishing a trust fund, in an amount to be determined, to pay for the medical monitoring of all past, current and future NCAA football players, as frequently and appropriately as necessary;

   b.    Notifying all Medical Monitoring Class members in writing that they may require frequent medical monitoring;

   c.   Providing information to treating team physicians to aid them in detecting concussion or sub-concussions and to assist them in determining when the player is subjected to an increased risk of harm.

67.     Plaintiff and the Medical Monitoring Class have no adequate remedy at law in that monetary damages alone cannot compensate them for the risk of long-term physical and economic losses due to concussions and sub-concussive injuries. Without a Court- approved medical monitoring program as described herein, or established by the Court, Plaintiff and the

Medical Monitoring Subclass members will continue to face an unreasonable risk of injury and disability.

## VII. JURY DEMAND

68.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all claims in this Complaint so triable.

## VIII. REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Classes, requests judgment as follows:

A.  Certification of the proposed Classes pursuant to Federal Rules of Civil Procedure Rule 23(a), (b)(2) and (b)(3);

B.  Designation of Plaintiff as representative of the proposed Classes and designation of Plaintiff's counsel as Class counsel;

C.  An award of compensatory damages, the amount of which is to be determined at trial;

D.  Injunctive relief requiring the NCAA, among other things, to adopt corrective measures regarding:

    i.   The coaching of tackling methodologies that cause head injuries;

    ii.  The implementation of system-wide "return to play" guidelines for student-athletes who have sustained concussions;

    iii. The implementation of system-wide guidelines for the screening and detection of head injuries; and

    iv.  The implementation of legislation addressing the treatment and eligibility of student-athletes who have sustained multiple concussions in the course of play.

E.  The establishment of a medical monitoring program that includes, among other things:

      i.   Establishing a trust fund, in an amount to be determined, to pay for the medical monitoring of all past, current and future NCAA football players, as frequently and appropriately as necessary;

     ii.   Notifying all Medical Monitoring Class members in writing that they may require frequent medical monitoring;

    iii.   Providing information to treating team physicians to aid them in detecting concussion or sub-concussions and to assist them in determining when the player is subjected to an increased risk of harm.

F.   An award to the Plaintiff and the Classes of prejudgment interest, costs and attorneys' fees.

G.   An award to the Plaintiff and Classes for such other and further relief as the Court deems just and proper.

Date: September 12, 2011                Respectfully submitted,

ADRIAN ARRINGTON, individually and on behalf of all others similarly situated

By:_____

       One of the Attorneys for
       Plaintiff and the Putative Class

Joseph J. Siprut
*jsiprut@siprut.com*
Aleksandra M. S. Vold, Of Counsel
SIPRUT PC
122 South Michigan Avenue
Suite 1850
Chicago, Illinois 60603
312.588.1440
Fax: 312.878.1342
www.siprut.com

4850-0792-4490, v. 1