UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ADRIAN ARRINGTON, DEREK OWENS,
MARK TURNER, and ANGELA PALACIOS,
individually and on behalf of all others
similarly situated,

                                    Plaintiffs,

                    v.

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION,

                                    Defendant.

Case No. 11-cv-06356

Hon. Sharon Johnson Coleman

**JURY DEMAND**

## [CORRECTED] CONSOLIDATED CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

Page(s)

I.    NATURE OF THE ACTION .........................................................................................1

II.    JURISDICTION AND VENUE .................................................................................3

III.    PARTIES ....................................................................................................................3

    A.    Plaintiff Arrington.........................................................................................3

    B.    Plaintiff Owens .............................................................................................5

    C.    Plaintiff Turner............................................................................................10

    D.    Plaintiff Palacios .........................................................................................12

    E.    Defendant and Defendant Class Representative ..........................................15

IV.    FACTUAL BACKGROUND ....................................................................................15

    A.    A primer on concussions..............................................................................15

        1.    Concussions and what they cause. ..................................................15

        2.    Signs and symptoms of concussions...............................................17

        3.    What doctors do. ..............................................................................19

        4.    After a concussion............................................................................19

    B.    Concussions occur in many sports................................................................20

    C.    Studies ignored by the NCAA ......................................................................21

    D.    The NCAA's inadequate rules and policies...................................................24

    E.    Discovery of the cause of action, the NCAA's fraudulent concealment and Plaintiffs' vulnerability ...........................................................................27

V.    CLASS ACTION ALLEGATIONS ........................................................................28

    A.    Plaintiffs' class allegations ..........................................................................28

    B.    Defendant class allegations..........................................................................31

VI.    CLAIMS ALLEGED ...............................................................................................33

COUNT I:  NEGLIGENCE (On Behalf of the Class)................................................................33

COUNT II:  FRAUDULENT CONCEALMENT (On Behalf of the Class).................................35

COUNT III:  UNJUST ENRICHMENT (On Behalf of the Class) ...............................................37

COUNT IV:  MEDICAL MONITORING (On Behalf of the Class) ...........................................37

VII.    JURY DEMAND.............................................................................................................39

VIII.   REQUEST FOR RELIEF ................................................................................................39

Plaintiffs Adrian Arrington ("Arrington"), Derek Owens ("Owens"), Mark Anthony Turner ("Turner"), and Angela Palacios ("Palacios") (collectively, the "Plaintiffs") bring this class action complaint against Defendant National Collegiate Athletic Association ("NCAA"), individually and on behalf of all others similarly situated, and complain and allege upon personal knowledge as to themselves and their own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by their attorneys.

## I. NATURE OF THE ACTION

1. The NCAA's constitution recognizes that: "It is the responsibility of each member institution to protect the health of and provide a safe environment for each of its participating student-athletes." NCAA Constitution, Article 2, at 2.2.3 (Adopted: 1/10/95).

2. The NCAA has failed to meet its responsibility to safeguard student athletes. The NCAA has engaged in a long-established pattern of negligence and inaction with respect to concussions and concussion-related maladies sustained by its student-athletes, all the while profiting immensely from those same student-athletes.

3. Specifically, the NCAA has failed to address and/or correct the coaching of tackling, checking or playing methodologies that cause head injuries; the NCAA has failed to educate coaches, trainers and student athletes as to the symptoms indicating possible concussions; the NCAA has failed to implement system-wide "return to play" guidelines for student-athletes who have sustained concussions; the NCAA has failed to implement system-wide guidelines for the screening and detection of head injuries; the NCAA has failed to implement legislation addressing the treatment and eligibility of student-athletes who have sustained multiple concussions in the course of play; and the NCAA has failed to implement a support system for student-athletes who, after sustaining concussions, are left unable to either play their sport or even lead a normal life.

- 1 -

4.     On average, the NCAA makes over $750 million in revenue each year and recently signed multi-billion dollar television contracts for football games.  Unlike professional sports organizations, however, the NCAA does not use revenues to pay its athletes, nor does the money go towards pension or medical benefits for post-collegiate athletes.  Unlike professional athletes the student athletes have no collective bargaining power to negotiate for such benefits with no leverage to require such benefits.  The NCAA gives no medical or financial support to post-collegiate student-athletes who sustained concussions while playing an NCAA sport and who are then left to cope with the necessary costs and care resulting from their injuries.  The NCAA, however, retains the economic benefits resulting from the student athletes' labors.

5.     The NCAA's conduct is particularly egregious in light of the fact that its policies and procedures – or lack thereof – leave student-athletes like Plaintiffs and members of the below-defined Classes inadequately protected from sustaining, monitoring and recovering brain injuries at a particularly early and vulnerable point in their lives.  Unlike professional athletes, who at least have resources to pay for medical care necessitated by head injuries caused during their professional careers, collegiate players typically range in age from 18-23 and are just beginning their adult lives.  For such NCAA student-athletes, including Plaintiffs and the putative Classes, these injuries can have long-term, debilitating effects, ranging from an inability to finish their education, to loss of memory, to depression, and early-onset dementia.

6.     Accordingly, this nationwide class action seeks medical monitoring and financial recovery for the long-term and chronic injuries, financial losses, expenses and other losses suffered by the Plaintiffs and members of the Classes as a result of the NCAA's carelessness, negligence, and concealment of information.

- 2 -

## II.    JURISDICTION AND VENUE

7.      This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2).  In the aggregate, Plaintiffs' claims and the claims of the other members of the Class exceed $5,000,000 exclusive of interest and costs, and there are numerous class members who are citizens of states other than the NCAA's states of citizenship.

8.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1), (2) and 1391(c) as:  the NCAA is deemed to reside in this judicial district because it is subject to personal jurisdiction here; and a substantial part of the events and/or omissions giving rise to the claims emanated from activities within this jurisdiction and the Defendant conducts substantial business in this jurisdiction.

## III.    PARTIES

### A.    Plaintiff Arrington

9.      Adrian Arrington is a natural person and a citizen of the State of Illinois. Arrington is 25 years old.  Arrington currently attends Eastern Illinois University ("EIU"), an NCAA member school, where he formerly competed on the EIU football team.

10.     Before attending EIU, Arrington was named All-State for the Illinois Football Coaches Association Class 6A; he received a special All-State mention by the Chicago Tribune and Champaign News-Gazette; he was a three-time Illinois 6A State runner-up; he was named the WJBC Player of the Year; he was Big 12 Conference Defensive MVP and team MVP; and he competed in the summer Shrine All-Star game.

11.     Arrington continued to shine as a member of the EIU football team.  From 2006-2009, he was a Strong Safety and was the captain of the EIU football team during the 2009 season.  In 2007, he earned a starting position and led the team with 48 solo tackles.  Arrington finished his career with an impressive 154 total tackles.

12.     During his time on the team, however, Arrington suffered numerous and repeated concussions during football games.  In each instance after he sustained his first three concussions, the EIU team doctor told Arrington he could return to play the very next day.

13.     After his third concussion, Arrington started experiencing memory loss unrelated to a specific traumatic event.  Around the same time, Arrington also began experiencing seizures.  Only after these symptoms started to manifest did EIU finally send Arrington to a neurologist for testing.

14.     At no time was Arrington coached on how to make safer tackles.  In fact, at all times the message from EIU was to "play hard and play fast" without regard to safety, and that those who did not play in that manner would be summarily cut.  Arrington was also never given literature or lectures about concussion or other head injury prevention.

15.     Arrington sustained two additional concussions before finally leaving the football team to focus on matriculating from EIU.  That has proved difficult, however, as Arrington had to drop out of a number of his classes due to the memory loss, depression and the almost-daily migraines he continues to experience as a result of his head injuries.

16.     Recently, as a result of his symptoms, Arrington's doctors suggested he receive an MRI.  The MRI showed that he has scarring on the frontal lobe of his brain.

17.     Specifically, with respect to Arrington, *inter alia*, the NCAA failed to implement system-wide "return to play" guidelines for student-athletes who have sustained concussions.  As a result, Arrington was returned to play football while still recovering from prior concussion injuries.  The NCAA failed to adequately educate and adopt rules requiring the education of coaches, staff and athletes regarding the symptoms and dangers of concussions.  Moreover, the NCAA failed to implement system-wide guidelines for the screening and detection of head

injuries that would have detected the numerous concussions Arrington received and thus prevented him from playing until he had fully recovered. The NCAA has also failed to implement legislation addressing the treatment and eligibility of student-athletes, such as Arrington, who have sustained multiple concussions in the course of play.

18.     The NCAA did not require its members to properly educate its athletes as to the true symptoms of when a concussion can occur. Without such knowledge, requiring athletes to report symptoms is meaningless.

19.     Further, the NCAA has utterly failed Arrington since he has had to take time off from school due to his injuries. Neither the NCAA nor EIU have provided Arrington with any support system; in fact, neither the NCAA nor EIU have any support system in place for student-athletes who, after sustaining concussions, are left unable to either play football or even lead a normal life.

20.     Finally, Arrington has incurred out-of-pocket costs and continues to pay for ongoing medical treatment directly related to the post-concussion syndrome with which he has been diagnosed.

**B.     Plaintiff Owens**

21.     Derek K. Owens is a natural person and a citizen of the State of Arkansas. Owens is 22 years old. Owens was a student at the University of Central Arkansas ("UCA"), was on an academic scholarship and was a member of the football team.

22.     Before attending UCA in the fall of 2008, Owens played football at Russellville High School in Russellville, Arkansas. He was the only person to attend that school who lettered in three varsity sports in three consecutive years. He was the first chair in trumpet in the school band for three years. He scored a 32 on his ACT. And he was a star football player. As a wide receiver, he was named the Top Offensive Player in the State of Arkansas, he was chosen to play

at his position in the state All-Star Game, and he was named one of the top Scholar-Athletes in the State.

23.     UCA recruited Owens, and offered Owens the choice between an academic scholarship or a football scholarship.  He chose the academic scholarship.  But he could not wait to play football for UCA.

24.     In the summer of 2008, UCA offered incoming freshman football players the chance to attend "voluntary practices" with certain other members of the team, but without coaches, to get acquainted with the school.  Prior to the "voluntary practice," Owens did not receive any information from or on behalf of the NCAA on how to recognize or report head injuries.  Owens did not receive any information from or on behalf of the NCAA concerning proper tackling and blocking techniques that could avoid head injuries.  Owens attended and shined as a receiver.  However, during one practice without pads or helmets, Owens was hit in the head from behind.  No one from the team provided him any treatment.  After practice, Owens called his parents, telling them he was dizzy, he was having difficulty seeing, and he did not think he could drive.  He stayed that evening locally with his cousin because he could not drive and went home the next day.  He did not return to the summer practices.  No one at UCA followed up with him.

25.     Owens returned to school for the fall semester and the fall football season.  Prior to the start of the season Owens did not receive any training on the subject of how to recognize a potential concussion, nor the steps to take to report any potential symptoms that may signify a concussion has occurred.  Owens believed that a concussion only occurred if he "blacked out" or was "knocked out."  During a practice in the second week of the season, however, Owens was hit by a linebacker and was knocked unconscious.  No one from UCA called Owens' family.  In

- 6 -

fact, the UCA trainers returned Owens to his dorm room, told his roommates that Owens had a "severe concussion," and asked his roommates to wake him up every couple of hours to make sure he was okay. His mom learned what had happened after receiving several strange texts from her son, which prompted her to call his cell phone to see if he was okay. One of Owens' roommates answered his cell phone and said that Owens was unable to talk as a result of the concussion. Owens' mother called the UCA trainers and stated that this was Owens' second concussion of the season. UCA red-shirted Derek for the 2007-2008 Season; he sat out for three to four weeks until the team doctor cleared him to return to the practice team.

26. The NCAA did not pass regulations requiring its members to educate student athletes on what symptoms may be signs of a concussion. Owens suffered numerous and repeated concussions while playing football at UCA. Some of those he did not recognize as concussions as he did not "black out" or was not "knocked out," but instead would get headaches, hear ringing in his ears, feel pressure in his head, feel as if his head was swollen, or would vomit.

27. In the fall of 2010, Owens was playing in a game against University of Tulsa as the punt returner and was hit just as he caught the ball. Owens' mom saw that he hit his head. The Tulsa player even bragged about how hard he hit Owens to the newspaper THE TULSA WORLD. THE TULSA WORLD wrote after the game:

> TU deep snapper Bo Abbott said racing down to drill Central Arkansas punt returner Derek Owens last Saturday night was the highlight of his career. "The only problem was, his helmet didn't fly off," Abbott said with a chuckle.

Mike Brown, "TU notebook: Headhunter," THE TULSA WORLD (Oklahoma) (September 30, 2010). No one from the team checked on Owens when he returned to the sidelines. However, it was obvious from watching the play that Owens had a possible head injury.

28.     By the fall of 2010, Owens had been and was experiencing memory loss, headaches, an inability to concentrate or focus, anxiety and depression. He complained that he was not feeling well and was having trouble sleeping. He would study for tests, but if he went to sleep he would forget what he had studied, so he started making himself stay up all night out of fear of failing. His grades plummeted even though his academics had been his priority. As a result, he lost his regular academic scholarship. Thus, for the fall semester 2010, Owens obtained a school loan and a partial state lottery scholarship to make up for the lost academic scholarship.

29.     During the spring semester of 2011, Owens was paying for school through a small football scholarship, the state lottery scholarship and his school loan. However, Owens' grade in one of his core science classes was a low C/high D. As a result, Owens either had to drop the class and lose his state lottery scholarship (because he would not meet the minimum hours required to maintain it), or take the grade. He dropped the class and sacrificed his lottery scholarship in an attempt to keep his grade point average up.

30.     In May 2011, Owens asked to go to his family doctor because he feared he had ADHD. However, after hearing Owens' story, Owens' doctor diagnosed the problems as being related to his concussions. This was the first time he learned that the symptoms he had been experiencing and the steady decline in his academics were directly related to the multiple concussions he had suffered. At no time did the NCAA require UCA to provide Owens with adequate information about (a) how to tackle and block so as to avoid as much as possible a head injury, (b) the symptoms of a head injury, and (c) the possible long term consequences of concussions.

31.     Owens attempted to take classes during the first period of the summer of 2011 but was forced to drop out of school and football as a result of his symptoms.  Owens told his mother:  "I feel like a 22 year old with Alzheimer's."  Owens lost his lottery scholarship because he did not maintain the required hours.

32.     When Owens informed his coach that he could not play due to medical issues, the coach inquired "so what's your plan?," informing Owens that as soon as he walked out the door all of the benefits Owens had from football would cease.  At no time did his coach offer to take responsibility for the consequences of Owens' injury.  Owens felt like he had been "kicked to the gutter."  Subsequently, after Owens' mother went directly to the Athletic Director to fight for Owens' right to retain his athletic scholarship since Owens was injured while playing football, UCA agreed Owens would maintain his athletic scholarship (approximately $2,000) since he had to quit as a result of his medical condition.

33.     Since then, Owens has seen both a neurologist as well as a specialist in football-related concussions, has been diagnosed with post-concussion syndrome, and was told the front part of his brain had been injured.  The symptoms of post-concussion syndrome, each of which Owens has suffered, include migraine headaches, dizziness, fatigue, irritability, anxiety, insomnia, loss of concentration and memory, and noise and light sensitivity.

34.     Specifically, with respect to Owens, *inter alia,* the NCAA failed to implement system-wide "return to play" guidelines for student-athletes who have sustained concussions.  As a result, Owens was returned to play football while still recovering from prior concussion injuries, even despite his mother's intervention.  The NCAA failed to adequately educate and adopt rules requiring the education of coaches, staff and athletes regarding the symptoms and long-term consequences of concussions if not properly treated, as well as the proper treatment

- 9 -

protocol for head injuries.  Moreover, the NCAA failed to implement system-wide guidelines for the screening and detection of head injuries that would have detected the numerous concussions Owens received and thus prevented him from playing until he had fully recovered.  The NCAA has also failed to implement legislation addressing the treatment and eligibility of student-athletes, such as Owens, who have sustained multiple concussions in the course of play.

35.     Owens did not learn that concussions could occur without a "blackout" or "knockout experience" until he saw his doctor.  The NCAA did not require its members to properly educate its athletes as to the true symptoms of when a concussion can occur without a "blackout" or "knockout."  Without such knowledge, requiring athletes to report symptoms is meaningless.

36.     Further, the NCAA has utterly failed Owens since he has had to take time off from school due to his injuries.  Neither the NCAA nor UCA have provided Owens with any support system; in fact, neither the NCAA nor UCA have any support system in place for student-athletes who, after sustaining concussions, are left unable to either play football or even lead a normal life.

37.     Finally, Owens has incurred out-of-pocket costs as a result of the loss of his academic scholarship, and has incurred and continues to incur out-of-pocket costs for ongoing medical treatment directly related to the post-concussion syndrome with which Owens has been diagnosed.

## C.     Plaintiff Turner

38.     Plaintiff Mark Turner is a natural person and a citizen of the State of New York.  Turner was a student at Fordham University in New York, was on an academic scholarship and was a member of the football team.

39.     Between 1988 and 1989, Turner was a defensive back and special teams player for the Fordham football team.

40.     During a game in his second season, Turner went to make a tackle. As he made contact with the other player, the other player's knee hit the front of Turner's head. As a result of the impact, Turner lost consciousness momentarily.

41.     Turner was taken out of the game but was never examined to determine if he had a concussion, despite his loss of consciousness. For the next few days, Turner experienced migraine headaches. He was never checked on by any of the team staff. As a result of his injuries, Turner soon quit the football team.

42.     Shortly thereafter, Turner experienced his first episode of Bell's Palsy – a form of partial facial paralysis. Turner was referred to a neurologist who, after examining Turner, found that Turner had a dark area on the frontal lobe of his brain – precisely where he was hit when he lost consciousness.

43.     Despite treatment, Turner continues to experience symptoms of Bell's Palsy, which was caused by his football injury.

44.     Specifically, with respect to Turner, *inter alia*, the NCAA failed to implement system-wide "return to play" guidelines for student-athletes who have sustained concussions. As a result, Turner was returned to play football while still recovering from prior concussion injuries. The NCAA failed to adequately educate and adopt rules requiring the education of coaches, staff and athletes regarding the symptoms and dangers of concussions. Moreover, the NCAA failed to implement system-wide guidelines for the screening and detection of head injuries that would have detected the numerous concussions Turner received and thus prevented him from playing until he had fully recovered. The NCAA has also failed to implement

- 11 -

legislation addressing the treatment and eligibility of student-athletes, such as Turner, who have sustained multiple concussions in the course of play.

45.     The NCAA did not require its members to properly educate its athletes as to the true symptoms of when a concussion can occur.  Without such knowledge, requiring athletes to report symptoms is meaningless.

46.     Further, the NCAA has utterly failed Turner since he has had to take time off from school due to his injuries.  Neither the NCAA nor Fordham have provided Turner with any support system; in fact, neither the NCAA nor Fordham have any support system in place for student-athletes who, after sustaining concussions, are left unable to either play football or even lead a normal life.

47.     Finally, Turner has incurred out-of-pocket costs and continues to pay for ongoing medical treatment directly related to the post-concussion syndrome with which he has been diagnosed.

**D.     Plaintiff Palacios**

48.     Plaintiff Angela Palacios is a natural person and a citizen of the State of Texas. Palacios is 19 years old.  Palacios currently attends Ouachita Baptist University ("OBU"), an NCAA member school located in Arkadelphia, Arkansas, where she formerly competed on the OBU women's soccer team.

49.     Prior to attending OBU, Palacios sustained two concussions playing soccer in high school.  Her parents alerted the school about Palacios' concussions and provided protective head gear for her to wear while playing on OBU women's soccer team.

50.     As a freshman at OBU, Palacios started in 14 of 18 games and played in 17 games overall.  Palacios is listed among the 2010 team leaders in points, assists, shots on goal, and game winning goals.

51.     At a team practice held on September 13, 2011 – just prior to OBU's fourth game of the season – Palacios' face collided with another team member's head during a practice drill. Immediately after the incident, the athletic trainer asked Palacios if she was dizzy, nauseated, or had a headache.  Palacios answered yes to all three.

52.     Despite her responses and despite Palacios' eye swelling shut almost instantly, no further concussion-related tests were administered on the day of her injuries and she was not sent to the emergency room.  Instead, the team trainer directed Palacios to go to her dorm room to rest, never once checking in on her or arranging for Palacios to have any type of monitoring.

53.     The following day, Palacios was given an online test to determine whether she had any lingering neurological deficiencies.  Based on that test, Palacios did not participate in practices until September 17th.  That morning, after consistently suffering from headaches every day since her injury, Palacios vomited.  When she arrived at practice she alerted her coach that she was still not feeling well.

54.     Without any clearance from the training staff and despite Palacios' lingering side effects, the coach made her participate in running drills.  After being ordered to run, Palacios asked a trainer for help.  The trainer simply said:  "you don't want to make the coach mad."

55.     Palacios was finally excused from practice after the coach was contacted by her mother.  After that call, Palacios' coach told her that she was allowed to sit out – and should expect to sit out for a long time, insinuating that Palacios would no longer be allowed to play.

56.     Realizing that her medical needs were being ignored by OBU, Palacios sought medical attention at a hospital emergency room.  There, the doctor found that Palacios had diminished sensation on her left side, that her memory was sluggish, and that she had sustained a

serious concussion.  Palacios was told by the ER doctor that she should not participate in any activities for two more weeks.

57.     Specifically, with respect to Palacios, *inter alia*, the NCAA failed to implement system-wide "return to play" guidelines for student-athletes who have sustained concussions.  As a result, Palacios was returned to play soccer while still recovering from prior concussion injuries.  The NCAA failed to adequately educate and adopt rules requiring the education of coaches, staff and athletes regarding the symptoms and dangers of concussions.  Moreover, the NCAA failed to implement system-wide guidelines for the screening and detection of head injuries that would have prevented Palacios from playing until she had fully recovered.  The NCAA has also failed to implement legislation addressing the treatment and eligibility of student-athletes, such as Palacios, who have sustained multiple concussions in the course of play.

58.     The NCAA did not require its members to properly educate its athletes as to the true symptoms of when a concussion can occur.  Without such knowledge, requiring athletes to report symptoms is meaningless.

59.     Finally, Palacios has incurred out-of-pocket costs directly related to the concussion with which she has been diagnosed.

60.     While playing NCAA sports, the NCAA did not encourage Arrington, Turner, Owens, Palacios or other student-athletes to report or complain about their physical well-being, did not thoroughly educate or warn Arrington, Turner, Owens, Palacios or other student-athletes of the long-term effects of concussions, and did not thoroughly educate Plaintiffs, or other student-athletes on head injury prevention.  Moreover, the NCAA did not provide baseline testing prior to each season to identify and manage a concussion once it occurred and failed to conduct any follow up with players forced to stop playing as a result of concussions.  As a result,

Plaintiffs and the members of the Classes have or may have suffered physical injury as well as incurred out-of-pocket costs related to their injuries.

**E.  Defendant and Defendant Class Representative**

61.  Defendant National Collegiate Athletic Association is an unincorporated association that acts as the governing body of college sports. Its principal office is located in Indianapolis, Indiana.  According to its website, the NCAA oversees 88 championships in 23 sports.  There are more than 400,000 student-athletes competing in three divisions at over 1,000 colleges and universities within the NCAA.  Through various licensing programs, the NCAA takes in, on average, over $750 million in revenues each year.  It is named as the class representative for all NCAA members with an athletics program.

## IV.  FACTUAL BACKGROUND

**A.  A primer on concussions**

**1.  Concussions and what they cause.**

62.  The brain is made of soft tissue and is cushioned by spinal fluid. It is encased in the hard, protective skull.  When a person gets a head injury, the brain can slosh around inside the skull and even bang against it.  This can lead to bruising of the brain, tearing of blood vessels, and injury to the nerves.  When this happens, a person can get a concussion – a temporary loss of normal brain function.

63.  Concussions and other brain injuries are fairly common.  One of the most common reasons people get concussions is through a sports injury.  High-contact sports such as football, boxing, soccer, and hockey pose a higher risk of head injury, even with the use of protective headgear:



**School of hard knocks**

A concussion occurs when a violent blow to the head causes the brain to slam against the skull beyond the ability of the cerebrospinal fluid to cushion the impact. Between 1996 and 2001, NFL teams reported nearly 900 concussions.

**1** When a football player takes a hit to the head, speeds range from 17 to 25 miles per hour with a force averaging 98 times the force of gravity.

**2** The shock wave passes through the brain and bounces back off the skull. The concussion usually occurs at the opposite side from the point of impact.

**3** The impact can cause bruising of the brain, tearing of blood vessels and nerve damage.

A study commissioned by the NFL revealed most hits occurred from a blow to the side of the head, often on the lower half of the face.

Skull
Brain
Cerebro-spinal fluid
Blood vessel

**Symptoms**

**Immediate**
Confusion
Amnesia
Loss of consciousness
Ringing in the ears
Nausea and vomiting
Convulsions

**Delayed**
Irritability
Headaches
Depression
Sleep disorders
Poor concentration
Trouble with memory

**Cumulative effects**
Studies show that prior concussions may lower the threshold for subsequent concussion injury and increase severity of symptoms.

Sources: MayoClinic.com, Biokinetics, Washington Post, Science Daily, kidshealth.org, Kaiser Permanente

Andrew Lucas, Jeff Goertzen | The Denver Post

64.　　Men are more likely to get concussions than women. However, in certain sports, like soccer, girls have a higher potential for concussion. Below is a depiction of how a concussion occurs in athletics:

010270-11  486889 V1



**IMPACT OF CONCUSSION ON ATHLETE'S BRAIN**

*A concussion is a brain injury caused by a bump, blow or jolt to the head. Symptoms can appear right away or days later. A severe concussion has a dangerous cumulative effect and can cause debilitating memory loss, chronic headaches and clinical depression.*

**What happens**
In a severe concussion, forces can twist and break the long, slender axons of brain cells

Healthy brain cell

Brain cell dies after trauma

Twisted axon

Fluid surrounding the brain can fail to protect blood vessels and nerves from damage

Skull
Cerebrospinal fluid
Brain

Outer blood vessels break

Shock wave pushes brain against skull on opposite side

Impact can be almost 100 times the force of gravity

### 2. Signs and symptoms of concussions.

65. The signs of a concussion are not always well recognized. And because of that, athletes may put themselves at risk for another injury. For example, players may return to a game before they should, thinking nothing is wrong. That is a problem, because if the brain hasn't healed properly from a concussion and someone gets another brain injury (even if it's with less force), it can be serious.

66. Repeated injury to the brain can lead to swelling, and sometimes people develop long-term disabilities, or even die, as a result of serious head injuries. So it is really important to recognize and understand the signals of a concussion.

67. Although we may think of a concussion as someone losing consciousness (passing out), a person can have a concussion and never lose consciousness.

68. Symptoms of a concussion may include:

"seeing stars" and feeling dazed, dizzy, or lightheaded;

memory loss, such as trouble remembering things that happened right before and after the injury;

nausea or vomiting;

headaches;

blurred vision and sensitivity to light;

slurred speech or saying things that don't make sense;

difficulty concentrating, thinking, or making decisions;

difficulty with coordination or balance (such as being unable to catch a ball or other easy tasks);

feeling anxious or irritable for no apparent reason; or

feeling overly tired.

69.     Different grades of concussion.  There are different grades of concussion:

Someone with a grade 1 concussion can have some of the symptoms listed above, but with no loss of consciousness and with symptoms ending within 15 minutes.

With a grade 2 concussion, there has been no loss of consciousness but the symptoms last longer than 15 minutes.

In a grade 3 concussion, the person loses consciousness – even if it is just for a few seconds.

Knowing the different grades is important because how soon a player can safely return to a sports activity is tied to the grade of the concussion.

70.     With a grade 1 concussion, the player can resume play once symptoms have stopped.  However, that player should stop play if he or she gets another head injury.  A grade 2 concussion requires that a player stop playing and not return to any type of sport or physical activity that could cause a head injury for at least another week.  Someone with a grade 3 concussion should see a doctor as quickly as possible.

010270-11  486889 V1

### 3. What doctors do.

71. If a doctor suspects that someone may have a concussion, he or she will ask about the head injury – such as how it happened and when – and the symptoms. The doctor may ask what seem like silly questions – things like "Who are you?" or "Where are you?" or "What day is it?" and "Who is the president?" Doctors ask these questions to check the person's level of consciousness and memory and concentration abilities.

72. The doctor will perform a thorough examination of the nervous system, including testing balance, coordination of movement, and reflexes. The doctor may ask the patient to do some activity such as running in place for a few minutes to see how well the brain functions after a physical workout.

73. Sometimes a doctor may order a CT scan (a special brain X-ray) or an MRI (a special non-X-ray brain image) to rule out bleeding or other serious injury involving the brain.

74. If the concussion isn't serious enough to require hospitalization, the doctor will give instructions on what to do at home, like having someone wake the person up at least once during the night. If a person with a concussion cannot be easily awakened, becomes increasingly confused, or has other symptoms such as vomiting, it may mean there is a more severe problem that requires contacting the doctor again.

75. The doctor will probably recommend that someone with a concussion take acetaminophen or other aspirin-free medications for headaches. The person also will have to take things easy at school or work.

### 4. After a concussion.

76. After a concussion, the brain needs time to heal until all symptoms of a concussion have cleared up before returning to normal activities. The amount of time someone needs to recover depends on how long the symptoms last. Healthy teens can usually resume

their normal activities within a few weeks, but each situation is different.  A doctor should monitor the athlete closely to make sure it is appropriate to return to the game.

77.     Someone who has had a concussion and has not recovered within a few months is said to have postconcussion syndrome.  The person may have the same problems described earlier – such as poor memory, headaches, dizziness, and irritability – but these will last for longer periods of time and may even be permanent.

78.     If someone has continuing problems after a concussion, the doctor may refer him or her to a rehabilitation specialist for additional help.

**B.     Concussions occur in many sports**

79.     Concussions are not exclusive to American football.  In the United States the next most concussive sport is soccer, the number one sport in the world.

80.     A research project by University of North Carolina reported concussion rates by 100,000 athlete-exposures and separated it by sport.  Here is what the list showed:

1.     Football

2.     Boys Soccer

3.     Girls Basketball

4.     Girls Track

5.     Girls Soccer

6.     Baseball

7.     Softball

8.     Boys Track

9.     Boys Basketball

10.     Wrestling

11.     Cheerleading

**C.      Studies ignored by the NCAA**

81.      Since the early 1970s, the high incidence of concussions among student-athletes in many different sports, including football, hockey and soccer, has been well known to the NCAA.  Further, based on studies that the NCAA *itself* paid for (as explained in detail below), the NCAA has been aware that a history of multiple concussions has been associated with greater risk of future brain defects in student-athletes, including symptoms of post-traumatic brain injury such as headaches, dizziness, loss of memory, impulse control problems, and Chronic Traumatic Encephalopathy.

82.      Moreover, in the early 2000s, the NCAA specifically became aware of the correlation between concussions and depression, dementia, and early on-set Alzheimer's disease.  Despite this knowledge, the NCAA failed to act reasonably by developing appropriate means to identify at-risk players and guidelines or rules regarding return to play criteria.  The NCAA's inaction increased the risk of long-term injury and illness in student-athletes.

83.      As early as in 2002, a prominent study published in the Archives of Clinical Neuropsychology entitled *Enduring Effects of Concussion in Youth Athletes* documented that there were enduring effects in youth who have experienced a history of two or more concussions.[1]  These include decreased overall neuropsychological functioning, as well as decreased mental speed.

84.      In 2003, the University of North Carolina, Chapel Hill, published a study, funded in part by the NCAA, which concluded that NCAA football players required an average of five

---

[1] Moser, *et al*., Archives of Clinical Neuropsychology, 17 (2002) 91-100.

to seven days after concussion for their cognitive functioning to return to normal.[2]  The study concluded that ***athletes required a full seven days after a concussion before completely regaining their pre-concussion abilities***.

85.     Despite this knowledge, the NCAA continues to allow student-athletes to return to play the very next calendar day after sustaining a concussion.  In practice, this means that a student athlete can be back on the field less than 24 hours after sustaining a serious brain injury – thereby placing the student-athlete in serious medical jeopardy.

86.     In another 2003 UNC-Chapel Hill study, again partially funded by the NCAA, the affects of multiple concussions sustained by a single athlete were examined.[3]  The study found that NCAA football players who had a history of concussions are at an increased risk of sustaining additional future concussions, and that those student-athletes who had three previous concussions were at a three-fold greater risk of future concussions.  The study recommended that athletes with a high cumulative history of concussions should receive more information about the increased risk of repeat concussions before deciding whether to continue to play football.

87.     The study also concluded that the use of standardized assessment tools would assist medical staff in better determining how long student-athletes should rest before returning to play.  Despite this knowledge, the NCAA has failed to implement any guidelines or rules pertaining to repeat concussions and failed to implement an educational program for athletes with a history of concussions who profess a desire to continue playing football.

---

[2] McCrea, *et al.*, *Acute Effects and Recovery Time Following Concussions in Collegiate Football Players, The NCAA Concussion Study*, JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, Vol. 290, No. 19, November 19, 2003, at 2561.

[3] Guskiewicz, *et al.*, *Cumulative Effects Associated With Recurrent Concussion in Collegiate Football Players, The NCAA Concussion Study*, THE JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, Vol. 290, No. 19, November 19, 2003, at 2549.

88. But there is more. In 2005 UNC-Chapel Hill published a study that found a clear link between previous head injuries and the likelihood of developing mild cognitive impairment (MCI) and early-onset Alzheimer's disease.[4] In fact, the study found that players with three or more reported concussions were five times more likely to develop MCI, three times more likely to develop significant memory problems, and possessed an overall higher likelihood of developing early on-set Alzheimer's disease. The NCAA did not even acknowledge the study, let alone act on it or even alert its student-athletes of these known risks.

89. Two years later, the NCAA ignored yet another UNC-Chapel Hill study, which found that recurrent concussions were linked to a heightened risk of depression in former football players.[5] The results of that study showed that former football players who sustained three or more concussions were three times more likely to be diagnosed with depression. Those with two or more concussions were one and one-half times more likely to be diagnosed with depression.

90. Further, it is well known that student-athletes in the NCAA are at risk for concussion. In 2010, a study from the University of North Carolina reported that men's hockey players suffered 1.47 concussions per 1,000 player hours. Women's college hockey was worse, with 2.72 concussions occurring for every 1,000 hours.[6]

91. In fact, at a 2010 Mayo Clinic conference on concussions, researchers discussed that concussions comprised about 25 percent of the injuries in women's ice hockey, the highest

---

[4] Guskiewicz, *et al.*, *Association between recurrent concussions and late-life cognitive impairment in retired professional football players*, NEUROSURGERY, Vol. 50, October 2005, at 719.

[5] Guskiewicz, *et al.*, *Recurrent concussions and risk of depression in retired professional football players,* MED. SCI. SPORTS EXERC., Vol. 39, June 2007, at 903.

[6] http://www.hockeyprimetime.com/news/futures-watch/ncaa-hockeys-growing-headache.

cause of injury in the sport. In men's ice hockey concussions account for 9 percent of the injuries (No. 2 in the sport), and in football they account for 7 percent (No. 3 in the sport).[7]

92.     The NCAA also knows, but has ignored, that concussions are not limited to helmeted sports. A study conducted by McGill University in Montreal found that 60 percent of college soccer players reported symptoms of a concussion at least once during the season. The study also revealed that concussion rates in soccer players were comparable to those in football. According to this study, athletes who suffered a concussion were four to six times more likely to suffer a second concussion.[8]/[9]

93.     Consistent with the pattern described herein, the NCAA chose to ignore the fact that the mental health of student-athletes was at risk, implementing no policy or educational stance that would properly protect and/or inform the football players at risk.

**D.     The NCAA's inadequate rules and policies**

94.     In the early 1970s, rule-makers in the NCAA recognized that the use of the helmeted head as an offensive weapon was dangerous and was increasing the rate of concussions.

95.     In 1976, the NCAA passed a rule prohibiting initial contact of the head in blocking and tackling in football.

96.     Even after the football regulations of the 1970s were passed, however, football student-athletes continued to be coached and trained to use all portions of their helmets to block,

---

[7] http://slapshot.blogs.nytimes.com/2010/10/19/at-the-mayo-clinic-womens-hockey-a-most-dangerous-game/.

[8] http://www.aans.org/Patient%20Information/Conditions%20and%20Treatments/Sports-Related%20Head%20Injury.aspx.

[9] http://aans.org/en/Patient%20Information/Conditions%20and%20Treatments/Concussion.aspx.

tackle, butt, spear, ram and/or injure opposing players by hitting with their helmeted heads. While these techniques were *publicly* condemned by the NCAA, on a private level they were not meaningfully condemned by the NCAA. To date, the harshest penalty imposed on football coaches whose players were found to use the helmeted head to tackle was a letter of reprimand.

97. At the individual level, the penalties for student-athletes who make dangerous helmet-based tackles include being either ejected or suspended from play. But at the *team* level, teams are assessed only a 15-yard penalty for dangerous tackling. What is more, the stated rationale behind these penalties has consistently been to protect *the player being tackled* without regard for the player *using* the helmet to make the tackle – as he was coached to do.

98. Despite its awareness of these dangerous practices and the increased risk of head injury to the players, during the 1970s, 1980s, 1990s and 2000s, the NCAA turned a blind eye to the players being coached and trained to use all portions of their helmet to block, tackle, butt, spear, ram and/or injure opposing players by hitting with their helmeted heads, and instead elevated its financial self-interest above the physical safety of its student-athletes.

99. Similarly, in hockey, no rule or guidance was provided on hitting with the head in the NCAA. Finally, in 2010, the NCAA installed new rules in the hockey off-season to address the growing problem of concussions and head and neck injuries. As of the 2010-11 season, all hits to the head are penalized by a five-minute major and the referee's option of a game misconduct or disqualification. A disqualification carries with it an automatic one-game suspension.

100. Finally, in August 13, 2010, the NCAA passed legislation requiring its member schools to have a Concussion Management Plan (CMP) in place for all sports. Prior to that date, the decision of whether to address concussion management with staff or athletes, or within

particular sports, was the prerogative of individual schools. Even with the passing of the CMP legislation, however, the NCAA continued its pattern of failing to address important issues such as the tackling methodology being taught by football coaches; the effects and prevention of multiple concussions; and long-term problems such as headaches, dizziness, dementia and/or Alzheimer's disease that many players have experienced.

101.    Rather than creating a system-wide policy that focused on the best interest of the student-athletes, the NCAA's so-called "plan" relies on member schools to self-police their return-to-play policies. Further, the NCAA's plan put the onus of concussion management on the student-athletes by requiring that they "sign a statement in which they accept the responsibility for reporting their injuries and illnesses to the institutional medical staff, including signs and symptoms of concussions."[10]

102.    Boiled down to its essence, the plan rejects any measure of responsibility for the NCAA, its member schools, and the coaching staff of individual teams; and instead, puts the burden squarely on the shoulders of student-athletes – *the same student-athletes who have just sustained fresh head trauma* – to seek out medical attention, or decide whether to seek it in the first place.

103.    The NCAA and its members not only avoid responsibility but have agreed that medical expenses can be paid only to current student athletes.

104.    NCAA Bylaw 12.02.5 defines "a student athlete":

> 12.02.5 Student-Athlete. A student-athlete is a student whose enrollment was solicited by a member of the athletics staff or other representative of athletics interests with a view toward the student's ultimate participation in the intercollegiate athletics program. Any other student becomes a student-athlete only when

---

[10] NCAA Rule 3.2.4.17 (*available at* http://www.ncaapublications.com/productdownloads/D112.pdf).

the student reports for an intercollegiate squad that is under the jurisdiction of the athletics department, as specific in Constitution 3.2.4.5. A student is not deemed a student-athlete solely on the basis of prior high school athletics participation.

105. Bylaw Article 15 sets forth all forms of permitted financial aid, and such aid, including medical expenses, are to be paid only to student athletes. No provision allows payments post-graduation. Bylaw Article 16.4 allows payment of medical expenses only for current student athletes.

**E.      Discovery of the cause of action, the NCAA's fraudulent concealment and Plaintiffs' vulnerability**

106. Prior to passage of the NCAA CMP on August 13, 2010, Plaintiffs and the Classes were unaware that the conduct of the NCAA may have caused them to be at an increased risk for developing chronic brain injury symptoms, including, but not limited to, dementia and/or Alzheimer's disease.

107. Until at least August 13, 2010, Plaintiffs and the Classes did not have a reasonable basis to know or believe that the aforementioned harm was caused by the concealment, neglect and/or misconduct of the NCAA.

108. Leading up to August 13, 2010, and over the past four decades, the NCAA has actively concealed any correlation between on-field concussions, its return-to-play policies and the chronic mental illnesses and maladies suffered by former student-athletes, including the Plaintiffs and the Classes.

109. Even today, by failing to implement appropriate policies to prevent, manage, mitigate and remedy head injuries and concussions sustained by its student-athletes, the NCAA continues to ignore and actively conceal the repeated warnings and patterns of injury of which the NCAA has actual knowledge.

110.     Although the debilitating effects of concussions and other head injuries have already manifested for many former student-athletes, there are many others who have sustained such injuries as a direct result of the NCAA's failures and inactivity described above, but whose symptoms have only partially manifested or not yet manifested at all.

111.     The NCAA has failed to establish a proper and adequate methodology to monitor and detect when players suffer concussive or sub-concussive injury in practice or game play. This has increased the risk of injury that will materialize in the future.

112.     As a result, Plaintiffs and the Classes require medical monitoring to detect the manifestation of post-injury symptoms.

## V.     CLASS ACTION ALLEGATIONS

### A.     Plaintiffs' class allegations

113.     Plaintiffs bring Counts I-III, as set forth below, individually and as a class action, pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class defined as:

> All former NCAA student-athletes who sustained a concussion(s) or suffered concussion-like symptoms while playing sports at an NCAA school, and who have, since ending their NCAA careers, developed chronic headaches, chronic dizziness or dementia or Alzheimer's disease and/or other physical and mental problems as a result of the concussion(s) suffered while a player and who post-college have incurred medical expenses from such injuries (the "Class").

Excluded from the Class are the NCAA and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the judge to whom this case is assigned and any immediate family members thereof.

114.     Plaintiffs bring Count IV, as set forth below, on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure on behalf of a class defined as:

> All former and current NCAA student-athletes who have suffered a concussion or concussion-like symptoms while playing sports at an NCAA school (the "Medical Monitoring Class").

Excluded from the Medical Monitoring Class are the NCAA and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Medical Monitoring Class; governmental entities; and the judge to whom this case is assigned and any immediate family members thereof.  The Class and Medical Monitoring Class are collectively referred to as the "Classes," unless specifically indicated otherwise.

115.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

116.     **Numerosity – Federal Rule of Civil Procedure 23(a)(1).**  The members of the Classes are so numerous that individual joinder of all members of the Classes is impracticable.  On information and belief, there are thousands of student-athletes who have been damaged by the NCAA's wrongful conduct as alleged herein.  The precise number of members of the Classes and their addresses is presently unknown to Plaintiffs, but may be ascertained from the NCAA's books and records.  Members of the Classes may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

117.     **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).**  This action involves common questions of law and fact, which predominate over any questions affecting individual members of the Classes, including, without limitation:

a. whether the NCAA engaged in the conduct as alleged herein;

b. whether Plaintiffs and the Classes are entitled to compensatory or other forms of damages, and other monetary relief and, if so, in what amount(s); and

c. whether Plaintiffs and the Classes are entitled to equitable relief, including, but not limited to, medical monitoring and other injunctive relief.

118. **Typicality – Federal Rule of Civil Procedure 23(a)(3).**  Plaintiffs' claims are typical of the claims of the other members of the Classes because, among other things, all members of the Classes were comparably injured through the uniform misconduct described above.

119. **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).**  Plaintiffs are adequate representatives of the Classes because their interests do not conflict with the interests of the members of the Classes they seek to represent; they have retained counsel competent and experienced in complex commercial and class action litigation; and Plaintiffs intend to prosecute this action vigorously.  The interests of the Classes will be fairly and adequately protected by Plaintiffs and their counsel.

120. **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).**  The NCAA has acted or refused to act on grounds generally applicable to Plaintiffs and the members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below.

121. **Superiority – Federal Rule of Civil Procedure 23(b)(3).**  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and members of the Classes are

relatively small compared to the burden and expense that would be required to individually litigate their claims against the NCAA, so it would be impracticable for members of the Classes to individually seek redress for the NCAA' wrongful conduct. Even if members of the Classes could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

**B.     Defendant class allegations**

122.    Plaintiffs assert a defendant class defined as:

> The NCAA and all members of the NCAA that have sports teams in which student-athletes participate.

123.    The NCAA is an adequate class representative as it is the governing body and all NCAA schools have agreed to abide by all legislation governing the conduct of intercollegiate athletics, Constitutions, Article I, 1.3.2, and agree that as part of being an eligible institution they must abide by the Constitution and Bylaws, 3.1.1.

124.    At all relevant times, the NCAA and its members have agreed to act in the same manner with respect to rules and education regarding concussions and with respect to payment of post college career treatment and expenses associated with concussion related injuries.

125.    **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The members of the defendant class are numerous and individual joinder is impracticable.

126.    **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b )(3).** This action involves common questions of law and fact, which predominate over any questions affecting individual members of the Classes, including, without limitation:

a. Whether the NCAA engaged in the conduct as alleged herein;

b. Whether the NCAA and its members are negligent and/or have been unjustly enriched;

c. Whether Plaintiffs and the Classes are entitled to compensatory or other forms of damages, and other monetary relief and, if so, in what amount(s); and

d. Whether Plaintiffs and the Classes are entitled to equitable relief, including, but not limited to, medical monitoring and other injunctive relief.

127. **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of the claims of the other members of the Classes because, among other things, all members of the Classes were comparably injured through the uniform misconduct described above. Defendant is typical of all members of the Class as it set the policy and issues and enforces it.

128. **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** The NCAA is an adequate representative of the Classes because its interests do not conflict with the interests of the members of the Classes; it will retain counsel competent to vigorously defend this action. The interests of the Classes will be fairly and adequately protected by the NCAA and its counsel.

129. **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** The NCAA has acted or refused to act on grounds generally applicable to Plaintiffs and the members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below.

130.    **Superiority – Federal Rule of Civil Procedure 23(b)(3).**  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.

131.    In addition, the NCAA sets the policy that governs the action and having it defend the action is superior to naming all member institutions with football programs.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VI.    CLAIMS ALLEGED

### COUNT I

### NEGLIGENCE
### (On Behalf of the Class)

132.    Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

133.    At all relevant times, the NCAA had a duty toward Plaintiffs and the Class to supervise, regulate, monitor and provide reasonable and appropriate rules to minimize the risk of injury to the players.

134.    The NCAA acted carelessly and negligently in its position as the regulatory body for college teams and its student-athletes, including Plaintiffs and the Class.  The NCAA knew or should have known that its actions or its inaction in light of the rate and extent of concussions reported and made known to the NCAA would cause harm to players in both the short- and long-term.

135.    The NCAA was careless and negligent by breaching the duty of due care it assumed for the benefit of the Plaintiffs and the Class, both generally and in the following particular respects:

a. Failing to educate players concerning symptoms that may indicate a concussion has occurred;

b. Failing to warn of the risk of unreasonable harm resulting from repeated concussions;

c. Failing to disclose the special risks of long-term complications from repeated concussions and return to play;

d. Failing to disclose the role of repeated concussions in causing chronic life-long cognitive decline;

e. Failing to promulgate rules and regulations to adequately address the dangers of repeated concussions and a return-to-play policy to minimize long-term chronic cognitive problems;

f. Misrepresenting pertinent facts that players needed to be aware of to make determinations of the safety of return to play;

g. Concealing pertinent facts;

h. Failing to adopt rules and reasonably enforce those rules to minimize the risk of players suffering debilitating concussions; and

i. Other acts of negligence or carelessness that may materialize during the pendency of this action.

136. The Plaintiffs individually and the Class members have each sustained past medical expenses and will in all likelihood incur future medically-related costs associated with the harm suffered and injuries and disability referenced above.

137. The Plaintiffs individually and the Class members have in the past experienced, and they may in the future suffer, from an assortment of problems associated with the harm and

injuries described including, but not limited to, headaches, dizziness, loss of memory, depression, impulsivity to anger, cognitive dysfunction, employment impairment, limitations in physical activities, embarrassment, and loss of the pleasures of life, among other things.

138.    As a result of the foregoing, the Plaintiffs and the Class have suffered damages and will in the future suffer damages caused by the misconduct of the Defendant.

139.    The Plaintiffs and the Class are entitled to damages in an amount to be determined at trial, and injunctive relief requiring the NCAA, among other things, to adopt corrective measures regarding:  the coaching of tackling methodologies that cause head injuries; the implementation of system-wide "return to play" guidelines for student-athletes who have sustained concussions; the implementation of system-wide guidelines for the screening and detection of head injuries; and the implementation of legislation addressing the treatment and eligibility of student-athletes who have sustained multiple concussions in the course of play.

140.    Moreover, Plaintiffs have no adequate remedy at law in that monetary damages alone cannot compensate them for the risk of long-term physical and economic losses due to concussions and sub-concussive injuries.  Thus, Plaintiffs and the Medical Monitoring Subclass are entitled to medical monitoring.  Without a Court-approved medical monitoring program as described herein in Count IV, or established by the Court, Plaintiffs and the Medical Monitoring Subclass members will continue to face an unreasonable risk of injury and disability.

## COUNT II

### FRAUDULENT CONCEALMENT
### (On Behalf of the Class)

141.    Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

142.     The NCAA concealed facts and information which were material.  As more fully described above, since the early 1970s, the high incidence of concussions among student-athletes in many different sports, including football, hockey and soccer, has been well known to the NCAA.  Further, based on studies for which the NCAA *itself* paid, the NCAA has been aware that a history of multiple concussions has been associated with greater risk of future brain defects in student-athletes, including symptoms of post-traumatic brain injury such as headaches, dizziness, loss of memory, impulse control problems, and Chronic Traumatic Encephalopathy.  Moreover, in the early 2000s, the NCAA specifically became aware of the correlation between concussions and depression, dementia, and early on-set Alzheimer's disease.

143.     Through concealment of material facts, the NCAA intended to induce a false belief, under circumstances creating a duty to speak.  The NCAA specifically intended to induce a false belief in its student-athletes that they should continue to play and should not be prevented from playing their respective sports even after a concussion or several concussions that should have required time to heal.

144.     Plaintiffs could not have discovered the truth through reasonable inspection or inquiry, or was prevented from doing so.  Plaintiffs were under the care and treatment of the NCAA and school trainers and doctors, and justifiably relied on their silence as representing that the facts did not exist.

145.     The concealed information was such that Plaintiffs would have acted differently if they had been aware of the material facts.  Plaintiffs would not have continued to play, or would have taken additional time to allow their brain injuries to heal before returning to play.  Despite the NCAA's knowledge, the NCAA failed to act reasonably by developing appropriate means to

identify at-risk players and guidelines or rules regarding return to play criteria.  The NCAA's

inaction increased the risk of long-term injury and illness in student-athletes.

146.     As a proximate cause of the NCAA's concealment, Plaintiffs and the Classes

suffered harm described above, and/or will suffer future injuries and damages that have not yet

fully manifested.

**COUNT III**

**UNJUST ENRICHMENT**
**(On Behalf of the Class)**

147.     Plaintiffs reallege the foregoing allegations as if fully set forth herein.

148.     The NCAA and its members enjoy enormous revenues from college sports,

including by way of example in football, including a 15-year deal between the Southeast

Conference (SEC) and ESPN estimated in value at $2.25 billion (Smith & Ourand, 2008), the

$2.8 billion expected to be generated over the next 25 years by the Big Ten Network (Ourand &

Smith, 2008), and the newly inked Pac 12 TV deal that will generate $3 billion over the next 12

years (Ubben, 2011).  Individual campus deals, such as the Longhorn Network developed

between the University of Texas and ESPN, has a projected income profile of $300 million over

the span of next 20 years (Haurwitz, 2011).

149.     It is unjust to allow the NCAA and its members to earn revenues and retain the

benefits of athletes' services while refusing to pay medical expenses of sports-related injuries

whose treatment is required post college career.

**COUNT IV**

**MEDICAL MONITORING**
**(On Behalf of the Class)**

150.     Plaintiffs adopt and incorporate by reference all prior paragraphs of this

Complaint as if fully set forth herein.  Plaintiffs bring this Count IV as a remedy under the law of

- 37 -

the State of Indiana. Alternatively, Plaintiffs bring this Count IV under the laws of the states in which they reside and assert claims on behalf of the Medical Monitoring Class under the laws of the states in which class members reside.

151.     The Medical Monitoring Class has been exposed to a greater risk of concussions and sub-concussions, which have created an increased risk of long-term injury and the illnesses as described above.

152.     The members of the Medical Monitoring Class have not yet fully manifested the long-term physical and mental effects of the NCAA's misconduct, and require specialized testing that is not generally given or available to the public at large for the early detection of the long-term effects of concussions and sub-concussions.

153.     Medical monitoring is reasonably necessary according to contemporary scientific principles within the medical community that specialize in close head injuries and their connection to memory loss, early onset dementia, CTE and Alzheimer-like syndromes.

154.     By monitoring and testing former (and current) NCAA student-athletes who are believed to have suffered a concussion or sub-concussion while playing or practicing, the risk of each such player suffering long term injuries, disease and losses as described above will be significantly reduced.

155.     Because the NCAA has failed to properly, reasonably and safely monitor, test or otherwise study whether and when a player has suffered a concussion or sub-concussion to minimize the risk of long-term injury or illness, medical monitoring is the most appropriate method by which it can be determined whether a particular individual is now at risk for long-term injury or illness from a concussion or sub-concussive event.

156.     Accordingly, the NCAA should be required to establish a medical monitoring program that includes, among other things:

        a.     Establishing a trust fund, in an amount to be determined, to pay for the medical monitoring of all past, current and future NCAA student-athletes, as frequently and appropriately as necessary;

        b.     Notifying all Medical Monitoring Class members in writing that they may require frequent medical monitoring; and

        c.     Providing information to treating team physicians to aid them in detecting concussion or sub-concussions and to assist them in determining when the student-athlete is subjected to an increased risk of harm.

157.     Plaintiffs and the Medical Monitoring Class have no adequate remedy at law in that monetary damages alone cannot compensate them for the risk of long-term physical and economic losses due to concussions and sub-concussive injuries. Without a Court-approved medical monitoring program as described herein, or established by the Court, Plaintiffs and the Medical Monitoring Subclass members will continue to face an unreasonable risk of injury and disability.

## VII.    JURY DEMAND

158.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all claims in this Complaint so triable.

## VIII.    REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Classes, request judgment as follows:

        A.     Certification of the proposed Classes pursuant to Federal Rules of Civil Procedure Rule 23(a), (b)(2) and (b)(3);

B.      Designation of Plaintiffs as representatives of the proposed Classes and designation of Plaintiffs' counsel as Class counsel;

C.      An award of compensatory damages, the amount of which is to be determined at trial;

D.      Injunctive relief requiring the NCAA, among other things, to adopt corrective measures regarding:

1.      The coaching of tackling methodologies or other sports plays that cause head injuries;

2.      The implementation of system-wide "return to play" guidelines for student-athletes who have sustained concussions;

3.      The implementation of system-wide guidelines for the screening and detection of head injuries; and

4.      The implementation of legislation addressing the treatment and eligibility of student-athletes who have sustained multiple concussions in the course of play.

E.      The establishment of a medical monitoring program that includes, among other things:

1.      Establishing a trust fund, in an amount to be determined, to pay for the medical monitoring of all past, current and future NCAA student-athletes, as frequently and appropriately as necessary;

2.      Notifying all Medical Monitoring Class members in writing that they may require frequent medical monitoring; and

3. Providing information to treating team physicians to aid them in detecting concussion or sub-concussions and to assist them in determining when the player is subjected to an increased risk of harm.

F. An award to the Plaintiffs and the Classes of prejudgment interest, costs and attorneys' fees; and

G. An award to the Plaintiffs and Classes for such other and further relief as the Court deems just and proper.

Date: November 18, 2011     Respectfully submitted,

          ADRIAN ARRINGTON, DEREK OWENS, MARK TURNER, and ANGELA PALACIOS, individually and on behalf of all others similarly situated

By /s/ Steve W. Berman
  Steve W. Berman
  *steve@hbsslaw.com*
  Robert B. Carey
  *rob@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
206.623.7292
Fax: 206.623.0594

Elizabeth A. Fegan
*beth@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
1144 W. Lake Street, Suite 400
Oak Park, IL 60301
708.628.4949
Fax: 708.628.4950

By     /s/ Joseph J. Siprut

Joseph J. Siprut
*jsiprut@siprut.com*
Aleksandra M. S. Vold
*avold@siprut.com*
SIPRUT PC
122 South Michigan Avenue, Suite 1850
Chicago, Illinois  60603
312.588.1440
Fax: 312.878.1342

*Interim Plaintiffs' Co-Lead Class Counsel*

Stuart M. Paynter (to be admitted *Pro Hac Vice*)
*stuart@smplegal.com*
THE PAYNTERLAW FIRM PLLC
1200 G Street N.W., Suite 800
Washington, D.C. 20005
202.626.4486
Fax: 866.734.0622

*Additional Plaintiffs' Counsel of Record*

**CERTIFICATE OF SERVICE**

I, Steve W. Berman, an attorney, hereby certify that I caused a copy of the attached

**[Corrected] Consolidated Class Action Complaint** to be filed electronically with the Clerk of

the Court and served on all counsel of record in this case using the CM/ECF system on this the

21th day of November, 2011.


_____ /s/ Steve W. Berman_____
Steve W. Berman