**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ADRIAN ARRINGTON, DEREK OWENS, MARK TURNER, and ANGELA PALACIOS, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| | ) | Civil Action No. 1:11-cv-06356 |
| Plaintiffs, | ) | Judge Sharon Johnson Coleman |
| v. | ) ) | Jury Demand |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, | ) ) ) | |
| Defendant. | ) | |

**ANSWER AND AFFIRMATIVE DEFENSES OF DEFENDANT
NATIONAL COLLEGIATE ATHLETIC ASSOCIATION TO
[CORRECTED] CONSOLIDATED CLASS ACTION COMPLAINT**

Defendant National Collegiate Athletic Association (the "NCAA") submits the following

answer and affirmative defenses to the [Corrected] Consolidated Class Action Complaint (the

"Consolidated Complaint") filed on November 18, 2011 by Plaintiffs Adrian Arrington, *et al.*

(collectively, "Plaintiffs").

## I.  NATURE OF THE ACTION

1.  The NCAA's constitution recognizes that: "It is the responsibility of each member institution to protect the health of and provide a safe environment for each of its participating student-athletes." NCAA Constitution, Article 2, at 2.2.3 (Adopted: 1/10/95).

**ANSWER:**

The material referenced in Paragraph 1 speaks for itself and, to the extent that the

allegations in Paragraph 1 vary therewith, the NCAA denies those allegations.

2.  The NCAA has failed to meet its responsibility to safeguard student athletes.  The NCAA has engaged in a long-established pattern of negligence and inaction with respect to concussions and concussion-related maladies sustained by its student-athletes, all the while

profiting immensely from those same student-athletes.

**ANSWER:**

The NCAA denies the allegations in Paragraph 2.

3.      Specifically, the NCAA has failed to address and/or correct the coaching of tackling, checking or playing methodologies that cause head injuries; the NCAA has failed to educate coaches, trainers and student athletes as to the symptoms indicating possible concussions; the NCAA has failed to implement system-wide "return to play" guidelines for student-athletes who have sustained concussions; the NCAA has failed to implement systemwide guidelines for the screening and detection of head injuries; the NCAA has failed to implement legislation addressing the treatment and eligibility of student-athletes who have sustained multiple concussions in the course of play; and the NCAA has failed to implement a support system for student-athletes who, after sustaining concussions, are left unable to either play their sport or even lead a normal life.

**ANSWER:**

The NCAA denies the allegations in Paragraph 3.

4.      On average, the NCAA makes over $750 million in revenue each year and recently signed multi-billion dollar television contracts for football games.  Unlike professional sports organizations, however, the NCAA does not use revenues to pay its athletes, nor does the money go towards pension or medical benefits for post-collegiate athletes.  Unlike professional athletes the student athletes have no collective bargaining power to negotiate for such benefits with no leverage to require such benefits.  The NCAA gives no medical or financial support to post-collegiate student-athletes who sustained concussions while playing an NCAA sport and who are then left to cope with the necessary costs and care resulting from their injuries.  The NCAA, however, retains the economic benefits resulting from the student athletes' labors.

**ANSWER:**

The NCAA admits that in 2009-2010, it earned approximately $749.8 million in revenue.

The NCAA further admits that it does not pay a salary to student-athletes, who are not

professional athletes and many of whom are receiving some type of financial assistance

(including full tuition scholarships) to attend NCAA member institutions.  The NCAA further

admits that it does not pay a pension to former student-athletes.  The NCAA affirmatively states

that currently over 96% of its revenue is distributed to NCAA conferences and member

institutions.  Except as expressly admitted, the NCAA denies any and all remaining allegations in

Paragraph 4.

5.     The NCAA's conduct is particularly egregious in light of the fact that its policies and procedures — or lack thereof — leave student-athletes like Plaintiffs and members of the below-defined Classes inadequately protected from sustaining, monitoring and recovering brain injuries at a particularly early and vulnerable point in their lives.  Unlike professional athletes, who at least have resources to pay for medical care necessitated by head injuries caused during their professional careers, collegiate players typically range in age from 18-23 and are just beginning their adult lives.  For such NCAA student-athletes, including Plaintiffs and the putative Classes, these injuries can have long-term, debilitating effects, ranging from an inability to finish their education, to loss of memory, to depression, and early-onset dementia.

**ANSWER:**

The NCAA admits that many student-athletes range in age from 18-23.  The NCAA is

without knowledge or information sufficient to form a belief as to the truth or falsity of the

allegations in the last sentence in Paragraph 5 and, on that basis, denies them.  The NCAA denies

any and all remaining allegations in Paragraph 5.

6.     Accordingly, this nationwide class action seeks medical monitoring and financial recovery for the long-term and chronic injuries, financial losses, expenses and other losses suffered by the Plaintiffs and members of the Classes as a result of the NCAA's carelessness, negligence, and concealment of information.

**ANSWER:**

The NCAA admits that Plaintiffs purport to seek medical monitoring and damages on

behalf of two nationwide classes.  The NCAA expressly denies that Plaintiffs are entitled to any

relief in this lawsuit.  The NCAA denies any and all remaining allegations in Paragraph 6.

## II.     JURISDICTION AND VENUE

7.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2).  In the aggregate, Plaintiffs' claims and the claims of the other members of the Class exceed $5,000,000 exclusive of interest and costs, and there are numerous class members who are citizens of states other than the NCAA's states of citizenship.

**ANSWER:**

The allegations in Paragraph 7 call for a legal conclusion and therefore require no

answer.  To the extent an answer is required, the NCAA admits that Plaintiffs purport to assert

jurisdiction pursuant to 28 U.S.C. § 1332(d)(2).  Except as expressly admitted, the NCAA denies

any and all remaining allegations in Paragraph 7.

8.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1), (2) and
1391(c) as: the NCAA is deemed to reside in this judicial district because it is subject to personal
jurisdiction here; and a substantial part of the events and/or omissions giving rise to the claims
emanated from activities within this jurisdiction and the Defendant conducts substantial business
in this jurisdiction.

**ANSWER:**

The allegations in Paragraph 8 call for a legal conclusion and therefore require no

answer.  To the extent an answer is required, the NCAA admits that Plaintiffs purport to assert

that venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1), (2) and 1391(c).

Except as expressly admitted, the NCAA denies any and all remaining allegations in

Paragraph 8.

### III.     PARTIES

**A.     Plaintiff Arrington**

9.     Adrian Arrington is a natural person and a citizen of the State of Illinois.
Arrington is 25 years old.  Arrington currently attends Eastern Illinois University ("EIU"), an
NCAA member school, where he formerly competed on the EIU football team.

**ANSWER:**

The NCAA admits that EIU is a member of the NCAA.  The NCAA is without

knowledge or information sufficient to form a belief as to the truth or falsity of the remaining

allegations in Paragraph 9 and, on that basis, denies them.  Except as expressly admitted, the

NCAA denies any and all remaining allegations in Paragraph 9.

10.     Before attending EIU, Arrington was named All-State for the Illinois Football
Coaches Association Class 6A; he received a special All-State mention by the Chicago Tribune
and Champaign News-Gazette; he was a three-time Illinois 6A State runner-up; he was named
the WJBC Player of the Year; he was Big 12 Conference Defensive MVP and team MVP; and he
competed in the summer Shrine All-Star game.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 10 and, on that basis, denies them. The NCAA denies any and all remaining allegations in Paragraph 10.

11. Arrington continued to shine as a member of the EIU football team. From 2006-2009, he was a Strong Safety and was the captain of the EIU football team during the 2009 season. In 2007, he earned a starting position and led the team with 48 solo tackles. Arrington finished his career with an impressive 154 total tackles.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 11 and, on that basis, denies them. The NCAA denies any and all remaining allegations in Paragraph 11.

12. During his time on the team, however, Arrington suffered numerous and repeated concussions during football games. In each instance after he sustained his first three concussions, the EIU team doctor told Arrington he could return to play the very next day.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 12 and, on that basis, denies them. The NCAA denies any and all remaining allegations in Paragraph 12.

13. After his third concussion, Arrington started experiencing memory loss unrelated to a specific traumatic event. Around the same time, Arrington also began experiencing seizures. Only after these symptoms started to manifest did EIU finally send Arrington to a neurologist for testing.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 13 and, on that basis, denies them. The NCAA denies any and all remaining allegations in Paragraph 13.

14. At no time was Arrington coached on how to make safer tackles. In fact, at all

times the message from EIU was to "play hard and play fast" without regard to safety, and that those who did not play in that manner would be summarily cut. Arrington was also never given literature or lectures about concussion or other head injury prevention.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 14 and, on that basis, denies them. The NCAA denies any and all remaining allegations in Paragraph 14.

15. Arrington sustained two additional concussions before finally leaving the football team to focus on matriculating from EIU. That has proved difficult, however, as Arrington had to drop out of a number of his classes due to the memory loss, depression and the almost-daily migraines he continues to experience as a result of his head injuries.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 15 and, on that basis, denies them. The NCAA denies any and all remaining allegations in Paragraph 15.

16. Recently, as a result of his symptoms, Arrington's doctors suggested he receive an MRI. The MRI showed that he has scarring on the frontal lobe of his brain.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 16 and, on that basis, denies them. The NCAA denies any and all remaining allegations in Paragraph 16.

17. Specifically, with respect to Arrington, *inter alia,* the NCAA failed to implement system-wide "return to play" guidelines for student-athletes who have sustained concussions. As a result, Arrington was returned to play football while still recovering from prior concussion injuries. The NCAA failed to adequately educate and adopt rules requiring the education of coaches, staff and athletes regarding the symptoms and dangers of concussions. Moreover, the NCAA failed to implement system-wide guidelines for the screening and detection of head injuries that would have detected the numerous concussions Arrington received and thus prevented him from playing until he had fully recovered. The NCAA has also failed to implement legislation addressing the treatment and eligibility of student-athletes, such as Arrington, who have sustained multiple concussions in the course of play.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 17 regarding Plaintiff Arrington and, on that

basis, denies them.  The NCAA denies any and all remaining allegations in Paragraph 17.

18.    The NCAA did not require its members to properly educate its athletes as to the
true symptoms of when a concussion can occur.  Without such knowledge, requiring athletes to
report symptoms is meaningless.

**ANSWER:**

The NCAA affirmatively states that under the NCAA Constitution, each member

institution is responsible for protecting the health of its student-athletes.  The NCAA further

affirmatively states that for decades it has provided appropriate information and guidance on

concussions to its member institutions, including information to be disseminated to student-

athletes.  The NCAA further affirmatively states that it strongly encourages its member

institutions to educate student-athletes about symptoms associated with concussions.  Except as

expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 18.

19.    Further, the NCAA has utterly failed Arrington since he has had to take time off
from school due to his injuries.  Neither the NCAA nor EIU have provided Arrington with any
support system; in fact, neither the NCAA nor EIU have any support system in place for student-
athletes who, after sustaining concussions, are left unable to either play football or even lead a
normal life.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 19 regarding EIU and, on that basis, denies

them.  The NCAA denies any and all remaining allegations in Paragraph 19.

20.    Finally, Arrington has incurred out-of-pocket costs and continues to pay for
ongoing medical treatment directly related to the post-concussion syndrome with which he has
been diagnosed.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 20 and, on that basis, denies them. The NCAA denies any and all remaining allegations in Paragraph 20.

**B.    Plaintiff Owens**

21.    Derek K. Owens is a natural person and a citizen of the State of Arkansas. Owens is 22 years old. Owens was a student at the University of Central Arkansas ("UCA"), was on an academic scholarship and was a member of the football team.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 21 and, on that basis, denies them. The NCAA denies any and all remaining allegations in Paragraph 21.

22.    Before attending UCA in the fall of 2008, Owens played football at Russellville High School in Russellville, Arkansas. He was the only person to attend that school who lettered in three varsity sports in three consecutive years. He was the first chair in trumpet in the school band for three years. He scored a 32 on his ACT. And he was a star football player. As a wide receiver, he was named the Top Offensive Player in the State of Arkansas, he was chosen to play at his position in the state All-Star Game, and he was named one of the top Scholar-Athletes in the State.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 22 and, on that basis, denies them. The NCAA denies any and all remaining allegations in Paragraph 22.

23.    UCA recruited Owens, and offered Owens the choice between an academic scholarship or a football scholarship. He chose the academic scholarship. But he could not wait to play football for UCA.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 23 and, on that basis, denies them. The

NCAA denies any and all remaining allegations in Paragraph 23.

24.     In the summer of 2008, UCA offered incoming freshman football players the chance to attend "voluntary practices" with certain other members of the team, but without coaches, to get acquainted with the school. Prior to the "voluntary practice," Owens did not receive any information from or on behalf of the NCAA on how to recognize or report head injuries.  Owens did not receive any information from or on behalf of the NCAA concerning proper tackling and blocking techniques that could avoid head injuries.  Owens attended and shined as a receiver.  However, during one practice without pads or helmets, Owens was hit in the head from behind.  No one from the team provided him any treatment.  After practice, Owens called his parents, telling them he was dizzy, he was having difficulty seeing, and he did not think he could drive.  He stayed that evening locally with his cousin because he could not drive and went home the next day.  He did not return to the summer practices.  No one at UCA followed up with him.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 24 and, on that basis, denies them.  The

NCAA denies any and all remaining allegations in Paragraph 24.

25.     Owens returned to school for the fall semester and the fall football season.  Prior to the start of the season Owens did not receive any training on the subject of how to recognize a potential concussion, nor the steps to take to report any potential symptoms that may signify a concussion has occurred.  Owens believed that a concussion only occurred if he "blacked out" or was "knocked out."  During a practice in the second week of the season, however, Owens was hit by a linebacker and was knocked unconscious.  No one from UCA called Owens' family.  In fact, the UCA trainers returned Owens to his dorm room, told his roommates that Owens had a "severe concussion," and asked his roommates to wake him up every couple of hours to make sure he was okay.  His mom learned what had happened after receiving several strange texts from her son, which prompted her to call his cell phone to see if he was okay.  One of Owens' roommates answered his cell phone and said that Owens was unable to talk as a result of the concussion.  Owens' mother called the UCA trainers and stated that this was Owens' second concussion of the season. UCA red-shirted Derek for the 2007-2008 Season; he sat out for three to four weeks until the team doctor cleared him to return to the practice team.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 25 and, on that basis, denies them.  The

NCAA denies any and all remaining allegations in Paragraph 25.

26.     The NCAA did not pass regulations requiring its members to educate student

athletes on what symptoms may be signs of a concussion. Owens suffered numerous and repeated concussions while playing football at UCA. Some of those he did not recognize as concussions as he did not "black out" or was not "knocked out," but instead would get headaches, hear ringing in his ears, feel pressure in his head, feel as if his head was swollen, or would vomit.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 26 regarding Plaintiff Owens and, on that

basis, denies them. The NCAA denies any and all remaining allegations in Paragraph 26.

27.     In the fall of 2010, Owens was playing in a game against University of Tulsa as the punt returner and was hit just as he caught the ball. Owens' mom saw that he hit his head. The Tulsa player even bragged about how hard he hit Owens to the newspaper THE TULSA WORLD. THE TULSA WORLD wrote after the game:

> TU deep snapper Bo Abbott said racing down to drill Central Arkansas punt returner Derek Owens last Saturday night was the highlight of his career. "The only problem was, his helmet didn't fly off," Abbott said with a chuckle.

Mike Brown, "TU notebook: Headhunter," THE TULSA WORLD (Oklahoma) (September 30, 2010). No one from the team checked on Owens when he returned to the sidelines. However, it was obvious from watching the play that Owens had a possible head injury.

**ANSWER:**

The alleged newspaper article referenced in Paragraph 27 speaks for itself and, to the

extent that the allegations in Paragraph 27 vary therewith, the NCAA denies those allegations.

The NCAA is without knowledge or information sufficient to form a belief as to the truth or

falsity of the remaining allegations contained in Paragraph 27 and, on that basis, denies them.

28.     By the fall of 2010, Owens had been and was experiencing memory loss, headaches, an inability to concentrate or focus, anxiety and depression. He complained that he was not feeling well and was having trouble sleeping. He would study for tests, but if he went to sleep he would forget what he had studied, so he started making himself stay up all night out of fear of failing. His grades plummeted even though his academics had been his priority. As a result, he lost his regular academic scholarship. Thus, for the fall semester 2010, Owens obtained a school loan and a partial state lottery scholarship to make up for the lost academic scholarship.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 28 and, on that basis, denies them.  The

NCAA denies any and all remaining allegations in Paragraph 28.

29.     During the spring semester of 2011, Owens was paying for school through a small
football scholarship, the state lottery scholarship and his school loan.  However, Owens' grade in
one of his core science classes was a low C/high D.  As a result, Owens either had to drop the
class and lose his state lottery scholarship (because he would not meet the minimum hours
required to maintain it), or take the grade.  He dropped the class and sacrificed his lottery
scholarship in an attempt to keep his grade point average up.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 29 and, on that basis, denies them.  The

NCAA denies any and all remaining allegations in Paragraph 29.

30.     In May 2011, Owens asked to go to his family doctor because he feared he had
ADHD.  However, after hearing Owens' story, Owens' doctor diagnosed the problems as being
related to his concussions.  This was the first time he learned that the symptoms he had been
experiencing and the steady decline in his academics were directly related to the multiple
concussions he had suffered.  At no time did the NCAA require UCA to provide Owens with
adequate information about (a) how to tackle and block so as to avoid as much as possible a head
injury, (b) the symptoms of a head injury, and (c) the possible long term consequences of
concussions.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations regarding Plaintiff Owens contained in Paragraph 30 and, on that

basis, denies them.  The NCAA affirmatively states that it has published rules, guidelines and

other information (i) recommending tackling and blocking techniques to avoid head injury, (ii)

describing the symptoms of a head injury, and (iii) discussing the adverse effects of, including

the possible long-term consequences of, concussions.  Except as expressly admitted, the NCAA

denies any and all remaining allegations in Paragraph 30.

31.     Owens attempted to take classes during the first period of the summer of 2011 but was forced to drop out of school and football as a result of his symptoms.  Owens told his mother: "I feel like a 22 year old with Alzheimer's."  Owens lost his lottery scholarship because he did not maintain the required hours.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 31 and, on that basis, denies them.  The

NCAA denies any and all remaining allegations in Paragraph 31.

32.     When Owens informed his coach that he could not play due to medical issues, the coach inquired "so what's your plan?," informing Owens that as soon as he walked out the door all of the benefits Owens had from football would cease.  At no time did his coach offer to take responsibility for the consequences of Owens' injury. Owens felt like he had been "kicked to the gutter."  Subsequently, after Owens' mother went directly to the Athletic Director to fight for Owens' right to retain his athletic scholarship since Owens was injured while playing football, UCA agreed Owens would maintain his athletic scholarship (approximately $2,000) since he had to quit as a result of his medical condition.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 32 and, on that basis, denies them.  The

NCAA denies any and all remaining allegations in Paragraph 32.

33.     Since then, Owens has seen both a neurologist as well as a specialist in football-related concussions, has been diagnosed with post-concussion syndrome, and was told the front part of his brain had been injured.  The symptoms of post-concussion syndrome, each of which Owens has suffered, include migraine headaches, dizziness, fatigue, irritability, anxiety, insomnia, loss of concentration and memory, and noise and light sensitivity.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 33 and, on that basis, denies them.  The

NCAA denies any and all remaining allegations in Paragraph 33.

34.     Specifically, with respect to Owens, *inter alia,* the NCAA failed to implement system-wide "return to play" guidelines for student-athletes who have sustained concussions.  As a result, Owens was returned to play football while still recovering from prior concussion

injuries, even despite his mother's intervention. The NCAA failed to adequately educate and adopt rules requiring the education of coaches, staff and athletes regarding the symptoms and long-term consequences of concussions if not properly treated, as well as the proper treatment protocol for head injuries. Moreover, the NCAA failed to implement system-wide guidelines for the screening and detection of head injuries that would have detected the numerous concussions Owens received and thus prevented him from playing until he had fully recovered. The NCAA has also failed to implement legislation addressing the treatment and eligibility of student-athletes, such as Owens, who have sustained multiple concussions in the course of play.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 34 regarding Plaintiff Owens and, on that

basis, denies them. The NCAA denies any and all remaining allegations in Paragraph 34.

35.     Owens did not learn that concussions could occur without a "blackout" or "knockout experience" until he saw his doctor. The NCAA did not require its members to properly educate its athletes as to the true symptoms of when a concussion can occur without a "blackout" or "knockout." Without such knowledge, requiring athletes to report symptoms is meaningless.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 35 regarding Plaintiff Owens and, on that

basis, denies them. The NCAA incorporates its answer to Paragraph 18 as and for its answer to

Paragraph 35. Except as expressly admitted, the NCAA denies any and all remaining allegations

in Paragraph 35.

36.     Further, the NCAA has utterly failed Owens since he has had to take time off from school due to his injuries. Neither the NCAA nor UCA have provided Owens with any support system; in fact, neither the NCAA nor UCA have any support system in place for student-athletes who, after sustaining concussions, are left unable to either play football or even lead a normal life.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 36 regarding Plaintiff Owens or UCA and, on

that basis, denies them.  The NCAA denies any and all remaining allegations in Paragraph 36.

37.     Finally, Owens has incurred out-of-pocket costs as a result of the loss of his academic scholarship, and has incurred and continues to incur out-of-pocket costs for ongoing medical treatment directly related to the post-concussion syndrome with which Owens has been diagnosed.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 37 and, on that basis, denies them.  The

NCAA denies any and all remaining allegations in Paragraph 37.

**C.     Plaintiff Turner**

38.     Plaintiff Mark Turner is a natural person and a citizen of the State of New York. Turner was a student at Fordham University in New York, was on an academic scholarship and was a member of the football team.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 38 and, on that basis, denies them.  The

NCAA denies any and all remaining allegations in Paragraph 38.

39.     Between 1988 and 1989, Turner was a defensive back and special teams player for the Fordham football team.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 39 and, on that basis, denies them.  The

NCAA denies any and all remaining allegations in Paragraph 39.

40.     During a game in his second season, Turner went to make a tackle.  As he made contact with the other player, the other player's knee hit the front of Turner's head.  As a result of the impact, Turner lost consciousness momentarily.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 40 and, on that basis, denies them. The

NCAA denies any and all remaining allegations in Paragraph 40.

41.     Turner was taken out of the game but was never examined to determine if he had a concussion, despite his loss of consciousness. For the next few days, Turner experienced migraine headaches. He was never checked on by any of the team staff. As a result of his injuries, Turner soon quit the football team.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 41 and, on that basis, denies them. The

NCAA denies any and all remaining allegations in Paragraph 41.

42.     Shortly thereafter, Turner experienced his first episode of Bell's Palsy — a form of partial facial paralysis. Turner was referred to a neurologist who, after examining Turner, found that Turner had a dark area on the frontal lobe of his brain — precisely where he was hit when he lost consciousness.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 42 and, on that basis, denies them. The

NCAA denies any and all remaining allegations in Paragraph 42.

43.     Despite treatment, Turner continues to experience symptoms of Bell's Palsy, which was caused by his football injury.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 43 and, on that basis, denies them. The

NCAA denies any and all remaining allegations in Paragraph 43.

44.     Specifically, with respect to Turner, *inter alia,* the NCAA failed to implement system-wide "return to play" guidelines for student-athletes who have sustained concussions. As a result, Turner was returned to play football while still recovering from prior concussion injuries. The NCAA failed to adequately educate and adopt rules requiring the education of coaches, staff and athletes regarding the symptoms and dangers of concussions. Moreover, the NCAA failed to implement system-wide guidelines for the screening and detection of head

injuries that would have detected the numerous concussions Turner received and thus prevented him from playing until he had fully recovered. The NCAA has also failed to implement legislation addressing the treatment and eligibility of student-athletes, such as Turner, who have sustained multiple concussions in the course of play.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 44 regarding Plaintiff Turner and, on that

basis, denies them. The NCAA denies any and all remaining allegations in Paragraph 44.

45.     The NCAA did not require its members to properly educate its athletes as to the true symptoms of when a concussion can occur. Without such knowledge, requiring athletes to report symptoms is meaningless.

**ANSWER:**

The NCAA incorporates its answer to Paragraph 18 as and for its answer to Paragraph 45.

Except as expressly admitted, the NCAA denies any and all remaining allegations in Paragraph

45.

46.     Further, the NCAA has utterly failed Turner since he has had to take time off from school due to his injuries. Neither the NCAA nor Fordham have provided Turner with any support system; in fact, neither the NCAA nor Fordham have any support system in place for student-athletes who, after sustaining concussions, are left unable to either play football or even lead a normal life.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 46 regarding Fordham and, on that basis,

denies them. The NCAA denies any and all remaining allegations in Paragraph 46.

47.     Finally, Turner has incurred out-of-pocket costs and continues to pay for ongoing medical treatment directly related to the post-concussion syndrome with which he has been diagnosed.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 47 and, on that basis, denies them. The

NCAA denies any and all remaining allegations in Paragraph 47.

**D.     Plaintiff Palacios**

48.     Plaintiff Angela Palacios is a natural person and a citizen of the State of Texas. Palacios is 19 years old. Palacios currently attends Ouachita Baptist University ("OBU"), an NCAA member school located in Arkadelphia, Arkansas, where she formerly competed on the OBU women's soccer team.

**ANSWER:**

The NCAA admits that OBU is a member of the NCAA. The NCAA is without

knowledge or information sufficient to form a belief as to the truth or falsity of the remaining

allegations contained in Paragraph 48 and, on that basis, denies them. Except as expressly

admitted, the NCAA denies any and all remaining allegations in Paragraph 48.

49.     Prior to attending OBU, Palacios sustained two concussions playing soccer in high school. Her parents alerted the school about Palacios' concussions and provided protective head gear for her to wear while playing on OBU women's soccer team.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 49 and, on that basis, denies them. The

NCAA denies any and all remaining allegations in Paragraph 49.

50.     As a freshman at OBU, Palacios started in 14 of 18 games and played in 17 games overall. Palacios is listed among the 2010 team leaders in points, assists, shots on goal, and game winning goals.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 50 and, on that basis, denies them.

51.     At a team practice held on September 13, 2011 — just prior to OBU's fourth game of the season — Palacios' face collided with another team member's head during a practice drill. Immediately after the incident, the athletic trainer asked Palacios if she was dizzy, nauseated, or had a headache. Palacios answered yes to all three.

**ANSWER**:

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 51 and, on that basis, denies them. The NCAA denies any and all remaining allegations in Paragraph 51.

52.     Despite her responses and despite Palacios' eye swelling shut almost instantly, no further concussion-related tests were administered on the day of her injuries and she was not sent to the emergency room. Instead, the team trainer directed Palacios to go to her dorm room to rest, never once checking in on her or arranging for Palacios to have any type of monitoring.

**ANSWER**:

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 52 and, on that basis, denies them. The NCAA denies any and all remaining allegations in Paragraph 52.

53.     The following day, Palacios was given an online test to determine whether she had any lingering neurological deficiencies. Based on that test, Palacios did not participate in practices until September 17th. That morning, after consistently suffering from headaches every day since her injury, Palacios vomited. When she arrived at practice she alerted her coach that she was still not feeling well.

**ANSWER**:

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 53 and, on that basis, denies them. The NCAA denies any and all remaining allegations in Paragraph 53.

54.     Without any clearance from the training staff and despite Palacios' lingering side effects, the coach made her participate in running drills. After being ordered to run, Palacios asked a trainer for help. The trainer simply said: "you don't want to make the coach mad."

**ANSWER**:

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 54 and, on that basis, denies them. The NCAA denies any and all remaining allegations in Paragraph 54.

55. Palacios was finally excused from practice after the coach was contacted by her mother. After that call, Palacios' coach told her that she was allowed to sit out — and should expect to sit out for a long time, insinuating that Palacios would no longer be allowed to play.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 55 and, on that basis, denies them. The

NCAA denies any and all remaining allegations in Paragraph 55.

56. Realizing that her medical needs were being ignored by OBU, Palacios sought medical attention at a hospital emergency room. There, the doctor found that Palacios had diminished sensation on her left side, that her memory was sluggish, and that she had sustained a serious concussion. Palacios was told by the ER doctor that she should not participate in any activities for two more weeks.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 56 and, on that basis, denies them. The

NCAA denies any and all remaining allegations in Paragraph 56.

57. Specifically, with respect to Palacios, *inter alia,* the NCAA failed to implement system-wide "return to play" guidelines for student-athletes who have sustained concussions. As a result, Palacios was returned to play soccer while still recovering from prior concussion injuries. The NCAA failed to adequately educate and adopt rules requiring the education of coaches, staff and athletes regarding the symptoms and dangers of concussions. Moreover, the NCAA failed to implement system-wide guidelines for the screening and detection of head injuries that would have prevented Palacios from playing until she had fully recovered. The NCAA has also failed to implement legislation addressing the treatment and eligibility of student-athletes, such as Palacios, who have sustained multiple concussions in the course of play.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 57 regarding Plaintiff Palacios and, on that

basis, denies them. The NCAA denies any and all remaining allegations in Paragraph 57.

58. The NCAA did not require its members to properly educate its athletes as to the true symptoms of when a concussion can occur. Without such knowledge, requiring athletes to report symptoms is meaningless.

**ANSWER:**

The NCAA incorporates its answer to Paragraph 18 as and for its answer to Paragraph 58.

Except as expressly admitted, the NCAA denies any and all remaining allegations in

Paragraph 58.

59.     Finally, Palacios has incurred out-of-pocket costs directly related to the
concussion with which she has been diagnosed.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 59 and, on that basis, denies them.  The

NCAA denies any and all remaining allegations in Paragraph 59.

60.     While playing NCAA sports, the NCAA did not encourage Arrington, Turner,
Owens, Palacios or other student-athletes to report or complain about their physical well-being,
did not thoroughly educate or warn Arrington, Turner, Owens, Palacios or other student-athletes
of the long-term effects of concussions, and did not thoroughly educate Plaintiffs, or other
student-athletes on head injury prevention.  Moreover, the NCAA did not provide baseline
testing prior to each season to identify and manage a concussion once it occurred and failed to
conduct any follow up with players forced to stop playing as a result of concussions.  As a result,
Plaintiffs and the members of the Classes have or may have suffered physical injury as well as
incurred out-of-pocket costs related to their injuries.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 60 regarding Plaintiffs' alleged injuries and,

on that basis, denies them.  The NCAA affirmatively states that it encourages student-athletes to

report suspected injuries to their schools' athletic and/or medical personnel.  Except as expressly

admitted, the NCAA denies any and all remaining allegations in Paragraph 60.

**E.     Defendant and Defendant Class Representative**

61.     Defendant National Collegiate Athletic Association is an unincorporated
association that acts as the governing body of college sports.  Its principal office is located in
Indianapolis, Indiana.  According to its website, the NCAA oversees 88 championships in 23
sports.  There are more than 400,000 student-athletes competing in three divisions at over 1,000

colleges and universities within the NCAA. Through various licensing programs, the NCAA takes in, on average, over $750 million in revenues each year. It is named as the class representative for all NCAA members with an athletics program.

**ANSWER:**

The statements on the NCAA's website speak for themselves and, to the extent that the

allegations in Paragraph 61 vary therewith, the NCAA denies those allegations. The NCAA

admits that it is an unincorporated association that acts as the governing body of certain college

sports for NCAA member institutions. The NCAA further admits that its principal office is in

Indianapolis, Indiana. The NCAA further admits that the Consolidated Complaint purports to

name the NCAA as a class representative for all NCAA members with an athletic program.

Except as expressly admitted, the NCAA denies any and all remaining allegations in Paragraph

61.

## IV.    FACTUAL BACKGROUND

### A.    A primer on concussions

#### 1.    Concussions and what they cause.

62.    The brain is made of soft tissue and is cushioned by spinal fluid. It is encased in the hard, protective skull. When a person gets a head injury, the brain can slosh around inside the skull and even bang against it. This can lead to bruising of the brain, tearing of blood vessels, and injury to the nerves. When this happens, a person can get a concussion — a temporary loss of normal brain function.

**ANSWER:**

The NCAA admits the allegations in Paragraph 62.

63.    Concussions and other brain injuries are fairly common. One of the most common reasons people get concussions is through a sports injury. High-contact sports such as football, boxing, soccer, and hockey pose a higher risk of head injury, even with the use of protective headgear:

**School of hard knocks**

A concussion occurs when a violent blow to the head causes the brain to slam against the skull beyond the ability of the cerebrospinal fluid to cushion the impact. Between 1996 and 2001, NFL teams reported nearly 900 concussions.

**1** When a football player takes a hit to the head, speeds range from 17 to 25 miles per hour with a force averaging 98 times the force of gravity.

**2** The shock wave passes through the brain and bounces back off the skull. The concussion usually occurs at the opposite side from the point of impact.

**3** The impact can cause bruising of the brain, tearing of blood vessels and nerve damage.

A study commissioned by the NFL revealed most hits occurred from a blow to the side of the head, often on the lower half of the face.

Skull
Cerebro-spinal fluid
Brain
Blood vessel

**Symptoms**

**Immediate**
Confusion
Amnesia
Loss of consciousness
Ringing in the ears
Nausea and vomiting
Convulsions

**Delayed**
Irritability
Headaches
Depression
Sleep disorders
Poor concentration
Trouble with memory

**Cumulative effects**
Studies show that prior concussions may lower the threshold for subsequent concussion injury and increase severity of symptoms.

Sources: MayoClinic.com, Biokinetics, Washington Post, Science Daily, kidshealth.org, Kaiser Permanente

Andrew Lucas, Jeff Goertzen | The Denver Post

**ANSWER:**

The material referenced in Paragraph 63 speaks for itself and, to the extent that the allegations in Paragraph 63 vary therewith, the NCAA denies those allegations. The NCAA admits that concussions and other brain injuries occur. The NCAA further admits that participation in sports is one of many causes of concussions. Except as expressly admitted, the

NCAA denies any and all remaining allegations in Paragraph 63.

64.     Men are more likely to get concussions than women.  However, in certain sports, like soccer, girls have a higher potential for concussion.  Below is a depiction of how a concussion occurs in athletics:



**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 64 and, on that basis, denies them.  The

NCAA denies any and all remaining allegations in Paragraph 64.

2.     **Signs and symptoms of concussions.**

65.     The signs of a concussion are not always well recognized.  And because of that, athletes may put themselves at risk for another injury.  For example, players may return to a game before they should, thinking nothing is wrong.  That is a problem, because if the brain hasn't healed properly from a concussion and someone gets another brain injury (even if it's with less force), it can be serious.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 65 and, on that basis, denies them.  The

NCAA denies any and all remaining allegations in Paragraph 65.

66.     Repeated injury to the brain can lead to swelling, and sometimes people develop long-term disabilities, or even die, as a result of serious head injuries.  So it is really important to recognize and understand the signals of a concussion.

**ANSWER:**

The NCAA admits the allegations contained in Paragraph 66.

67.     Although we may think of a concussion as someone losing consciousness (passing out), a person can have a concussion and never lose consciousness.

**ANSWER:**

The NCAA admits that each person's concussion is different and that a person can

sustain a concussion without losing consciousness.  Except as expressly admitted, the NCAA

denies any and all remaining allegations in Paragraph 67.

68.     Symptoms of a concussion may include:

"seeing stars" and feeling dazed, dizzy, or lightheaded;
memory loss, such as trouble remembering things that happened right before and after the injury;
nausea or vomiting;
headaches;
blurred vision and sensitivity to light;
slurred speech or saying things that don't make sense;
difficulty concentrating, thinking, or making decisions;
difficulty with coordination or balance (such as being unable to catch a ball or other easy tasks);

feeling anxious
or irritable for no apparent reason; or
feeling overly tired.

**ANSWER:**

The NCAA admits that Paragraph 68 lists some symptoms that may be associated with

concussions.  The NCAA affirmatively states that each person's concussion is different and the

symptoms associated with a concussion may vary from individual to individual.  Except as

expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 68.

69.     Different grades of concussion.  There are different grades of concussion:

Someone with a grade 1 concussion can have some of the symptoms listed
above, but with no loss of consciousness and with symptoms ending
within 15 minutes.

With a grade 2 concussion, there has been no loss of consciousness but the
symptoms last longer than 15 minutes.

In a grade 3 concussion, the person loses consciousness — even if it is just
for a few seconds.

Knowing the different grades is important because how soon a player can safely return to a
sports activity is tied to the grade of the concussion.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 69 and, on that basis, denies them.  The

NCAA affirmatively states that the symptoms associated with a concussion and their severity

may vary from individual to individual.  The NCAA denies any and all remaining allegations in

Paragraph 69.

70.     With a grade 1 concussion, the player can resume play once symptoms have
stopped.  However, that player should stop play if he or she gets another head injury.  A grade 2
concussion requires that a player stop playing and not return to any type of sport or physical
activity that could cause a head injury for at least another week.  Someone with a grade 3
concussion should see a doctor as quickly as possible.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 70 and, on that basis, denies them.  The NCAA affirmatively states that each person's concussion is different and that appropriate treatment varies from individual to individual.  The NCAA further affirmatively states that the circumstances under which a person who has sustained a concussion may resume athletic activity vary from individual to individual. The NCAA denies any and all remaining allegations in Paragraph 70.

**3.     What doctors do.**

71.     If a doctor suspects that someone may have a concussion, he or she will ask about the head injury — such as how it happened and when — and the symptoms.  The doctor may ask what seem like silly questions — things like "Who are you?" or "Where are you?" or "What day is it?" and "Who is the president?" Doctors ask these questions to check the person's level of consciousness and memory and concentration abilities.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 71 and, on that basis, denies them.  The NCAA affirmatively states that each person's concussion is different and that appropriate medical treatment varies from individual to individual.  The NCAA denies any and all remaining allegations in Paragraph 71.

72.     The doctor will perform a thorough examination of the nervous system, including testing balance, coordination of movement, and reflexes.  The doctor may ask the patient to do some activity such as running in place for a few minutes to see how well the brain functions after a physical workout.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 72 and, on that basis, denies them.  The

NCAA affirmatively states that each person's concussion is different and that appropriate medical treatment varies from individual to individual. The NCAA denies any and all remaining allegations in Paragraph 72.

73.     Sometimes a doctor may order a CT scan (a special brain X-ray) or an MRI (a special non-X-ray brain image) to rule out bleeding or other serious injury involving the brain.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 73 and, on that basis, denies them. The NCAA affirmatively states that each person's concussion is different and that appropriate medical treatment varies from individual to individual. The NCAA denies any and all remaining allegations in Paragraph 73.

74.     If the concussion isn't serious enough to require hospitalization, the doctor will give instructions on what to do at home, like having someone wake the person up at least once during the night. If a person with a concussion cannot be easily awakened, becomes increasingly confused, or has other symptoms such as vomiting, it may mean there is a more severe problem that requires contacting the doctor again.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 74 and, on that basis, denies them. The NCAA affirmatively states that each person's concussion is different and that appropriate medical treatment varies from individual to individual. The NCAA denies any and all remaining allegations in Paragraph 74.

75.     The doctor will probably recommend that someone with a concussion take acetaminophen or other aspirin-free medications for headaches. The person also will have to take things easy at school or work.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 75 and, on that basis, denies them.  The

NCAA affirmatively states that each person's concussion is different and that appropriate

medical treatment varies from individual to individual.  The NCAA denies any and all remaining

allegations in Paragraph 75.

**4.      After a concussion.**

76.      After a concussion, the brain needs time to heal until all symptoms of a
concussion have cleared up before returning to normal activities.  The amount of time someone
needs to recover depends on how long the symptoms last.  Healthy teens can usually resume
their normal activities within a few weeks, but each situation is different.  A doctor should
monitor the athlete closely to make sure it is appropriate to return to the game.

**ANSWER:**

The NCAA admits that each person's concussion is different and that appropriate

treatment varies from individual to individual.  The NCAA is without knowledge or information

sufficient to form a belief as to the truth or falsity of the remaining allegations contained in

Paragraph 76 and, on that basis, denies them.  The NCAA denies any and all remaining

allegations in Paragraph 76.

77.      Someone who has had a concussion and has not recovered within a few months is
said to have postconcussion syndrome.  The person may have the same problems described
earlier — such as poor memory, headaches, dizziness, and irritability — but these will last for
longer periods of time and may even be permanent.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 77 and, on that basis, denies them.  The

NCAA affirmatively states that each person's concussion is different and that the duration and

severity of concussion symptoms vary from individual to individual.  The NCAA denies any and

all remaining allegations in Paragraph 77.

78.      If someone has continuing problems after a concussion, the doctor may refer him
or her to a rehabilitation specialist for additional help.

28

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations contained in Paragraph 78 and, on that basis, denies them.  The

NCAA affirmatively states that each person's concussion is different and that appropriate

treatment varies from individual to individual.  The NCAA denies any and all remaining

allegations in Paragraph 78.

**B.  Concussions occur in many sports**

79.  Concussions are not exclusive to American football.  In the United States the next most concussive sport is soccer, the number one sport in the world.

**ANSWER:**

The NCAA admits that participants in various sports may sustain concussions.  The

NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of

the remaining allegations contained in Paragraph 79 and, on that basis, denies them.

80.  A research project by University of North Carolina reported concussion rates by 100,000 athlete-exposures and separated it by sport. Here is what the list showed:

1.  Football

2.  Boys Soccer

3.  Girls Basketball

4.  Girls Track

5.  Girls Soccer

6.  Baseball

7.  Softball

8.  Boys Track

9.  Boys Basketball

10.  Wrestling

11.  Cheerleading

**ANSWER:**

The material referenced in Paragraph 80 speaks for itself and, to the extent that the

allegations in Paragraph 80 vary therewith, the NCAA denies those allegations. The NCAA

denies any and all remaining allegations in Paragraph 80.

**C.      Studies ignored by the NCAA**

81.      Since the early 1970s, the high incidence of concussions among student-athletes
in many different sports, including football, hockey and soccer, has been well known to the
NCAA. Further, based on studies that the NCAA *itself* paid for (as explained in detail below),
the NCAA has been aware that a history of multiple concussions has been associated with
greater risk of future brain defects in student-athletes, including symptoms of post-traumatic
brain injury such as headaches, dizziness, loss of memory, impulse control problems, and
Chronic Traumatic Encephalopathy.

**ANSWER:**

The NCAA admits that it has paid for studies on concussions. The NCAA further admits

that a history of multiple concussions may be associated with potentially serious complications.

The NCAA affirmatively states that since the 1970s, it has tracked the incidence and effects of

head injuries and concussions in sports and has issued appropriate guidance to its member

institutions regarding the avoidance of head injuries. Except as expressly admitted, the NCAA

denies any and all remaining allegations in Paragraph 81.

82.      Moreover, in the early 2000s, the NCAA specifically became aware of the
correlation between concussions and depression, dementia, and early on-set Alzheimer's disease.
Despite this knowledge, the NCAA failed to act reasonably by developing appropriate means to
identify at-risk players and guidelines or rules regarding return to play criteria. The NCAA's
inaction increased the risk of long-term injury and illness in student-athletes.

**ANSWER:**

The NCAA denies the allegations in Paragraph 82.

83.      As early as in 2002, a prominent study published in the Archives of Clinical
Neuropsychology entitled *Enduring Effects of Concussion in Youth Athletes* documented that
there were enduring effects in youth who have experienced a history of two or more

concussions.[1]  These include decreased overall neuropsychological functioning, as well as decreased mental speed.

**ANSWER:**

The material referenced in Paragraph 83 speaks for itself and, to the extent that the

allegations in Paragraph 83 vary therewith, the NCAA denies those allegations.

84.     In 2003, the University of North Carolina, Chapel Hill, published a study, funded in part by the NCAA, which concluded that NCAA football players required an average of five to seven days after concussion for their cognitive functioning to return to normal.[2]  The study concluded that *athletes required a full seven days after a concussion before completely regaining their pre-concussion abilities.*

**ANSWER:**

The NCAA admits that it provided funding to support the study described in Paragraph

84 and Footnote 2.  The material referenced in Paragraph 84 speaks for itself and, to the extent

that the allegations in Paragraph 84 vary therewith, the NCAA denies those allegations.   Except

as expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 84.

85.     Despite this knowledge, the NCAA continues to allow student-athletes to return to play the very next calendar day after sustaining a concussion.  In practice, this means that a student athlete can be back on the field less than 24 hours after sustaining a serious brain injury — thereby placing the student-athlete in serious medical jeopardy.

**ANSWER:**

The NCAA admits that its Concussion Management Plan ("CMP") legislation includes a

policy precluding a student-athlete diagnosed with a concussion from returning to athletic

activity for at least the remainder of that calendar day.  The NCAA affirmatively states that

under its CMP legislation, it recommends that student-athletes diagnosed with concussions

receive medical clearance from a physician before returning to athletic activity.  Except as

---

[1]     Moser, et al., Archives of Clinical Neuropsychology, 17 (2002) 91-100.
[2]     McCrea, *et al., Acute Effects and Recovery Time Following Concussions in Collegiate Football Players, The NCAA Concussion Study,* JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, Vol. 290, No. 19, November 19, 2003, at 2561.

expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 85.

86.     In another 2003 UNC-Chapel Hill study, again partially funded by the NCAA, the affects of multiple concussions sustained by a single athlete were examined.[3]  The study found that NCAA football players who had a history of concussions are at an increased risk of sustaining additional future concussions, and that those student-athletes who had three previous concussions were at a three-fold greater risk of future concussions.  The study recommended that athletes with a high cumulative history of concussions should receive more information about the increased risk of repeat concussions before deciding whether to continue to play football.

**ANSWER:**

The NCAA admits that it provided funding to support the study described in Paragraph

86 and Footnote 3.  The material referenced in Paragraph 86 speaks for itself and, to the extent

that the allegations in Paragraph 86 vary therewith, the NCAA denies those allegations.   Except

as expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 86.

87.     The study also concluded that the use of standardized assessment tools would assist medical staff in better determining how long student-athletes should rest before returning to play.  Despite this knowledge, the NCAA has failed to implement any guidelines or rules pertaining to repeat concussions and failed to implement an educational program for athletes with a history of concussions who profess a desire to continue playing football.

**ANSWER:**

The material referenced in Paragraph 87 speaks for itself and, to the extent that the

allegations in Paragraph 87 vary therewith, the NCAA denies those allegations.   The NCAA

denies any and all remaining allegations in Paragraph 87.

88.     But there is more.  In 2005 UNC-Chapel Hill published a study that found a clear link between previous head injuries and the likelihood of developing mild cognitive impairment (MCI) and early-onset Alzheimer's disease.[4]  In fact, the study found that players with three or more reported concussions were five times more likely to develop MCI, three times more likely to develop significant memory problems, and possessed an overall higher likelihood of

---

[3]     Guskiewicz, *et al., Cumulative Effects Associated With Recurrent Concussion in Collegiate Football Players, The NCAA Concussion Study,* THE JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, Vol. 290, No. 19, November 19, 2003, at 2549.

[4]     Guskiewicz, *et al., Association between recurrent concussions and late-life cognitive impairment in retired professional football players,* NEUROSURGERY, Vol. 50, October 2005, at 719.

developing early on-set Alzheimer's disease. The NCAA did not even acknowledge the study, let alone act on it or even alert its student-athletes of these known risks.

**ANSWER:**

The material referenced in Paragraph 88 speaks for itself and, to the extent that the

allegations in Paragraph 88 vary therewith, the NCAA denies those allegations. The NCAA

denies any and all remaining allegations in Paragraph 88.

89.     Two years later, the NCAA ignored yet another UNC-Chapel Hill study, which found that recurrent concussions were linked to a heightened risk of depression in former football players.[5] The results of that study showed that former football players who sustained three or more concussions were three times more likely to be diagnosed with depression. Those with two or more concussions were one and one-half times more likely to be diagnosed with depression.

**ANSWER:**

The material referenced in Paragraph 89 speaks for itself and, to the extent that the

allegations in Paragraph 89 vary therewith, the NCAA denies those allegations. The NCAA

denies any and all remaining allegations in Paragraph 89.

90.     Further, it is well known that student-athletes in the NCAA are at risk for concussion. In 2010, a study from the University of North Carolina reported that men's hockey players suffered 1.47 concussions per 1,000 player hours. Women's college hockey was worse, with 2.72 concussions occurring for every 1,000 hours.[6]

**ANSWER:**

The material referenced in Paragraph 90 speaks for itself and, to the extent that the

allegations in Paragraph 90 vary therewith, the NCAA denies those allegations. The NCAA

denies any and all remaining allegations in Paragraph 90.

91.     In fact, at a 2010 Mayo Clinic conference on concussions, researchers discussed that concussions comprised about 25 percent of the injuries in women's ice hockey, the highest cause of injury in the sport. In men's ice hockey concussions account for 9 percent of the

---

[5]     Guskiewicz, *et al., Recurrent concussions and risk of depression in retired professional football players,* MED. SCI. SPORTS EXERC., Vol. 39, June 2007, at 903.

[6]     http://www.hockeyprimetime.com/news/futures-watch/ncaa-hockeys-growing-headache.

injuries (No. 2 in the sport), and in football they account for 7 percent (No. 3 in the sport).[7]

**ANSWER:**

The material referenced in Paragraph 91 speaks for itself and, to the extent that the

allegations in Paragraph 91 vary therewith, the NCAA denies those allegations.   Except as

expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 91.

92.    The NCAA also knows, but has ignored, that concussions are not limited to helmeted sports.  A study conducted by McGill University in Montreal found that 60 percent of college soccer players reported symptoms of a concussion at least once during the season.  The study also revealed that concussion rates in soccer players were comparable to those in football.  According to this study, athletes who suffered a concussion were four to six times more likely to suffer a second concussion.[8]/[9]

**ANSWER:**

The material referenced in Paragraph 92 speaks for itself and, to the extent that the

allegations in Paragraph 92 vary therewith, the NCAA denies those allegations.   Except as

expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 92.

93.    Consistent with the pattern described herein, the NCAA chose to ignore the fact that the mental health of student-athletes was at risk, implementing no policy or educational stance that would properly protect and/or inform the football players at risk.

**ANSWER:**

The NCAA denies the allegations in Paragraph 93.

**D.    The NCAA's inadequate rules and policies**

94.    In the early 1970s, rule-makers in the NCAA recognized that the use of the helmeted head as an offensive weapon was dangerous and was increasing the rate of concussions.

---

[7]     http://slapshot.blogs.nytimes.com/2010/10/19/at-the-mayo-clinic-womens-hockey-a-most-dangerous-game/.

[8]     http:fiwww.aans.org/Patient%20Information/Conditions%20and%20Treatments/Sports-Related%20Head%20Injury.aspx.

[9]     http://aans.org/en/Patient%20Information/Conditions%20and%20Treatments/Concussion.aspx.

**ANSWER**:

The NCAA admits that in the 1970s, the committee that promulgates rules governing football recognized that the use of the helmeted head as a weapon was dangerous. The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 94 regarding the rate of concussions and, on that basis, denies them. Except as expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 94.

95.     In 1976, the NCAA passed a rule prohibiting initial contact of the head in blocking and tackling in football.

**ANSWER**:

The NCAA admits the allegations in Paragraph 95.

96.     Even after the football regulations of the 1970s were passed, however, football student-athletes continued to be coached and trained to use all portions of their helmets to block, tackle, butt, spear, ram and/or injure opposing players by hitting with their helmeted heads. While these techniques were *publicly* condemned by the NCAA, on a private level they were not meaningfully condemned by the NCAA. To date, the harshest penalty imposed on football coaches whose players were found to use the helmeted head to tackle was a letter of reprimand.

**ANSWER**:

The NCAA admits that it discourages the use of the helmeted head to block, tackle, butt, spear, ram and/or injure opposing players. Except as expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 96.

97.     At the individual level, the penalties for student-athletes who make dangerous helmet-based tackles include being either ejected or suspended from play. But at the *team* level, teams are assessed only a 15-yard penalty for dangerous tackling. What is more, the stated rationale behind these penalties has consistently been to protect *the player being tackled* without regard for the player *using* the helmet to make the tackle — as he was coached to do.

**ANSWER**:

The NCAA admits that penalties imposed on student-athletes who make dangerous tackles include ejection from a game and suspension from play. The NCAA further admits that

teams may be assessed a 15-yard penalty if a player initiates contact with the crown of the

helmet. Except as expressly admitted, the NCAA denies any and all remaining allegations in

Paragraph 97.

98.     Despite its awareness of these dangerous practices and the increased risk of head injury to the players, during the 1970s, 1980s, 1990s and 2000s, the NCAA turned a blind eye to the players being coached and trained to use all portions of their helmet to block, tackle, butt, spear, ram and/or injure opposing players by hitting with their helmeted heads, and instead elevated its financial self-interest above the physical safety of its student-athletes.

**ANSWER:**

The NCAA denies the allegations in Paragraph 98.

99.     Similarly, in hockey, no rule or guidance was provided on hitting with the head in the NCAA. Finally, in 2010, the NCAA installed new rules in the hockey off-season to address the growing problem of concussions and head and neck injuries. As of the 2010-11 season, all hits to the head are penalized by a five-minute major and the referee's option of a game misconduct or disqualification. A disqualification carries with it an automatic one-game suspension.

**ANSWER:**

The NCAA admits that in 2010, its Ice Hockey Rules Committee developed rules to

address concussions and head and neck injuries. The NCAA further admits that hits to the head

are subject to a five-minute major penalty and possible game misconduct or disqualification.

The NCAA further admits that disqualification results in an automatic one-game suspension.

Except as expressly admitted, the NCAA denies any and all allegations in Paragraph 99.

100.     Finally, in [sic] August 13, 2010, the NCAA passed legislation requiring its member schools to have a Concussion Management Plan (CMP) in place for all sports. Prior to that date, the decision of whether to address concussion management with staff or athletes, or within particular sports, was the prerogative of individual schools. Even with the passing of the CMP legislation, however, the NCAA continued its pattern of failing to address important issues such as the tackling methodology being taught by football coaches; the effects and prevention of multiple concussions; and long-term problems such as headaches, dizziness, dementia and/or Alzheimer's disease that many players have experienced.

**ANSWER:**

The NCAA admits that in August 2010, it enacted legislation requiring its member

schools to adopt a CMP.  Except as expressly admitted, the NCAA denies any and all remaining

allegations in Paragraph 100.

101.    Rather than creating a system-wide policy that focused on the best interest of the
student-athletes, the NCAA's so-called "plan" relies on member schools to self-police their
return-to-play policies.  Further, the NCAA's plan put the onus of concussion management on
the student-athletes by requiring that they "sign a statement in which they accept the
responsibility for reporting their injuries and illnesses to the institutional medical staff, including
signs and symptoms of concussions."[10]

**ANSWER:**

The NCAA admits that under the NCAA Constitution, each member institution is

responsible for protecting the health of its student-athletes.  The NCAA further admits that under

its CMP legislation, member schools are responsible for developing and implementing CMPs in

accordance with the NCAA's guidelines.  The NCAA further admits that its CMP legislation

states that student-athletes should be presented with educational materials on concussions and

should sign a statement in which they agree to report injuries and illnesses to institutional

medical staff, including signs and symptoms of concussions.  Except as expressly admitted, the

NCAA denies any and all remaining allegations in Paragraph 101.

102.    Boiled down to its essence, the plan rejects any measure of responsibility for the
NCAA, its member schools, and the coaching staff of individual teams; and instead, puts the
burden squarely on the shoulders of student-athletes — *the same student-athletes who have just
sustained fresh head trauma* — to seek out medical attention, or decide whether to seek it in the
first place.

**ANSWER:**

The NCAA denies the allegations in Paragraph 102.

103.    The NCAA and its members not only avoid responsibility but have agreed that
medical expenses can be paid only to current student athletes.

**ANSWER:**

The NCAA denies the allegations in Paragraph 103.

---

[10]    NCAA Rule 3.2.4.17 *(available at* http://www.ncaapublications.com/productdownloads/D112.pdf).

104.    NCAA Bylaw 12.02.5 defines "a student athlete":

>   12.02.5 Student-Athlete. A student-athlete is a student whose
>   enrollment was solicited by a member of the athletics staff or
>   other representative of athletics interests with a view toward the
>   student's ultimate participation in the intercollegiate athletics
>   program. Any other student becomes a student-athlete only when
>   the student reports for an intercollegiate squad that is under the
>   jurisdiction of the athletics department, as specific [sic] in
>   Constitution 3.2.4.5. A student is not deemed a student-athlete
>   solely on the basis of prior high school athletics participation.

**ANSWER**:

The material referenced in Paragraph 104 speaks for itself and, to the extent that the

allegations in Paragraph 104 vary therewith, the NCAA denies those allegations. The NCAA

denies any and all remaining allegations in Paragraph 104.

105.    Bylaw Article 15 sets forth all forms of permitted financial aid, and such aid,
including medical expenses, are to be paid only to student athletes. No provision allows
payments post-graduation. Bylaw Article 16.4 allows payment of medical expenses only for
current student athletes.

**ANSWER**:

The material referenced in Paragraph 105 speaks for itself and, to the extent that the

allegations in Paragraph 105 vary therewith, the NCAA denies those allegations. The NCAA

affirmatively states that Bylaw Article 16.4.1(e) allows payment of medical expenses for former

student-athletes who suffered a disabling illness or injury. The NCAA denies any and all

remaining allegations in Paragraph 105.

**E.    Discovery of the cause of action, the NCAA's fraudulent concealment and Plaintiffs'
vulnerability**

106.    Prior to passage of the NCAA CMP on August 13, 2010, Plaintiffs and the
Classes were unaware that the conduct of the NCAA may have caused them to be at an increased
risk for developing chronic brain injury symptoms, including, but not limited to, dementia and/or
Alzheimer's disease.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 106 regarding the purported knowledge of Plaintiffs and/or members of the proposed classes and, on that basis, denies them. The NCAA denies any and all remaining allegations in Paragraph 106.

107. Until at least August 13, 2010, Plaintiffs and the Classes did not have a reasonable basis to know or believe that the aforementioned harm was caused by the concealment, neglect and/or misconduct of the NCAA.

**ANSWER:**

The NCAA denies the allegations in Paragraph 107.

108. Leading up to August 13, 2010, and over the past four decades, the NCAA has actively concealed any correlation between on-field concussions, its return-to-play policies and the chronic mental illnesses and maladies suffered by former student-athletes, including the Plaintiffs and the Classes.

**ANSWER:**

The NCAA denies the allegations in Paragraph 108.

109. Even today, by failing to implement appropriate policies to prevent, manage, mitigate and remedy head injuries and concussions sustained by its student-athletes, the NCAA continues to ignore and actively conceal the repeated warnings and patterns of injury of which the NCAA has actual knowledge.

**ANSWER:**

The NCAA denies the allegations in Paragraph 109.

110. Although the debilitating effects of concussions and other head injuries have already manifested for many former student-athletes, there are many others who have sustained such injuries as a direct result of the NCAA's failures and inactivity described above, but whose symptoms have only partially manifested or not yet manifested at all.

**ANSWER:**

The NCAA denies the allegations in Paragraph 110.

111. The NCAA has failed to establish a proper and adequate methodology to monitor and detect when players suffer concussive or sub-concussive injury in practice or game play.

This has increased the risk of injury that will materialize in the future.

**ANSWER:**

The NCAA denies the allegations in Paragraph 111.

112.    As a result, Plaintiffs and the Classes require medical monitoring to detect the manifestation of post-injury symptoms.

**ANSWER:**

The NCAA denies the allegations in Paragraph 112.

## V.    CLASS ACTION ALLEGATIONS

**A.    Plaintiffs' class allegations**

113.    Plaintiffs bring Counts I-III, as set forth below, individually and as a class action, pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class defined as:

> All former NCAA student-athletes who sustained a concussion(s) or suffered concussion-like symptoms while playing sports at an NCAA school, and who have, since ending their NCAA careers, developed chronic headaches, chronic dizziness or dementia or Alzheimer's disease and/or other physical and mental problems as a result of the concussion(s) suffered while a player and who post-college have incurred medical expenses from such injuries (the "Class").

Excluded from the Class are the NCAA and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the judge to whom this case is assigned and any immediate family members thereof.

**ANSWER:**

The NCAA admits that Plaintiffs purport to bring their claims on behalf of themselves and the proposed class identified in Paragraph 113.  The NCAA denies that any claims against it are appropriate for class treatment.  The NCAA affirmatively states that the definition and description of the proposed class are not appropriate and do not meet applicable requirements. Except as expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 113.

114.    Plaintiffs bring Count IV, as set forth below, on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure on behalf of a class defined as:

>       All former and current NCAA student-athletes who have suffered a concussion or concussion-like symptoms while playing sports at an NCAA school (the "Medical Monitoring Class").

Excluded from the Medical Monitoring Class are the NCAA and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Medical Monitoring Class; governmental entities; and the judge to whom this case is assigned and any immediate family members thereof.  The Class and Medical Monitoring Class are collectively referred to as the "Classes," unless specifically indicated otherwise.

**ANSWER:**

The NCAA admits that Plaintiffs purport to bring their claims on behalf of themselves

and the proposed class identified in Paragraph 114.  The NCAA denies that any claims against it

are appropriate for class treatment.  The NCAA affirmatively states that the definition and

description of the proposed class are not appropriate and do not meet applicable requirements.

Except as expressly admitted, the NCAA denies any and all remaining allegations in

Paragraph 114.

115.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

**ANSWER:**

The NCAA denies the allegations in Paragraph 115 and expressly denies that class

treatment of Plaintiffs' claims is appropriate.

116.    **Numerosity — Federal Rule of Civil Procedure 23(a)(1).**  The members of the Classes are so numerous that individual joinder of all members of the Classes is impracticable.  On information and belief, there are thousands of student-athletes who have been damaged by the NCAA's wrongful conduct as alleged herein.  The precise number of members of the Classes and their addresses is presently unknown to Plaintiffs, but may be ascertained from the NCAA's books and records.  Members of the Classes may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

**ANSWER:**

The NCAA denies the allegations in Paragraph 116 and expressly denies that class treatment of Plaintiffs' claims is appropriate.

117.    **Commonality and Predominance — Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).**  This action involves common questions of law and fact, which predominate over any questions affecting individual members of the Classes, including, without limitation: whether the NCAA engaged in the conduct as alleged herein;

a.      Whether the NCAA engaged in the conduct as alleged herein;

b.      whether Plaintiffs and the Classes are entitled to compensatory or other forms of damages, and other monetary relief and, if so, in what amount(s); and

c.      whether Plaintiffs and the Classes are entitled to equitable relief, including, but not limited to, medical monitoring and other injunctive relief.

**ANSWER:**

The NCAA denies the allegations in Paragraph 117 and expressly denies that class treatment of Plaintiffs' claims is appropriate.

118.    **Typicality — Federal Rule of Civil Procedure 23(a)(3).**  Plaintiffs' claims are typical of the claims of the other members of the Classes because, among other things, all members of the Classes were comparably injured through the uniform misconduct described above.

**ANSWER:**

The NCAA denies the allegations in Paragraph 118 and expressly denies that class treatment of Plaintiffs' claims is appropriate.

119.    **Adequacy of Representation — Federal Rule of Civil Procedure 23(a)(4).**  Plaintiffs are adequate representatives of the Classes because their interests do not conflict with the interests of the members of the Classes they seek to represent; they have retained counsel competent and experienced in complex commercial and class action litigation; and Plaintiffs intend to prosecute this action vigorously.  The interests of the Classes will be fairly and adequately protected by Plaintiffs and their counsel.

**ANSWER:**

The NCAA denies the allegations in Paragraph 119 and expressly denies that class treatment of Plaintiffs' claims is appropriate.

120. **Declaratory and Injunctive Relief — Federal Rule of Civil Procedure 23(b)(2).** The NCAA has acted or refused to act on grounds generally applicable to Plaintiffs and the members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below.

**ANSWER:**

The NCAA denies the allegations in Paragraph 120, further denies that Plaintiffs are entitled to any relief whatsoever, including but not limited to the relief requested in the Consolidated Complaint, and expressly denies that class treatment of Plaintiffs' claims is appropriate.

121. **Superiority — Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and members of the Classes are relatively small compared to the burden and expense that would be required to individually litigate their claims against the NCAA, so it would be impracticable for members of the Classes to individually seek redress for the NCAA's wrongful conduct. Even if members of the Classes could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

**ANSWER:**

The NCAA denies the allegations in Paragraph 121 and expressly denies that class treatment of Plaintiffs' claims is appropriate.

**B.     Defendant class allegations**

122.    Plaintiffs assert a defendant class defined as:

The NCAA and all members of the NCAA that have sports teams
in which student-athletes participate.

**ANSWER:**

The NCAA admits that Plaintiffs purport to assert their claims against the defendant class identified in Paragraph 122. The NCAA denies that any claims against it are appropriate for class treatment. The NCAA affirmatively states that the definition and description of the proposed class are not appropriate and do not meet applicable requirements. Except as expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 122.

123.     The NCAA is an adequate class representative as it is the governing body and all NCAA schools have agreed to abide by all legislation governing the conduct of intercollegiate athletics, Constitutions, Article I, 1.3.2, and agree that as part of being an eligible institution they must abide by the Constitution and Bylaws, 3.1.1.

**ANSWER:**

The NCAA denies the allegations in Paragraph 123 and expressly denies that class treatment of Plaintiffs' claims is appropriate.

124.     At all relevant times, the NCAA and its members have agreed to act in the same manner with respect to rules and education regarding concussions and with respect to payment of post college career treatment and expenses associated with concussion related injuries.

**ANSWER:**

The NCAA denies the allegations in Paragraph 124 and expressly denies that class treatment of Plaintiffs' claims is appropriate.

125.     **Numerosity — Federal Rule of Civil Procedure 23(a)(1).** The members of the defendant class are numerous and individual joinder is impracticable.

**ANSWER:**

The NCAA denies the allegations in Paragraph 125 and expressly denies that class treatment of Plaintiffs' claims is appropriate.

126.     **Commonality and Predominance — Federal Rule of Civil Procedure 23(a)(2) and 23(b )(3).** This action involves common questions of law and fact, which predominate over any questions affecting individual members of the Classes, including, without limitation:

a.      Whether the NCAA engaged in the conduct as alleged herein;

      b.      Whether the NCAA and its members are negligent and/or have been unjustly enriched;

      c.      Whether Plaintiffs and the Classes are entitled to compensatory or other forms of damages, and other monetary relief and, if so, in what amount(s); and

      d.      Whether Plaintiffs and the Classes are entitled to equitable relief, including, but not limited to, medical monitoring and other injunctive relief.

**ANSWER:**

The NCAA denies the allegations in Paragraph 126 and expressly denies that class treatment of Plaintiffs' claims is appropriate.

127.    **Typicality — Federal Rule of Civil Procedure 23(a)(3).**  Plaintiffs' claims are typical of the claims of the other members of the Classes because, among other things, all members of the Classes were comparably injured through the uniform misconduct described above.  Defendant is typical of all members of the Class as it set the policy and issues and enforces it.

**ANSWER:**

The NCAA denies the allegations in Paragraph 127 and expressly denies that class treatment of Plaintiffs' claims is appropriate.

128.    **Adequacy of Representation — Federal Rule of Civil Procedure 23(a)(4).**  The NCAA is an adequate representative of the Classes because its interests do not conflict with the interests of the members of the Classes; it will retain counsel competent to vigorously defend this action.  The interests of the Classes will be fairly and adequately protected by the NCAA and its counsel.

**ANSWER:**

The NCAA denies the allegations in Paragraph 128 and expressly denies that class treatment of Plaintiffs' claims is appropriate.

129.    **Declaratory and Injunctive Relief — Federal Rule of Civil Procedure 23(b)(2).**  The NCAA has acted or refused to act on grounds generally applicable to Plaintiffs and the members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below.

**ANSWER:**

The NCAA denies the allegations in Paragraph 129, further denies that Plaintiffs are entitled to any relief whatsoever, including but not limited to the relief requested in the Consolidated Complaint, and expressly denies that class treatment of Plaintiffs' claims is appropriate.

130.     **Superiority — Federal Rule of Civil Procedure 23(b)(3).**  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.

**ANSWER:**

The NCAA denies the allegations in Paragraph 130 and expressly denies that class treatment of Plaintiffs' claims is appropriate.

131.     In addition, the NCAA sets the policy that governs the action and having it defend the action is superior to naming all member institutions with football programs.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

**ANSWER:**

The NCAA denies the allegations in Paragraph 131 and expressly denies that class treatment of Plaintiffs' claims is appropriate.

## VI.     CLAIMS ALLEGED

### COUNT I
### NEGLIGENCE

### (On Behalf of the Class)

132.     Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

**ANSWER:**

The NCAA repeats and realleges its answers to the preceding paragraphs as if set forth fully herein.

133.    At all relevant times, the NCAA had a duty toward Plaintiffs and the Class to supervise, regulate, monitor and provide reasonable and appropriate rules to minimize the risk of injury to the players.

**ANSWER:**

The allegations in Paragraph 133 state a legal conclusion to which no response is required but, to the extent a response is required, the NCAA denies those allegations.  The NCAA denies any and all remaining allegations in Paragraph 133 and expressly denies that class treatment of this claim is appropriate.

134.    The NCAA acted carelessly and negligently in its position as the regulatory body for college teams and its student-athletes, including Plaintiffs and the Class.  The NCAA knew or should have known that its actions or its inaction in light of the rate and extent of concussions reported and made known to the NCAA would cause harm to players in both the short- and long-term.

**ANSWER:**

The NCAA denies the allegations in Paragraph 134 and expressly denies that class treatment of this claim is appropriate.

135.    The NCAA was careless and negligent by breaching the duty of due care it assumed for the benefit of the Plaintiffs and the Class, both generally and in the following particular respects:

a.      Failing to educate players concerning symptoms that may indicate a concussion has occurred;

b.      Failing to warn of the risk of unreasonable harm resulting from repeated concussions;

c.      Failing to disclose the special risks of long-term complications from repeated concussions and return to play;

d.      Failing to disclose the role of repeated concussions in causing chronic life-long cognitive decline;

e.      Failing to promulgate rules and regulations to adequately address the dangers of repeated concussions and a return-to-play policy to minimize long-term chronic cognitive problems;

f.      Misrepresenting pertinent facts that players needed to be aware of to make determinations of the safety of return to play;

g.      Concealing pertinent facts;

h.      Failing to adopt rules and reasonably enforce those rules to minimize the risk of players suffering debilitating concussions; and

i.      Other acts of negligence or carelessness that may materialize during the pendency of this action.

**ANSWER:**

The NCAA denies the allegations in Paragraph 135 and expressly denies that class

treatment of this claim is appropriate.

136.    The Plaintiffs individually and the Class members have each sustained past medical expenses and will in all likelihood incur future medically-related costs associated with the harm suffered and injuries and disability referenced above.

**ANSWER:**

The NCAA denies the allegations in Paragraph 136 and expressly denies that class

treatment of this claim is appropriate.

137.    The Plaintiffs individually and the Class members have in the past experienced, and they may in the future suffer, from an assortment of problems associated with the harm and injuries described including, but not limited to, headaches, dizziness, loss of memory, depression, impulsivity to anger, cognitive dysfunction, employment impairment, limitations in physical activities, embarrassment, and loss of the pleasures of life, among other things.

**ANSWER:**

The NCAA is without knowledge or information sufficient to form a belief as to the truth

or falsity of the allegations in Paragraph 137 and, on that basis, denies them.  The NCAA denies

any and all remaining allegations in Paragraph 137 and expressly denies that class treatment of

this claim is appropriate.

138.    As a result of the foregoing, the Plaintiffs and the Class have suffered damages and will in the future suffer damages caused by the misconduct of the Defendant.

**ANSWER:**

The NCAA denies the allegations in Paragraph 138 and expressly denies that class

treatment of this claim is appropriate.

139.    The Plaintiffs and the Class are entitled to damages in an amount to be determined at trial, and injunctive relief requiring the NCAA, among other things, to adopt corrective measures regarding: the coaching of tackling methodologies that cause head injuries; the implementation of system-wide "return to play" guidelines for student-athletes who have sustained concussions; the implementation of system-wide guidelines for the screening and detection of head injuries; and the implementation of legislation addressing the treatment and eligibility of student-athletes who have sustained multiple concussions in the course of play.

**ANSWER:**

The NCAA denies the allegations in Paragraph 139, further denies that Plaintiffs are

entitled to any relief whatsoever, including but not limited to the relief requested in the

Consolidated Complaint, and expressly denies that class treatment of this claim is appropriate.

140.    Moreover, Plaintiffs have no adequate remedy at law in that monetary damages alone cannot compensate them for the risk of long-term physical and economic losses due to concussions and sub-concussive injuries.  Thus, Plaintiffs and the Medical Monitoring Subclass are entitled to medical monitoring.  Without a Court-approved medical monitoring program as described herein in Count IV, or established by the Court, Plaintiffs and the Medical Monitoring Subclass members will continue to face an unreasonable risk of injury and disability.

**ANSWER:**

The NCAA denies the allegations in Paragraph 140, further denies that Plaintiffs are

entitled to any relief whatsoever, including but not limited to the relief requested in the

Consolidated Complaint, and expressly denies that class treatment of this claim is appropriate.

**COUNT II**
**FRAUDULENT CONCEALMENT**

**(On Behalf of the Class)**

141.    Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.

**ANSWER:**

The NCAA repeats and realleges its answers to the preceding paragraphs as if set forth

fully herein.

142.    The NCAA concealed facts and information which were material.  As more fully described above, since the early 1970s, the high incidence of concussions among student-athletes in many different sports, including football, hockey and soccer, has been well known to the NCAA.  Further, based on studies for which the NCAA *itself* paid, the NCAA has been aware that a history of multiple concussions has been associated with greater risk of future brain defects in student-athletes, including symptoms of post-traumatic brain injury such as headaches, dizziness, loss of memory, impulse control problems, and Chronic Traumatic Encephalopathy. Moreover, in the early 2000s, the NCAA specifically became aware of the correlation between concussions and depression, dementia, and early on-set Alzheimer's disease.

**ANSWER:**

The NCAA denies the allegations in Paragraph 142 and expressly denies that class treatment of this claim is appropriate.

143.    Through concealment of material facts, the NCAA intended to induce a false belief, under circumstances creating a duty to speak.  The NCAA specifically intended to induce a false belief in its student-athletes that they should continue to play and should not be prevented from playing their respective sports even after a concussion or several concussions that should have required time to heal.

**ANSWER:**

The NCAA denies the allegations in Paragraph 143 and expressly denies that class treatment of this claim is appropriate.

144.    Plaintiffs could not have discovered the truth through reasonable inspection or inquiry, or was prevented from doing so.  Plaintiffs were under the care and treatment of the NCAA and school trainers and doctors, and justifiably relied on their silence as representing that the facts did not exist.

**ANSWER:**

The NCAA denies the allegations in Paragraph 144 and expressly denies that class treatment of this claim is appropriate.

145.    The concealed information was such that Plaintiffs would have acted differently if they had been aware of the material facts.  Plaintiffs would not have continued to play, or would have taken additional time to allow their brain injuries to heal before returning to play.  Despite the NCAA's knowledge, the NCAA failed to act reasonably by developing appropriate means to identify at-risk players and guidelines or rules regarding return to play criteria.  The NCAA's inaction increased the risk of long-term injury and illness in student-athletes.

**ANSWER:**

The NCAA denies the allegations in Paragraph 145 and expressly denies that class

treatment of this claim is appropriate.

146.    As a proximate cause of the NCAA's concealment, Plaintiffs and the Classes
suffered harm described above, and/or will suffer future injuries and damages that have not yet
fully manifested.

**ANSWER:**

The NCAA denies the allegations in Paragraph 146 and expressly denies that class

treatment of this claim is appropriate.

**COUNT III**
**UNJUST ENRICHMENT**

**(On Behalf of the Class)**

147.    Plaintiffs reallege the foregoing allegations as if fully set forth herein.

**ANSWER:**

The NCAA repeats and realleges its answers to the preceding paragraphs as if set forth

fully herein.

148.    The NCAA and its members enjoy enormous revenues from college sports,
including by way of example in football, including a 15-year deal between the Southeast
Conference (SEC) and ESPN estimated in value at $2.25 billion (Smith & Ourand, 2008), the
$2.8 billion expected to be generated over the next 25 years by the Big Ten Network (Ourand &
Smith, 2008), and the newly inked Pac 12 TV deal that will generate $3 billion over the next 12
years (Ubben, 2011).  Individual campus deals, such as the Longhorn Network developed
between the University of Texas and ESPN, has a projected income profile of $300 million over
the span of next 20 years (Haurwitz, 2011).

**ANSWER:**

The NCAA admits that it earns revenue through television broadcast contracts.  The

NCAA affirmatively states that over 96% of its revenue is distributed to NCAA conferences and

member institutions.   The NCAA is without knowledge or information sufficient to form a belief

as to the truth or falsity of the remaining allegations contained in Paragraph 148 and, on that

basis, denies them.

149.    It is unjust to allow the NCAA and its members to earn revenues and retain the benefits of athletes' services while refusing to pay medical expenses of sports-related injuries whose treatment is required post college career.

**ANSWER:**

The NCAA denies the allegations in Paragraph 149 and expressly denies that class

treatment of this claim is appropriate.

## COUNT IV
## MEDICAL MONITORING

### (On Behalf of the Class)

150.    Plaintiffs adopt and incorporate by reference all prior paragraphs of this Complaint as if fully set forth herein.  Plaintiffs bring this Count IV as a remedy under the law of the State of Indiana. Alternatively, Plaintiffs bring this Count IV under the laws of the states in which they reside and assert claims on behalf of the Medical Monitoring Class under the laws of the states in which class members reside.

**ANSWER:**

The NCAA repeats and realleges its answers to the preceding paragraphs as if set forth

fully herein.  The NCAA admits that Plaintiffs purport to bring Count IV under the law of the

State of Indiana or, alternatively, under the laws of the states in which they reside.  Except as

expressly admitted, the NCAA denies any and all remaining allegations in Paragraph 150, and

expressly denies that class treatment of this claim is appropriate.

151.    The Medical Monitoring Class has been exposed to a greater risk of concussions and sub-concussions, which have created an increased risk of long-term injury and the illnesses as described above.

**ANSWER:**

The NCAA denies the allegations in Paragraph 151 and expressly denies that class

treatment of this claim is appropriate.

152.    The members of the Medical Monitoring Class have not yet fully manifested the long-term physical and mental effects of the NCAA's misconduct, and require specialized testing that is not generally given or available to the public at large for the early detection of the long-term effects of concussions and sub-concussions.

**ANSWER:**

The NCAA denies the allegations in Paragraph 152 and expressly denies that class

treatment of this claim is appropriate.

153.    Medical monitoring is reasonably necessary according to contemporary scientific principles within the medical community that specialize in close head injuries and their connection to memory loss, early onset dementia, CTE and Alzheimer-like syndromes.

**ANSWER:**

The NCAA denies the allegations in Paragraph 153 and expressly denies that class

treatment of this claim is appropriate.

154.    By monitoring and testing former (and current) NCAA student-athletes who are believed to have suffered a concussion or sub-concussion while playing or practicing, the risk of each such player suffering long term injuries, disease and losses as described above will be significantly reduced.

**ANSWER:**

The NCAA denies the allegations in Paragraph 154 and expressly denies that class

treatment of this claim is appropriate.

155.    Because the NCAA has failed to properly, reasonably and safely monitor, test or otherwise study whether and when a player has suffered a concussion or sub-concussion to minimize the risk of long-term injury or illness, medical monitoring is the most appropriate method by which it can be determined whether a particular individual is now at risk for long-term injury or illness from a concussion or sub-concussive event.

**ANSWER:**

The NCAA denies the allegations in Paragraph 155 and expressly denies that class

treatment of this claim is appropriate.

156.    Accordingly, the NCAA should be required to establish a medical monitoring program that includes, among other things:

    a.       Establishing a trust fund, in an amount to be determined, to pay for the medical monitoring of all past, current and future NCAA student-athletes, as frequently and appropriately as necessary;

    b.       Notifying all Medical Monitoring Class members in writing that they may require frequent medical monitoring; and

    c.       Providing information to treating team physicians to aid them in detecting concussion or sub-concussions and to assist them in determining when the student-athlete is subjected to an increased risk of harm.

**ANSWER:**

The NCAA denies the allegations in Paragraph 156, further denies that Plaintiffs are entitled to any relief whatsoever, including but not limited to the relief requested in the Consolidated Complaint, and expressly denies that class treatment of this claim is appropriate.

157.    Plaintiffs and the Medical Monitoring Class have no adequate remedy at law in that monetary damages alone cannot compensate them for the risk of long-term physical and economic losses due to concussions and sub-concussive injuries. Without a Court-approved medical monitoring program as described herein, or established by the Court, Plaintiffs and the Medical Monitoring Subclass members will continue to face an unreasonable risk of injury and disability.

**ANSWER:**

The NCAA denies the allegations in Paragraph 157, further denies that Plaintiffs are entitled to any relief whatsoever, including but not limited to the relief requested in the Consolidated Complaint, and expressly denies that class treatment of this claim is appropriate.

## VII.   JURY DEMAND

158.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all claims in this Complaint so triable.

**ANSWER:**

The NCAA admits that Plaintiffs purport to seek a trial by jury of all claims in the Consolidated Complaint. Except as expressly admitted, the NCAA denies any and all remaining claims in Paragraph 158.

## VIII.   REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Classes, request judgment as follows:

A.      Certification of the proposed Classes pursuant to Federal Rules of Civil Procedure Rule 23(a), (b)(2) and (b)(3);

B.      Designation of Plaintiffs as representatives of the proposed Classes and designation of Plaintiffs' counsel as Class counsel;

C.      An award of compensatory damages, the amount of which is to be determined at trial;

D.      Injunctive relief requiring the NCAA, among other things, to adopt corrective measures regarding:

1.      The coaching of tackling methodologies or other sports plays that cause head injuries;

2.      The implementation of system-wide "return to play" guidelines for student-athletes who have sustained concussions;

3.      The implementation of system-wide guidelines for the screening and detection of head injuries; and

4.      The implementation of legislation addressing the treatment and eligibility of student-athletes who have sustained multiple concussions in the course of play.

E.      The establishment of a medical monitoring program that includes, among other things:

1.      Establishing a trust fund, in an amount to be determined, to pay for the medical monitoring of all past, current and future NCAA student-athletes, as frequently and appropriately as necessary;

2.      Notifying all Medical Monitoring Class members in writing that they may require frequent medical monitoring; and

3.      Providing information to treating team physicians to aid them in detecting concussion or sub-concussions and to assist them in determining when the player is subjected to an increased risk of harm.

F.      An award to the Plaintiffs and the Classes of prejudgment interest, costs and attorneys' fees; and

G.      An award to the Plaintiffs and Classes for such other and further relief as the Court deems just and proper.

**<u>ANSWER</u>:**

The NCAA denies that Plaintiffs are entitled to any relief whatsoever, including but not limited to the relief requested in the Consolidated Complaint. The NCAA expressly denies that class certification is appropriate, and further denies that any claims in this action are appropriate for class treatment. The NCAA denies any and all remaining allegations in the Paragraph entitled "Request for Relief."

<u>**AFFIRMATIVE DEFENSES**</u>

The NCAA's affirmative defenses to Plaintiffs' Consolidated Complaint are set forth below. By setting forth the following allegations and defenses, however, the NCAA does not assume the burden of proof on matters and issues other than those on which the NCAA bears the burden of proof as a matter of law.

<u>**FIRST AFFIRMATIVE DEFENSE**</u>

The Consolidated Complaint fails to state any claim upon which relief can be granted.

<u>**SECOND AFFIRMATIVE DEFENSE**</u>

The claims in Plaintiffs' Consolidated Complaint are barred, in whole or in part, because Plaintiffs and/or the members of the proposed classes voluntarily participated in sports at their respective colleges or universities, and assumed any and all risks inherent in the sports they

chose to play.

### THIRD AFFIRMATIVE DEFENSE

Upon information and belief, the claims in Plaintiffs' Consolidated Complaint are barred, in whole or in part, because Plaintiffs and/or the members of the proposed classes signed forms acknowledging the risks associated with concussions. In doing so, they expressly assumed the concussion risks associated with the sports they chose to play.

### FOURTH AFFIRMATIVE DEFENSE

The claims in Plaintiffs' Consolidated Complaint are barred, in whole or in part, under the contact sports exception to the ordinary standard of care.

### FIFTH AFFIRMATIVE DEFENSE

The claim in Plaintiffs' Consolidated Complaint for fraudulent concealment is barred, in whole or in part, because Plaintiffs have failed to plead that claim with particularity as required by Federal Rule of Civil Procedure 9(b).

### SIXTH AFFIRMATIVE DEFENSE

The claim in Plaintiffs' Consolidated Complaint for fraudulent concealment is barred, in whole or in part, because Plaintiffs cannot meet their burden of showing that any acts, conduct, statements or omissions on the part of the NCAA were likely to mislead.

### SEVENTH AFFIRMATIVE DEFENSE

The claim in Plaintiffs' Consolidated Complaint for fraudulent concealment is barred, in whole or in part, because the information the NCAA allegedly concealed was publicly available.

### EIGHTH AFFIRMATIVE DEFENSE

The claim in Plaintiffs' Consolidated Complaint for fraudulent concealment is barred, in whole or in part, because Plaintiffs and/or members of the proposed classes were not actually

misled or deceived by and/or did not rely upon any statements or omissions on the part of the NCAA in deciding whether to participate in sports at their respective colleges or universities.

### NINTH AFFIRMATIVE DEFENSE

The claims of Plaintiffs and/or one or more members of the proposed classes are time-barred under the applicable statutes of limitations.

### TENTH AFFIRMATIVE DEFENSE

Plaintiffs and/or persons claiming to be members of the proposed classes are barred from recovery, in whole or in part, because their injuries resulted from the intervening cause of another party.

### ELEVENTH AFFIRMATIVE DEFENSE

The claims of Plaintiffs and/or one or more members of the proposed classes are barred, in whole or in part, to the extent that any injury sustained by Plaintiffs and/or members of the proposed classes was caused by their own conduct, whether negligent or otherwise.

### TWELFTH AFFIRMATIVE DEFENSE

The claim in Plaintiffs' Consolidated Complaint for unjust enrichment is barred, in whole or in part, to the extent that no direct benefit was conferred upon the NCAA and/or Plaintiffs and/or the members of the proposed classes did not reasonably expect to be compensated for playing college sports.

### THIRTEENTH AFFIRMATIVE DEFENSE

The claim in Plaintiffs' Consolidated Complaint for unjust enrichment is barred, in whole or in part, to the extent that applicable state law does not recognize a claim for unjust enrichment.

## FOURTEENTH AFFIRMATIVE DEFENSE

The claim in Plaintiffs' Consolidated Complaint for medical monitoring is barred, in whole or in part, to the extent that applicable state law does not recognize a claim for medical monitoring.

## FIFTEENTH AFFIRMATIVE DEFENSE

The claims in Plaintiffs' Consolidated Complaint for equitable relief are barred, in whole or in part, by the fact that Plaintiffs and/or the members of the proposed classes have an adequate remedy at law.

## SIXTEENTH AFFIRMATIVE DEFENSE

The claims in Plaintiffs' Consolidated Complaint are barred, in whole or in part, to the extent that Plaintiffs and/or members of the proposed classes did not actually sustain a concussion and therefore suffered no injury.

## SEVENTEENTH AFFIRMATIVE DEFENSE

The claims in Plaintiffs' Consolidated Complaint are not properly maintained as a class action, because the requirements for class certification under federal law have not been met.

## EIGHTEENTH AFFIRMATIVE DEFENSE

The claims in Plaintiffs' Consolidated Complaint are not properly maintained as a class action, because certification of the proposed classes would result in a denial of due process to the NCAA as well as to members of the proposed classes, including, *inter alia*, by violating due process through applying the law of select jurisdictions to a nationwide class.

## NINETEENTH AFFIRMATIVE DEFENSE

The claims in Plaintiffs' Consolidated Complaint are not appropriate for class treatment because the claims necessarily turn on individual issues, including, but not limited to: (i) each

Plaintiff's and/or class member's individual knowledge regarding the risk of concussions inherent in the sport he/she played; (ii) the causes of each Plaintiff's and/or class member's alleged injury; and (iii) each Plaintiff's and/or class member's alleged reliance on the NCAA's alleged misrepresentations.

### TWENTIETH AFFIRMATIVE DEFENSE

This action is not appropriate for class treatment because the claims in Plaintiffs' Consolidated Complaint necessarily revolve around factors, parties and circumstances outside the control of the NCAA.

### TWENTY-FIRST AFFIRMATIVE DEFENSE

If Plaintiffs and/or persons claiming to be members of the proposed classes have delayed in bringing their claims, they may be barred from recovery, in whole or in part, by the doctrines of waiver or laches.

### TWENTY- SECOND AFFIRMATIVE DEFENSE

The claims of Plaintiffs and/or members of the proposed classes may be barred, in whole or in part, because they have made statements and/or taken actions that estop them from asserting their claims.

### TWENTY- THIRD AFFIRMATIVE DEFENSE

The claims of Plaintiffs and/or members of the proposed classes may be barred, in whole or in part, to the extent they have failed to mitigate damages.

### TWENTY- FOURTH AFFIRMATIVE DEFENSE

Plaintiffs and/or members of the proposed classes may be barred from recovery, in whole or in part, if in this or other tribunals they have brought actions and have received judgments or awards on some or all claims asserted herein.

### TWENTY- FIFTH AFFIRMATIVE DEFENSE

The claims of Plaintiffs and/or members of the proposed classes are barred by the doctrines of collateral estoppel and/or *res judicata*.

### TWENTY- SIXTH AFFIRMATIVE DEFENSE

If in this or other tribunals Plaintiffs and/or members of the proposed classes have settled, or are in the process of settling, the same or similar claims to those alleged in the Consolidated Complaint, they may be barred from recovery, in whole or in part, by such settlements.

### TWENTY- SEVENTH AFFIRMATIVE DEFENSE

Plaintiffs and their counsel have failed to join as parties to this action all persons and entities who would be necessary parties for the adjudication of the claims of Plaintiffs and/or members of the proposed classes.

### TWENTY- EIGHTH AFFIRMATIVE DEFENSE

If any persons claiming to be members of the proposed classes have released claims, they may be barred from recovery, in whole or in part, by such releases.

### TWENTY- NINTH AFFIRMATIVE DEFENSE

The proposed defendant class Plaintiffs seek to certify is not appropriate for class treatment because certification of the proposed class would violate the due process rights of its members.

### THIRTIETH AFFIRMATIVE DEFENSE

If any persons claiming to be members of the proposed classes engaged in unlawful, inequitable or improper conduct, they may be barred from recovery, in whole or in part.

### THIRTY-FIRST AFFIRMATIVE DEFENSE

Plaintiffs' Consolidated Complaint and the causes of action alleged therein are barred to

the extent that Plaintiffs lack standing.

## THIRTY-SECOND AFFIRMATIVE DEFENSE

The NCAA has insufficient knowledge or information upon which to form a belief as to whether it may have additional affirmative defenses that govern the claims asserted by Plaintiffs and on behalf of the persons claimed to be members of the proposed classes.  The NCAA, therefore, reserves the right to raise additional defenses as appropriate.

WHEREFORE, the NCAA prays:

(a) That Plaintiffs and all members of the proposed classes take nothing by reason of this suit;

(b) For attorneys' fees and costs;

(c) That the certification of all proposed classes herein be denied; and

(d) For any other and further relief as the Court deems just and proper.


Dated:  December 21, 2011                    Respectfully submitted,

By: /s/ B. John Casey                    
     Attorneys for Defendant

     Sean M. Berkowitz
     Mark S. Mester
     B. John Casey
     Johanna M. Spellman
     LATHAM & WATKINS LLP
     233 South Wacker Drive, Suite 5800
     Chicago, IL  60606
     (312) 876-7700
     john.casey@lw.com
     mark.mester@lw.com
     sean.berkowitz@lw.com
     johanna.spellman@lw.com