UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ADRIAN ARRINGTON, DEREK OWENS, ANGELICA PALACIOS, and KYLE SOLOMON, individually and on behalf of all others similarly situated, | Case No. 11-cv-06356 |
| | Hon. John Z. Lee |
| Plaintiffs, | Magistrate Judge Brown |
| v. | **JURY DEMAND** |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, | |
| Defendant. | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR CLASS CERTIFICATION**

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................................1

II.    SUMMARY OF FACTS ........................................................................................3

     A.    The NCAA Regulates All Aspects of College Sports, Including
           Player Safety ...........................................................................................3

     B.    As Early as 2002, the Scientific and Medical Communities Reached
           a Consensus on Concussion-Management and Return-to-Play
           Guidelines ...............................................................................................6

     C.    As Early as 2004, the NCAA Knew of Thousands of Concussions
           Across a Wide Spectrum of Sports, Yet the NCAA Decided Not to
           Follow the Scientific and Medical Consensus on Concussion-
           Management and Return-to-Play Guidelines............................................7

     D.    Plaintiffs Have Suffered Permanent Injuries as a Result of the
           NCAA's Failure to Follow the Scientific and Medical Consensus on
           Concussion-Management and Return-to-Play Guidelines.......................12

     E.    Dr. Cantu Has Designed a Medical-Monitoring Program for Present
           and Former Student-Athletes to Assess Whether They Suffer from
           Post-Concussion Syndrome ...................................................................14

III.    ARGUMENT .....................................................................................................15

     A.    Rule 23 Was Designed to Facilitate Aggregating Common Claims
           and Issues ..............................................................................................15

     B.    The Court Should Certify a Rule 23(b)(2) Negligence/Medical-
           Monitoring Class...................................................................................16

           1.    Plaintiffs satisfy all four Rule 23(a) requirements. ....................16

                    a.    Rule 23(a)(1): Joining all members of the Class is
                            impracticable...................................................................17

                    b.    Rule 23(a)(2): There are questions of law and fact
                            common to the Class.......................................................17

                    c.    Rule 23(a)(3): Plaintiffs' claims are typical of those
                            of the Proposed Class.....................................................20

        d.      Rule 23(a)(4): Plaintiffs and Class Counsel will fairly and adequately protect the interests of the proposed Class. ....................................................................................21

             (1)     Plaintiffs' interests do not conflict with the Class. ......................................................................21

             (2)     Plaintiffs' counsel are qualified. ........................................27

    2.     The proposed Class is ascertainable because membership criteria are objective and require documentation of concussion symptoms. ................................................................27

    3.     The proposed Class satisfies Rule 23(b)(2), because the NCAA has acted on grounds generally applicable to the entire Class, making final injunctive and declaratory relief appropriate with respect to the Class as a whole. ....................................28

  C.    The Proposed Core-Issues Class Satisfies Rule 23(b)(3) and (c)(4) Because Resolving Common Liability Issues Will Advance Disposition of the Entire Litigation .......................................................30

    1.     Under Rule 23(c)(4), courts certify issues common to class members' claims while reserving individual questions for individual determinations. ...........................................................30

    2.     A Core-Issues class easily satisfies Rule 23(a)'s requirements. .............................................................................32

    3.     A Core-Issues Class also satisfies Rule 23(b)(3). .....................................33

IV.    CONCLUSION ...................................................................................................35

010270-11  606955 V1

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Acik v. I.C. Sys.,
  251 F.R.D. 332 (N.D. Ill. 2008) .................................................................................16

Allen v. Int'l Truck & Engine Corp.,
  358 F.3d 469 (7th Cir. 2004) .....................................................................................32

Amchem Prods., Inc. v. Windsor,
  521 U.S. 591 (1997) .......................................................................................15, 21, 22

Anderson v. Cornejo,
  199 F.R.D. 228 (N.D. Ill. 2000) .................................................................................22

Apparel Art Int'l v. Amertex Enters.,
  48 F.3d 576 (1st Cir. 1995) ........................................................................................25

Arreola v. Godinez,
  546 F.3d 788 (7th Cir. 2008) .....................................................................................32

Blackwelder v. Millman,
  522 F.2d 766 (4th Cir. 1975) .....................................................................................25

Bowers v. NCAA,
  974 F. Supp. 459 (D.N.J. 1997) ...................................................................................3

Brown v. Yellow Transp., Inc.,
  2011 U.S. Dist. LEXIS 52345 (N.D. Ill. May 11, 2011) ..........................................16

Browning v. Levy,
  283 F.3d 761 (6th Cir. 2002) .....................................................................................25

Carnegie v. Household Int'l, Inc.,
  376 F.3d 656 (7th Cir. 2004) ................................................................................31, 32

Cater v. Cater,
  846 S.W.2d 173 (Ark. 1993) ......................................................................................25

Central States, Southeast & Southwest Areas Pension Fund v. Hunt Truck Lines, Inc.,
  296 F.3d 624 (7th Cir. 2002) .....................................................................................25

Comcast Corp. v. Behrend,
  133 S. Ct. 1426 (2013) ...............................................................................................32

Craft v. Vanderbilt Univ.,
  174 F.R.D. 396 (M.D. Tenn. 1996) ............................................................................30

*Crowder v. Lash,*
  687 F.2d 996 (7th Cir. 1982) ...............................................................................24

*D&K Props. Crystal Lake v. Mutual Life Ins. Co.,*
  112 F.3d 257 (7th Cir. 1997) ...............................................................................25

*Day v. NLO,*
  144 F.R.D. 330 (S.D. Ohio 1992)........................................................................30

*De La Fuente v. Stokely-Van Camp, Inc.,*
  713 F.2d 225 (7th Cir. 1983) .........................................................................18, 20

*DiTrolio v. Antiles,*
  662 A.2d 494 (N.J. 1995)....................................................................................25

*Dunn v. City of Chicago,*
  231 F.R.D. 367 (N.D. Ill. 2005)..........................................................................18

*Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130,*
  657 F.2d 890 (7th Cir. 1981) ...............................................................................18

*Eisen v. Carlisle,*
  417 U.S. 156 (1974) .............................................................................................16

*Espenscheid v. DirectSat USA, LLC,*
  688 F.3d 872 (7th Cir. 2012) ...............................................................................22

*Galvan v. NCO Fin. Sys.,*
  2012 U.S. Dist. LEXIS 128592 (N.D. Ill. Sept. 11, 2012) ..................................32

*General Tel. Co. of S.W. v. Falcon,*
  457 U.S. 147 (1982).............................................................................................15

*George v. Kraft Foods Global, Inc.,*
  2011 U.S. Dist. LEXIS 124210 (N.D. Ill. Oct. 25, 2011).....................................32

*Gooch v. Life Investors Ins. Co. of Am.,*
  672 F.3d 402 (6th Cir. 2012) ...............................................................................22

*Gunnells v. Healthplan Servs.,*
  348 F.3d 417 (4th Cir. 2003) ...............................................................................24

*Guzowski v. Hartman,*
  849 F.2d 252 (6th Cir. 1988) ...............................................................................25

*Harris v. General Dev. Corp.,*
  127 F.R.D. 655 (N.D. Ill. 1989)...........................................................................21

*Hiser v. Franklin*,
    94 F.3d 1287 (9th Cir. 1996) ............................................................................24

*Hudson v. City of Chicago*,
    242 F.R.D. 496 (N.D. Ill. 2007) ................................................................18, 20

*In re "Agent Orange" Prod. Liab. Litig.*,
    818 F.2d 145 (2d Cir. 1987) ............................................................................34

*In re Allstate Ins. Co.*,
    400 F.3d 505 (7th Cir. 2005) ..........................................................................32

*In re Energy Cooperative, Inc.*,
    814 F.2d 1226 (7th Cir. 1987) ........................................................................25

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    574 F.3d 29 (2d Cir. 2009) ..............................................................................22

*In re Folding Carton Antitrust Litig.*,
    75 F.R.D. 727 (N.D. Ill. 1977) .......................................................................15

*In re Nassau Cnty. Strip Search Cases*,
    461 F.3d 219 (2d Cir. 2006) ............................................................................32

*In re Paige*,
    610 F.3d 865 (5th Cir. 2010) ..........................................................................25

*In re Visa Check/MasterMoney Antitrust Litig.*,
    280 F.3d 124 (2d Cir. 2001) ............................................................................32

*In re Vitamin C Antitrust Litig.*,
    279 F.R.D. 90 (E.D.N.Y. 2012) .....................................................................25

*Jablonski v. Riverwalk Holdings, Ltd.*,
    2012 U.S. Dist. LEXIS 82846 (N.D. Ill. June 14, 2012) ...............................16

*Jahn v. ORCR, Inc.*,
    92 P.3d 984 (Colo. 2004) ................................................................................25

*Jamie S. v. Milwaukee Pub. Schs.*,
    668 F.3d 481 (7th Cir. 2012) ..........................................................................17

*Kartman v. State Farm Mut. Auto. Ins. Co.*,
    634 F.3d 883 (7th Cir. 2011) ..........................................................1, 28, 29, 30

*Keele v. Wexler*,
    149 F.3d 589 (7th Cir. 1998) ..........................................................................20

*Leib v. Rex Energy Operating Corp.*,
 2008 U.S. Dist. LEXIS 102847 (S.D. Ill. Dec. 19, 2008)..................................................24, 25

*Lemon v. International Union of Operating Eng'rs, Local No. 139*,
 216 F.3d 577 (7th Cir. 2000) ..........................................................................................28, 29

*Mace v. Van Ru Credit Corp.*,
 109 F.3d 338 (7th Cir. 1997) ................................................................................................15

*Maher v. GSI Lumonics, Inc.*,
 433 F.3d 123 (1st Cir. 2005)..................................................................................................25

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
 256 F.R.D. 586 (N.D. Ill. 2009).............................................................................................24

*Markham v. White*,
 171 F.R.D. 217 (N.D. Ill. 1997)............................................................................................18

*Marshall v. H&R Block Tax Servs.*,
 270 F.R.D. 400 (S.D. Ill. 2010) ............................................................................................21

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
 672 F.3d 482 (7th Cir.), *cert. denied*, 133 S. Ct. 338 (2012)................................30, 31, 32, 35

*Mejdrech v. Met-Coil Sys. Corp.*,
 319 F.3d 910 (7th Cir. 2003) ....................................................................................2, 31, 34

*Mountain Pure, LLC v. Turner Holdings, LLC*,
 439 F.3d 920 (8th Cir. 2006) ................................................................................................25

*N.B. v. Hamos*,
 2012 U.S. Dist. LEXIS 74284 (N.D. Ill. May 30, 2012) ........................................................15

*Olson v. Brown*,
 594 F.3d 577 (7th Cir. 2010) ................................................................................................16

*Oshana v. Coca-Cola Co.*,
 472 F.3d 506 (7th Cir. 2006) ..........................................................................................20, 27

*Phillips Petroleum Co. v. Shutts*,
 472 U.S. 797 (1985)...............................................................................................................15

*R&J Holding Co. v. Redevelopment Auth.*,
 670 F.3d 420 (3d Cir. 2011), *cert. denied*, 132 S. Ct. 2792 (2012)........................................25

*Retired Chicago Police Ass'n v. City of Chicago*,
 7 F.3d 584 (7th Cir. 1993) ....................................................................................................16

*Robinson v. Toyota Motor Credit Corp.*,
   201 Ill. 2d 403 (Ill. 2002) ................................................................................25

*Rosario v. Livaditis*,
   963 F.2d 1013 (7th Cir. 1992) ........................................................................18

*Ross v. Joseph J. Hoffman, Inc.*,
   1989 Me. Super. LEXIS 234 (Me. Super. Ct. Nov. 13, 1989) ................................25

*Rowe v. E.I. Dupont De Nemours & Co.*,
   2008 U.S. Dist. LEXIS 103528 (D.N.J. Dec. 23, 2008) ........................................24

*Sadler v. Midland Credit Mgmt., Inc.*,
   2008 U.S. Dist. LEXIS 51198 (N.D. Ill. July 3, 2008) ..........................................28

*Sadler v. Midland Credit Mgmt., Inc.*,
   2009 U.S. Dist. LEXIS 26771 (N.D. Ill. Mar. 31, 2009) ........................................28

*Schleicher v. Wendt*,
   618 F.3d 679 (7th Cir. 2010) ..........................................................................16

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
   559 U.S. 393, 130 S. Ct. 1431 (2010) ..............................................................16

*Spano v. Boeing Co.*,
   633 F.3d 574 (7th Cir. 2011) ..........................................................................18

*Spitznas v. Boone*,
   464 F.3d 1213 (10th Cir. 2006) ......................................................................25

*Srail v. Village of Lisle*,
   249 F.R.D. 544 (N.D. Ill. 2008) ......................................................................22

*Stolberg v. Members of Bd. Of Trustees for the State Colleges*,
   541 F.2d 890 (2d Cir. 1976) ..........................................................................25

*Tardiff v. Knox Cnty.*,
   365 F.3d 1 (1st Cir. 2004) ..............................................................................32

*Valentino v. Carter-Wallace, Inc.*,
   97 F.3d 1227 (9th Cir. 1996) ..........................................................................32

*Valley Drug Co. v. Geneva Pharms., Inc.*,
   350 F.3d 1181 (11th Cir. 2003) ......................................................................22

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011) ........................................................................16, 17, 18

*Yslava v. Hughes Aircraft Co.*,
   845 F. Supp. 705 (D. Ariz. 1993) ........................................................................30

## OTHER AUTHORITIES

6 Alba Conte & Herbert B. Newberg, NEWBERG ON CLASS ACTIONS § 18:14
   (4th ed. 2002) ......................................................................................................22

5 MOORE'S FEDERAL PRACTICE § 23.86[2]...................................................................32

18 MOORE'S FEDERAL PRACTICE § 131.40[3][e][iii] (2002) ......................................24

6 NEWBERG ON CLASS ACTIONS § 18:7 ........................................................................32

18 Wright, Miller & Cooper, FEDERAL PRACTICE AND PROCEDURE § 4413 (1981)................26, 27

Barbara J. Rothstein & Thomas E. Willging, MANAGING CLASS ACTION LITIGATION: A
   POCKET GUIDE FOR JUDGES 10 (2d ed. 2009) ..........................................................30

7AA FEDERAL PRAC. & PROC. § 1790 ...........................................................................32

MANUAL FOR COMPLEX LITIGATION § 21.24 (4th ed. 2004) ........................................30

MANUAL FOR COMPLEX LITIGATION § 22.74 (4th ed. 2004) ........................................30

RESTATEMENT (2D) OF JUDGMENTS § 26 ¶ 1(b) (1982) .................................................26

## I.     INTRODUCTION

Defendant NCAA owed a uniform duty to each student-athlete Plaintiff and Class Member: to safeguard their health and safety by ensuring colleges conduct their athletic programs in a manner designed to "provide a safe environment" and "to protect and enhance" their athletes' "physical and educational well-being." The NCAA breached this duty to student-athletes in contact sports, which produced more than 30,000 concussions at NCAA colleges in just 2004-2009. The NCAA was obliged to promulgate and enforce rules for best practices for managing concussions. The NCAA ignored its obligation, publishing substandard guidelines and negligently failing to adopt best practices that had been adopted by a consensus of medical and scientific authorities studying proper concussion management.

Rather than adopt and enforce a proper concussion-management plan, the NCAA delegated this duty to its members even when the NCAA knew those institutions were not providing adequate concussion-management care. The NCAA knew that 60% of its schools did not provide baseline testing, less than 50% required a concussed athlete to see a doctor, and half of its members allowed a concussed athlete to return to play in the same game. Such practices violate the consensus standard for concussion treatment. Tens-of-thousands of athletes have hence been concussed or received brain trauma from the accumulation of subconcussive hits, not received proper treatment, and may be suffering today from cognitive deficits, seizures, pain, memory loss, and other long-term neurological injuries.

Plaintiffs and the Class seek medical-monitoring relief for the purposes of diagnosing post-concussion syndrome. The Seventh Circuit recognizes the court-administered medical-monitoring program that Plaintiff seeks here as Rule (b)(2)-appropriate injunctive relief.[1] *See infra* at 28-30. The 23(b)(2) Negligence/Medical-Monitoring Class must also satisfy Rule

---

[1] *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 894 (7th Cir. 2011).

23(a)(1)-(4). Regarding 23(a)(1), the class, which numbers in the tens-of-thousands, is sufficiently numerous that joinder is impracticable. Rule 23(a)(2) requires that questions of law or fact be common to the class, and that the common question(s) are central to each Class Member's claim. Commonality is easily met here; each Class Member's negligence claim arises from the NCAA's uniform refusal to adopt best practices for concussion management and poses the same legal and factual issues. To satisfy (a)(3)'s typicality requirement, Plaintiffs' claims must arise from the same course of conduct as the Class Members' claims. The NCAA's misconduct injured Plaintiffs in precisely the same manner as the absent Class Members. Plaintiffs' interests do not conflict with the Class Members', and their chosen counsel are qualified to represent the Class, as Rule 23(a)(4) requires. *See infra* at 16-27.

The proposed Negligence/Medical-Monitoring Class is also ascertainable, that is, identifiable as a class without "daunting" individual inquiries. The Class is generally defined as all male and female players listed on a team roster in the contact sports of football, wrestling, basketball, field hockey, ice hockey, lacrosse, or soccer, at any NCAA institution in any of the 18 listed jurisdictions during the period from 2004 to the present. *See infra* at 27.

Plaintiffs also seek certification of common liability questions under Rules 23(b)(3) and (c)(4), which allow courts to certify common issues only, where doing so would advance disposition of the entire litigation. The Seventh Circuit embraces certifying common liability questions under 23(c)(4) when the entire claim cannot be certified due to the need for individualized damages determinations.[2] Here again, the NCAA's refusal to enact and enforce best practices for concussion management breached the same duties and affected all Plaintiffs and Class Members similarly. Regardless of whatever individualized issues may exist as to damages or medical-monitoring relief, determining common issues of liability will advance this litigation by elimina-

---

[2] *See, e.g.*, *Mejdrech v. Met-Coil Sys. Corp.*, 319 F.3d 910, 911 (7th Cir. 2003).

010270-11  606955 V1

ting the need to litigate the same liability issues repeatedly in potentially thousands of individual lawsuits against NCAA. This proposed Core-Issues Class would include all present or former students listed on a college team roster at any NCAA institution in any state (and the District of Columbia) during the period 2004 through the present who participated in the contact sports of football, wrestling, basketball, field hockey, ice hockey, lacrosse, or soccer. *See infra* at 30-35.

Both the Negligence/Medical-Monitoring Class and the Core-Issues Class will rely on common proof consisting of the expert report of Dr. Robert C. Cantu, and a common set of facts derived from the NCAA's own documents that apply to each Plaintiff and Class Member.[3] This common proof establishes that the NCAA acted in an identical manner as to each Plaintiff and Class Member. The NCAA, neglecting promises in its constitution and by-laws to provide a safe sports environment, failed to adopt the consensus best practices on concussion management. *See infra* at 3-12.

## II. SUMMARY OF FACTS

### A. The NCAA Regulates All Aspects of College Sports, Including Player Safety

College athletics at NCAA member institutions are tightly regulated by the NCAA Constitution, Operating Bylaws, and Administrative Bylaws. These rules govern in great detail all matters relating to athletic events, including player well-being and safety, playing time and practice rules for each sport, contest rules, amateurism, recruiting, eligibility, and scholarships.

The NCAA Constitution, Bylaws, and other legislative policies are contained within the annually updated and published NCAA Manual.[4] The NCAA promulgates sport-specific standards through its Playing-Rules Committees, which write the rules for 15 of the 23 men's

---

[3] This proof is submitted in the accompanying Proffer of Common Facts in Support of Motion for Class Certification ("Proffer").

[4] *See Bowers v. NCAA*, 974 F. Supp. 459, 461 (D.N.J. 1997) (explaining NCAA Governing legislation).

and women's sports that it regulates.[5]

The NCAA also publishes a *Sports Medicine Handbook*, which includes policies and guidelines for the treatment and prevention of injury and return to play. This handbook is also produced annually, delivered to head athletic trainers, and made available online to the athletic trainer staff and student-athletes.[6]

The NCAA Constitution defines the NCAA's purposes and fundamental policies to include maintaining control over and responsibility for intercollegiate sports and student-athletes. Among those purposes: "(a) To initiate, stimulate and improve intercollegiate athletics programs for student athletes[; and] (b) to uphold the principal of institutional control of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this association ...."[7] A "Fundamental Policy" requires "Member institutions ... to apply and enforce this legislation, and the enforcement procedures of the Association shall be applied to an institution when it fails to fulfill this obligation."[8]

Article 2.2 of the NCAA Constitution specifically governs the "Principle of Student-Athlete Well-Being" and provides that "Intercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well-being of student-athletes." Article 2.2.3 assigns "responsibility ... to protect the health of, and provide a safe environment for, each of its participating student-athletes of each member institution ...." To aid member institutions, the NCAA Constitution promises that "[t]he Association shall assist the

---

[5] Declaration of Steve W. Berman in Support of Plaintiffs' Motion for Class Certification ("Berman Decl."), Ex. 6 (NCAA, *Playing Rules Overview*, http://web.archive.org/web/20120705172330/https://www.ncaa.org/wps/wcm/connect/public/test/issues/playing+rules+overview (last visited July 19, 2013) (defining "playing rules" as "[r]ules that govern competition between institutions in NCAA-sponsored sports")).

[6] Berman Decl., Ex. 63 (NCAA00007589-7710, at NAA00007590).

[7] Proffer, ¶ 11 (NCAA Const., Art.1, § 1.2(a),(b)); Second Amended Complaint ("SAC") ¶ 94.

[8] Proffer, ¶ 11 (citing NCAA Const., Art. 1, § 1.3.2); SAC ¶ 94.

institution in its efforts to achieve full compliance with all rules and regulations…."[9]

Other NCAA pronouncements have consistently recognized the duty to provide student-athletes a safe environment. For example, the NCAA's website states: "Part of the NCAA's core mission is to provide student-athletes with a competitive environment that is safe and ensures fair play. While each school is responsible for the welfare of its student-athletes, the NCAA provides leadership by establishing safety guidelines, playing rules, equipment standards, drug testing procedures and research into the cause of injuries to assist decision making. By taking proactive steps to student-athletes' health and safety, we can help them enjoy a vibrant and fulfilling career."[10] As recently as August 27, 2012, the website announced that the "NCAA takes appropriate steps to modify safety guidelines, playing rules and standards to minimize those risks and provide student athletes with the best opportunity to enjoy a healthy career. …[W]e can provide athletes with a safe competitive environment."[11]

The NCAA also maintains the Committee on Safeguards and Medical Aspects of Sports, which the NCAA publicly touts as "serv[ing] to provide expertise and leadership to the NCAA in order to provide a healthy and safe environment for student-athletes through research, education, collaboration and policy development."[12]

Contrary to these touted policies, the NCAA did not prioritize a safe environment for student-athletes, as demonstrated below and in Plaintiffs' Fact Proffer. Instead, and in direct contravention of the obligations it assumed to protect athletes, the NCAA refused to follow the scientific and medical consensus on concussion-management and return-to-play guidelines. The

---

[9] Proffer, ¶ 14 (citing NCAA Const., Art. 2, § 2.8.2); SAC ¶ 97.

[10] Proffer, ¶ 15 (citing http://www.ncaa.org/wps/wcm/connect/public/NCAA/Health+and+Safety/index.html (last visited Jan. 31, 2013)); SAC ¶ 98.

[11] Proffer, ¶ 17; SAC ¶100.

[12] Proffer, ¶ 16; SAC ¶ 99.

foreseeable result:  a surge in concussion-related injuries in contact sports that has left many current and former students with debilitating brain injuries.

**B.      As Early as 2002, the Scientific and Medical Communities Reached a Consensus on Concussion-Management and Return-to-Play Guidelines**

The November 2001 International Symposium on Concussion in Sport ("Vienna Conference") resulted in the 2002 publication of a "consensus statement" that was "a comprehensive systematic approach to concussion to aid the injured athlete and direct management decisions" (the "*Vienna Protocol*").[13] The *Vienna Protocol* was intended to "be widely applicable to sport related concussion" and was "developed for use by doctors, therapists, health professionals, coaches, and other people involved in the care of injured athletes, whether at the recreational, elite, or professional level." The *Vienna Protocol* recommended specific return-to-play guidelines, baseline testing, neuropsychological testing, sideline testing, and concussion education,[14] including:

> [A]thletes suffering concussion symptoms should never be returned to play in the same game, and that coaches, players, trainers and physicians should follow a systematic return to play policy that includes systematic and graded return to exertion following injury, systematic reevaluation of symptoms following each exertional state, and a collective understanding that the patient is completely asymptomatic at rest, asymptomatic with exertion, and has intact neurocognitive performance prior to final clearance.[15]

Echoing this consensus, the National Athletic Trainers Association ("NATA") published

---

[13] Report of Dr. Robert Cantu, § VII.B.1, filed contemporaneously herewith ("Cantu Report"); Proffer, ¶ 60 (citing M. Aubry, R. Cantu, J. Dvorak, et al., *Summary and Agreement Statement of First International Conference on Concussion in Sport, Vienna 2001*, BRIT. J. SPORTS MED, Feb. 2002 ("*Aubry et al*")).

[14] Proffer, ¶ 60 (citing *Aubry et al* at 6, 9; Cantu Report, § VIII.B.1).

[15] Cantu Report, ¶¶ 21, 100-106.

an extensive position statement in 2004 about concussion management.[16]  It required that an

athletic trainer or team physician monitor a concussed athlete at five-minute intervals from the

time of the injury until the athlete's condition completely clears or the athlete is referred for

further care, and that the trainer should refer the athlete to a physician on the day of the injury if

the athlete experienced any of the following symptoms:[17]

| Day-of-injury referral | |
|---|---|
| 1. Loss of consciousness on the field | 14. Motor deficits subsequent to initial on-field assessment |
| 2. Amnesia lasting longer than 15 min | 15. Sensory deficits subsequent to initial on-field assessment |
| 3. Deterioration of neurologic function* | 16. Balance deficits subsequent to initial on-field assessment |
| 4. Decreasing level of consciousness* | 17. Cranial nerve deficits subsequent to initial on-field assessment |
| 5. Decrease or irregularity in respirations* | 18. Postconcussion symptoms that worsen |
| 6. Decrease or irregularity in pulse* | 19. Additional postconcussion symptoms as compared with those on the field |
| 7. Increase in blood pressure | 20. Athlete is still symptomatic at the end of the game (especially at high school level) |
| 8. Unequal, dilated, or unreactive pupils* | |
| 9. Cranial nerve deficits | |
| 10. Any signs or symptoms of associated injuries, spine or skull fracture, or bleeding* | Delayed referral (after the day of injury) |
| 11. Mental status changes: lethargy, difficulty maintaining arousal, confusion, or agitation* | 1. Any of the findings in the day-of-injury referral category |
| | 2. Postconcussion symptoms worsen or do not improve over time |
| 12. Seizure activity* | 3. Increase in the number of postconcussion symptoms reported |
| 13. Vomiting | 4. Postconcussion symptoms begin to interfere with the athlete's daily activities (ie, sleep disturbances or cognitive difficulties) |

*Requires that the athlete be transported immediately to the nearest emergency department.

C.    **As Early as 2004, the NCAA Knew of Thousands of Concussions Across a Wide Spectrum of Sports, Yet the NCAA Decided Not to Follow the Scientific and Medical Consensus on Concussion-Management and Return-to-Play Guidelines**

Using injury-surveillance data from member schools, the NCAA has tracked the

concussion incidences at member institutions.  That data show an estimated 29,225 concussions

in NCAA Sports from 2004-09. According to the NCAA's Director of Health and Safety in

2010, concussions are "a concern across all the sports."[18]

The concern was evident as early as 2004, when the injury-surveillance system

---

[16] Proffer, ¶ 61 (citing Kevin M. Guskiewicz, Scott L. Bruce, Robert C. Cantu, et al., *National Athletic Trainers' Association Position Statement: Management of Sport-Related Concussion*, 39 J. ATHLETIC TRAINING, 280-97 (Sept. 2004)); *see also* Cantu Report, § VII.B.2.

[17] Cantu Report, ¶ 23.

[18] Proffer, ¶ 46 (citing NCAA00014606-09).

documented a game concussion rate in football of 3.96, which is very high one concussion per every four games for a team of 60 participants. In women's soccer, 14% of all reported game injuries were concussions. For men's soccer, concussions accounted for 6.3% of game injuries and, for field hockey, 7% of all game injuries.[19]

The NCAA's knowledge about the frequency of concussions among its student-athletes was amplified in 2007 as a result of a series of articles co-authored by the NCAA's Randy Dick and published in the *Journal of Athletic Training*. Dick reviewed the NCAA's injury-surveillance data from 1988-89 to 2003-04 to identify potential areas for injury-prevention initiatives. His findings included the following:[20]

| Sport | Commonality of Concussions |
|---|---|
| Men's Basketball | Fourth most common game and eighth most common practice injury. |
| Women's Field Hockey | Third most common game injury and ninth most common practice injury. |
| Men's Football | Third most common game injury, fourth most common Fall and Spring practice injury, and eighth most common practice injury. |
| Women's Gymnastics | Sixth most common game and eighth most common practice injury. |
| Men's Ice Hockey | Second most common game and fourth most common practice injury, and a "significant concern in ice hockey." |
| Women's Ice Hockey | The *most* common game and practice injury, with the upward trend in concussions "of great concern." |
| Men's Lacrosse | Third most common game and fifth most common practice injury. |
| Women's Lacrosse | Third most common game and sixth most common practice injury. |
| Men's Soccer | Fifth most common game and eleventh most common practice injury and continued "to be a prominent concern." |
| Women's Soccer | Third most common game and seventh most common practice injury, adding that "[t]hese results are not surprising and that "concussions continue to be a concern during games." |
| Women's Softball | Third most common game and ninth most common practice injury. |
| Women's Volleyball | Fifth most common game and fourteenth most common practice injury. |
| Men's Wrestling | Fourth most common game and sixth most common practice injury. |

---

[19] Proffer, ¶ 40. The NCAA admits that the data underestimates the number of concussions because "[a]thletes may not report their symptoms for fear of losing playing time." *Id.* at ¶ 40 n.64 (citing NCAA00007931); *see also id.* (citing NCAA00007854-55, at 54).

[20] Proffer, ¶ 45.

Despite the *Vienna Protocol*, the NATA Position Statement reflecting the consensus best practice, and the NCAA's knowledge of the prevalence of concussions in contact sports, the NCAA did *not* materially revise its applicable concussion-management rules.[21] The NCAA did not require that all teams have physicians or that referrals to physicians be made. The NCAA's failure to require physician involvement or to require that an athlete with concussion symptoms be seen by medical personnel experienced in concussion management breached consensus best practices.

The *Vienna Protocol* establishes neuropsychological testing as a "cornerstone" of appropriate concussion management, which contributes significantly to both understanding the injury and managing the individual. Neuropsychological testing is especially critical in student-athletes because they may have a proclivity to minimize symptoms – whether because of pressure from a coach, to save their spot on the roster, or to protect their scholarship. Even when a student-athlete states that his or her symptoms are gone, neuropsychological testing will demonstrate whether their cognitive abilities, balance and vision have returned to pre-injury levels.[22] Yet, the NCAA failed to require formal baseline testing. Without a formal baseline, it is difficult for a physician to determine when a patient has recovered. And returning student-athletes to play before they fully recover risks permanent brain injury. There is no good reason not to require all student-athletes to undergo baseline testing.[23]

The NCAA has acknowledged internally that it has violated its duty of care. It knows, for example, that only 66% of schools performed baseline testing; yet the NCAA has not mandated baseline testing. The NCAA knows that less than 50% of schools require a concussed athlete to

---

[21] Proffer, ¶ 62 (citing Guideline 2o, *NCAA Sports Medicine Handbooks* (2002-03 and 2003-04); *id.* at ¶ 72.

[22] Cantu Report, ¶¶ 24-26.

[23] *Id.* at ¶ 27.

see a physician; yet the NCAA has not corrected this violation of the consensus best practices. Most alarming is the knowledge by the NCAA that half of its member institutions allow a student-athlete to return to play in the same game. It is well settled in the scientific community that an athlete must *never* be returned to play on the same day of a concussion diagnosis.[24]

By 2009, the NFL and the National Federation of State High School Associations had voted to require officials to remove athletes from playing if they exhibited symptoms of concussions.[25] On December 7, 2009, the NCAA's Managing Director of Government Relations and Director of Health and Safety recognized the backlash against the NCAA for lacking concussion-management rules:

> The landscape has clearly changed around us, at the professional and high school levels, so the focus will remain on us as long as we do not have a rule that keeps a player out (at least same day) after a hit to the head.[26]

Only then did the NCAA begin discussing new concussion-management rules.[27] Internal e-mails reflected complaints from athletic trainers to proposed new concussion-management rules, leading Princeton's head athletic trainer to comment:

> Why are they complaining? If they are not already using these guidelines, we are in trouble. If they are allowing athletes back in the game after losing consciousness, still suffering from amnesia, etc., we have a bigger problem than we thought. [28]

A NCAA committee recommended in 2010 that the NCAA "adopt a common sport playing rule for concussion injury." In support, proponents provided alarming statistics including an estimate of over 27,296 concussions in just five fall sports over a five-year period.[29]

---

[24] *Id.* at ¶ 28.

[25] Proffer, ¶ 75.

[26] *Id.*, ¶ 76 (citing NCAA10075934-36, at 35).

[27] *Id.*, ¶ 78.

[28] *Id.*, ¶¶ 78-81 (citing NCAA10011982-84).

[29] *Id.*, ¶ 83 (citing NCAA10082989-91).

Despite this evidence, the relevant NCAA committee *rejected* a common concussion rule, leaving the NCAA's medical director "at a loss." Why? A NCAA executive explained that a blanket rule has "a much harder impact on all divisions," meaning it would *cost* the NCAA to have its institutions comply with best practices for all sports with concussion risk.[30]

The NCAA convened a Concussion in Sports Collegiate Medical Summit ("Concussion Summit") in April 2010. NCAA executive David Klossner assembled materials for the participants, including a reading list, a concepts document, and a concussion-management plan document.[31] His identification of the Summit's goals admitted the NCAA's failure to create a uniform protective concussion-management plan:[32]

> **Goals:**
> - Promote a consistent approach for the development of a concussion management plan.
> - Reduce and eliminate premature return to play or practice relative to concussion.
> - Ensure student-athletes have access to appropriate healthcare coverage for injury assessment and return-to-play.

Klossner noted that the NCAA and its member institutions faced the following issues:[33]

- Most NCAA schools do not have the resources or expertise to meet the requirements as set for "elite" athlete return-to-play.

- College-age athletes often minimize symptoms and/or under report their injuries and may not understand the consequences of playing with a concussion.

- Despite the significance and commonality of this injury, a significant number of athletic trainers and team physicians are not up-to-date when it comes to concussion.

On April 29, 2010, the NCAA adopted a concussion-management policy that "passed the

---

[30] *Id.*, ¶¶ 86-87, 89.

[31] *Id.*, ¶ 112.

[32] *Id.*, ¶ 113.

[33] *Id.*, ¶ 114.

buck" by *delegating to institutions the responsibility of having a management plan.*[34] But the NCAA knew that schools and conferences typically did not implement concussion-management requirements stronger than the NCAA-required minimum. In fact, at a February 2010 House Judiciary Committee forum on head injuries in college and youth football, the NCAA admitted that neither schools nor conferences do more than what the NCAA requires to protect student-athletes. The NCAA also knew that a shockingly small number of its institutions properly managed concussions.[35]

In sum, the NCAA and its members violated the consensus best practices and the NCAA's duty of care to the Plaintiffs and the proposed class as follows:

- Until 2010, the NCAA failed to maintain or require, and the schools thus failed to maintain, a written protocol on concussion management;

- The NCAA failed to provide student-athletes with catastrophic-injury-risk education;

- The NCAA failed to implement appropriate baseline concussion testing;

- The NCAA failed to require a stepwise return-to-play protocol;

- The NCAA failed to require that student-athletes who suffered a concussion or displayed concussion symptoms be managed by medical personnel with specific expertise in concussion diagnosis, treatment, and management; and

- The NCAA failed to require adequate documentation of concussion incidents.[36]

**D. Plaintiffs Have Suffered Permanent Injuries as a Result of the NCAA's Failure to Follow the Scientific and Medical Consensus on Concussion-Management and Return-to-Play Guidelines**

Plaintiffs Adrian Arrington, Derek Owens, Angelica Palacios, and Kyle Solomon were college athletes participating in contact sports. Each sustained concussions during team play or practice and was returned to play by their team coach or trainer prematurely, without proper

---

[34] *Id.,* ¶ 131.

[35] Cantu Report, ¶¶ 195-98.

[36] *Id.* at ¶ 29.

evaluation and while still vulnerable to further injury from even minor head impacts.

Mr. Solomon attended University of Maine ("UM"), a NCAA member school, where he formerly competed on the UM hockey team. Solomon suffered several concussions in games and practices during his time on the team. He was never properly evaluated by a team physician (indeed, the team had no physician for much of his time on the team) and was allowed to return to play after a concussion – once during the same game – while still experiencing concussion symptoms such as head pain and nausea and was thus highly vulnerable to further, permanent injury. Solomon continues to experience migraine headaches, memory loss, intense psycho-logical distress and anxiety, and seizures, even long after he retired from the hockey team.[37]

The other Plaintiffs' experiences are similar, although their degree of brain damage varies. All were returned to play or practice too early, when the risk of permanent damage from an additional concussion remained high.[38]

The evidence demonstrates that many student-athletes have no idea they have suffered a brain injury. The co-chair of the NFL's Head, Neck and Spine Committee has explained that a brain injury clouds an athlete's judgment regarding whether or not they are functioning normally.[39] In an acute stage post-concussion, student-athletes may believe they are functioning normally but in fact be talking gibberish.[40] Over a prolonged period, student-athletes may be disabled by painful headaches[41] and experience seizures,[42] memory loss,[43] or extreme anxiety or

---

[37] *Id.*, ¶¶ 291-302.

[38] *Id.*, ¶¶ 222, 248, 282-84.

[39] Proffer, ¶ 160.

[40] *See, e.g., id.*, ¶ 194 (Solomon).

[41] *See, e.g., id.*, ¶ 181 (Owens), ¶ 189 (Palacios), ¶ 195 (Solomon).

[42] *See, e.g., id.*, ¶ 174 (Arrington).

[43] *See, e.g., id.*, ¶ 175 (Arrington), ¶ 182 (Owens), ¶ 197 (Solomon).

depression,[44] but do not relate those symptoms to concussions.[45] They may blame themselves for

falling grades or their inability to focus[46] when in fact these symptoms directly relate to their

brain injuries. They may seek help from their coaches or schools but are turned away when they

can no longer play for the school.[47]

Without education or intervention, student-athletes may attempt to self-medicate through

drugs or alcohol.[48] Further, without treatment, these symptoms disrupt the student-athletes' abi-

lity to function or lead the best life that they can with their brain injury – a tragic irony given that

Plaintiffs and the Class attended school in the first instance for education and self-improvement.

**E.    Dr. Cantu Has Designed a Medical-Monitoring Program for Present and Former
        Student-Athletes to Assess Whether They Suffer from Post-Concussion Syndrome**

Plaintiffs' expert, Dr. Robert C. Cantu, who is the nation's leading expert on athletic

brain trauma and a pioneer in the study of the link between concussions and progressive brain

disease in athletes,[49] concludes that, given the NCAA's failures, a program is needed to

medically monitor current and former student-athletes who have suffered concussions or

exhibited syndromes to determine whether they are suffering from post-concussion syndrome.

The program would involve testing that includes neurological and neurocognitive assessments. A

physician skilled in diagnosing, treating and managing concussions would evaluate all of the

information gathered from these tests and communicate the results and/or diagnosis to the

student-athlete. Armed with the results and/or diagnosis, the student-athlete will then be in a

position to seek treatment appropriate to the diagnosis and be knowledgeable about the effects, if

---

[44] *See, e.g., id.*, ¶ 176 (Arrington), ¶ 183 (Owens), ¶¶ 191, 195, 197 (Solomon).

[45] *See, e.g., id.*, ¶¶ 174-75 (Arrington), ¶ 184 (Owens).

[46] *See, e.g., id.*, ¶ 184 (Owens)

[47] *See, e.g., id.*, ¶ 171 (Arrington), ¶ 179 (Owens), ¶¶ 186-87 (Palacios), ¶ 192 (Solomon).

[48] *See, e.g., id.*, ¶ 176 (Arrington), ¶ 183 (Owens).

[49] Cantu Report, ¶ 2.

any, of concussions sustained at NCAA schools.[50] Dr. Cantu describes the specifics of an

appropriate medical-monitoring program in his Report at Section XI.

## III.    ARGUMENT

### A.    Rule 23 Was Designed to Facilitate Aggregating Common Claims and Issues

Rule 23 of the Federal Rules of Civil Procedure governs class certification. The class

action "'device saves the resources of both the courts and the parties by permitting an issue

potentially affecting every [class member] to be litigated in an economical fashion ....'"[51] Courts

embrace class actions as an essential tool for adjudicating cases involving multiple claims that

have similar factual and/or legal inquiries. In crafting Rule 23, "the Advisory Committee had

dominantly in mind vindication of 'the rights of groups of people who individually would be

without effective strength to bring their opponents into court at all.'"[52] Class actions give voice

to plaintiffs who "would have no realistic day in court if a class action were not available."[53]

Class actions also serve an important deterrent function. "[C]lass actions reinforce the

regulatory scheme by providing an additional deterrent beyond that afforded either by public

enforcement or by single-party private enforcement."[54] Class actions thus are a particularly

appropriate and desirable means of redressing common claims for uniform legal violations that

affect large numbers of persons in the same way.[55] The policies underlying the need for class

---

[50] *Id.*, ¶¶ 30-33, 316-44.

[51] *General Tel. Co. of the S.W. v. Falcon*, 457 U.S. 147, 155 (1982).

[52] *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997).

[53] *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985); *see also Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997).

[54] *In re Folding Carton Antitrust Litig.*, 75 F.R.D. 727, 733 (N.D. Ill. 1977) (citations and quotations omitted).

[55] *See N.B. v. Hamos*, 2012 U.S. Dist. LEXIS 74284, at *31 (N.D. Ill. May 30, 2012).

action litigation require that certification under Rule 23 be liberally construed.[56]

The propriety of class certification does not depend on the outcome of the suit or whether a party will prevail on the merits, but upon whether the requirements of Rule 23 are met.[57] As the Supreme Court recognized, Rule 23 "creates a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action."[58] The Court has broad discretion to certify after its "rigorous analysis" of the Rule 23 prerequisites.[59] While this analysis may sometimes "entail some overlap with the merits" of the underlying claim,[60] courts should not make an extensive determination of the merits of the case.[61] Rather, courts should allow for a "preliminary inquiry" into the merits, but only to the extent needed to deal with Rule 23 considerations.[62]

After conducting the necessary rigorous analysis, the Court should find that this action satisfies the requirements of Rule 23(a) and 23(b)(2). The record also supports certifying an issues-only class under Rule 23(b)(3) and (c)(4).

## B. The Court Should Certify a Rule 23(b)(2) Negligence/Medical-Monitoring Class

### 1. Plaintiffs satisfy all four Rule 23(a) requirements.

The proposed Class and Class Representatives Arrington, Owens, and Palacios satisfy all of Rule 23(a)'s requirements: (i) the size of the proposed Class, combined with other factors,

---

[56] *Jablonski v. Riverwalk Holdings, Ltd.*, 2012 U.S. Dist. LEXIS 82846, at *6 (N.D. Ill. June 14, 2012); *Brown v. Yellow Transp., Inc.*, 2011 U.S. Dist. LEXIS 52345, at *5 (N.D. Ill. May 11, 2011).

[57] *See Eisen v. Carlisle*, 417 U.S. 156, 177-78 (1974); *Schleicher v. Wendt*, 618 F.3d 679, 685-87 (7th Cir. 2010).

[58] *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 130 S. Ct. 1431, 1437 (2010).

[59] *Olson v. Brown*, 594 F.3d 577, 584 (7th Cir. 2010).

[60] *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct 2541, 2551-52 (2011).

[61] *Eisen v. Carlisle & Jacquelin*, 417 U.S. at 177-78.

[62] *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 599 (7th Cir. 1993); *Acik v. I.C. Sys.*, 251 F.R.D. 332, 334 (N.D. Ill. 2008).

makes joinder of all class members impracticable; (ii) the proposed Class's members share common questions of law and fact; (iii) Plaintiffs' negligence claim is typical of those of the proposed Class; and (iv) Plaintiffs and their counsel will vigorously protect the proposed Class's interests.

### a. Rule 23(a)(1): Joining all members of the Class is impracticable.

Rule 23(a)(1) requires that "the class [be] so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Generally, classes numbering greater than 40 individuals satisfy this requirement.[63]

This case easily satisfies the numerosity requirement. The proposed Class has at least tens of thousands of members. For example, although the proposed Class generally encompasses all student-athletes who participated in contact sports during the period 2004-2009, the NCAA estimated 29,225 concussions in nine sports.[64] Accordingly, the number of Class Members makes joinder of all class members impracticable.

### b. Rule 23(a)(2): There are questions of law and fact common to the Class.

Rule 23(a)(2) requires that there be questions of law or fact common to the class. This requires that class members' claims "must depend upon a common contention."[65] And that common contention "must be of such a nature that it is capable of class-wide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."[66]

---

[63] *E.g.*, *id.*

[64] Proffer, ¶ 46.

[65] *Wal-Mart*, 131 S. Ct. at 2551.

[66] *Id. See also Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 497 (7th Cir. 2012) (while a "superficial" common question is not enough, "even a single common question" can suffice for commonality).

Commonality is easily met[67] and not all questions of fact and law must be common to satisfy the rule.[68] A "common nucleus of operative fact is usually enough to satisfy the commonality requirement."[69] In such a case, "[f]actual variations among class members' experiences will not defeat class certification …."[70] Indeed, as the Supreme Court and Seventh Circuit made clear, "*even a single [common] question will do*" where that common question shows that class members "suffered the same injury."[71]

Claims, like Plaintiffs' negligence claim, that arise from defendants' standardized conduct towards members of the proposed class present a classic case for treatment as a class action.[72] "[C]ommonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members,"[73] and individual factual differences among the individual litigants will not preclude a finding of commonality.[74]

Plaintiffs' claims share common issues of law and fact with Class Members. The NCAA owes duties to each student-athlete participating in NCAA sports. Fundamental among these duties is the NCAA's duty to safeguard them. Indeed, this was the driving force for creating the NCAA, which the NCAA has repeatedly re-affirmed.[75] While the NCAA thoroughly regulates

---

[67] *Markham v. White*, 171 F.R.D. 217, 222 (N.D. Ill. 1997) (court give commonality requirement a "highly permissive reading," citing 7A Wright, Miller & Kane, FED. PRAC. & PROC. CIV. § 1763, at 196-98 (3d ed. Update 2011)).

[68] *See Spano v. Boeing Co.*, 633 F.3d 574, 588 (7th Cir. 2011) ("[b]ut this assumes that every question must be common, and, as we have discussed, that is not what Rule 23(a)(2) demands").

[69] *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992).

[70] *Id.*; *see also De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983); *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130*, 657 F.2d 890, 895-96 (7th Cir. 1981).

[71] *Wal-Mart*, 131 S. Ct. at 2556 (emphasis added) (quotations omitted).

[72] *Hudson v. City of Chicago*, 242 F.R.D. 496, 501 (N.D. Ill. 2007).

[73] *Dunn v. City of Chicago*, 231 F.R.D. 367, 373 (N.D. Ill. 2005) (quoting *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001)).

[74] *Hudson*, 242 F.R.D. at 503.

[75] *See* Proffer, ¶¶ 1-23.

college athletics at its member institutions (*see supra* at 3-5), it steadfastly refused to propound any safety return-to-play standard for a student-athlete who sustains a concussion while participating in a sport. That refusal violated the same duty owed to each proposed Class Member in an identical manner.

Furthermore, while Rule 23(a)(2) requires only one question of law *or* fact, there are many common questions, including the following negligence-liability questions:

- whether the NCAA owed a duty to safeguard student-athletes during their participation in NCAA-sanctioned sports activities;

- if so, whether this duty required the NCAA to promulgate and enforce best-practices concussion-management standards;

- if so, what are the appropriate best-practices concussion-management standards;

- whether the NCAA negligently failed to promulgate and enforce appropriate best-practices concussion-management standards;

- whether the NCAA's failure to promulgate and enforce appropriate best-practices concussion-management standards significantly increased Plaintiffs and Class Members' risk of injury from successive concussions; and

- whether a significantly increased risk of successive concussions or accumulation of subconcussive hits and ensuring brain injury were reasonably foreseeable consequences of the NCAA's failure.

These liability issues are common to the negligence claim of Plaintiffs and every Class Member, thereby satisfying Rule 23(a)(2)'s commonality requirement. Plaintiffs' requested medical-monitoring relief for the NCAA's negligence likewise presents commons questions, such as:

- whether a Court-supervised medical-monitoring program is an appropriate form of relief for the NCAA's breach of duty; and

- the specific contours of a Court-administered medical-monitoring program.

Bolstering commonality, the Class is limited to 18 jurisdictions[76] that permit medical-monitoring relief for negligence in the absence of physical injury. As explained in Plaintiffs' proposed Trial Plan at 7-14, the elements of common-law negligence and medical-monitoring relief are nearly identical in those jurisdictions and can be established with common evidence and legal conclusions.[77]

Further, Plaintiffs' negligence claim focuses on the NCAA's duty to Class Members and its breach thereof, which Plaintiffs will prove with evidence that is identical for all Class Members. Plaintiffs' Fact Proffer sets forth that evidence. Plaintiffs explain how they will use that evidence to prove the Class's negligence claims in the Trial Plan at 2-7.

### c. Rule 23(a)(3): Plaintiffs' claims are typical of those of the Proposed Class.

Rule 23(a)(3) requires that the "claims … of the representative parties [be] typical of the claims …of the class." A "plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory."[78] Total factual uniformity is not required.[79] Factual variations do not defeat typicality because the requirement seeks to ensure that the representative's claims simply have the "same essential characteristics" as the claims of the class at large.[80] A proposed class that meets the commonality standard will generally meet the typicality requirement.[81]

---

[76] Arizona, Arkansas, California, Colorado, District of Columbia, Florida, Illinois, Indiana, Maryland, Massachusetts, Missouri, Montana, New Jersey, New York, Ohio, Pennsylvania, Utah, and West Virginia. *See* Tables 4-5 (Exhibit A to Trial Plan).

[77] Plaintiffs are filing their Trial Plan concurrently with this memorandum.

[78] *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998) (quoting *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983)).

[79] *De La Fuente*, 713 F.2d at 231.

[80] *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006).

[81] *Hudson*, 242 F.R.D. at 501.

This requirement ensures that the class representative's interests align with those of the class as a whole.[82] Typicality refers to the nature of the representative's claim or defense and not to the specific facts from which it arose.[83]

Plaintiffs Arrington, Owens, and Palacios satisfy this requirement. They played for colleges in Illinois and Arkansas and can represent the proposed Class that includes participants in NCAA-sanctioned teams in 18 jurisdictions, including Illinois and Arkansas. Their claims arise from the same conduct and assert the same legal theories as those of the absent Class Members. This action is based on NCAA misconduct that injured many other Class Members – at least tens of thousands. Plaintiffs have the same claims as the Class Members, and are seeking the same relief. Plaintiffs are typical.

> ### d.  Rule 23(a)(4): Plaintiffs and Class Counsel will fairly and adequately protect the interests of the proposed Class.

Rule 23(a)(4) requires that the representative parties will "fairly and adequately protect the interests of the class." This requirement is satisfied when (i) the class representatives have no interests conflicting with the class; and (ii) the representatives and their attorneys will properly prosecute the case.

> ### (1)  Plaintiffs' interests do not conflict with the Class.

The Supreme Court has held that to meet this requirement, "[a] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members."[84] The *Amchem* Court also explained that Rule 23(a)(4)'s adequacy-of-representation requirement "tends to merge" with Rule 23(a)'s commonality and typicality criteria, which "serve as guideposts

---

[82] *E.g.*, *Marshall v. H&R Block Tax Servs.*, 270 F.R.D. 400, 405 (S.D. Ill. 2010).

[83] *E.g.*, *Harris v. General Dev. Corp.*, 127 F.R.D. 655, 661 (N.D. Ill. 1989).

[84] *Amchem Prods.*, 521 U.S. at 625-26 (quoting *East Texas Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)).

for determining whether … maintenance of a class action is economical and whether the named

plaintiff's claim and the class claims are so interrelated that the interests of the class members will

be fairly and adequately protected in their absence.[85] The class representative's interests cannot

conflict with the interests of the absent class members.[86] The existence of minor conflicts between

plaintiffs and the class alone will not defeat a party's claim to class certification; a conflict must be

fundamental to the specific issues in controversy.[87] Such a conflict exists where the class

representatives' economic interests and objectives "differ significantly from the economic interests

and objectives of unnamed class members," such as when other members of the class actually

benefitted from the conduct challenged by the plaintiffs.[88] No such conflict exists here.

Plaintiffs Arrington, Owens, and Palacios do not have interests antagonistic to or in

conflict with the interests of the Class Members they seek to represent. In fact, Plaintiffs and the

entire class share the common goal that the NCAA and their respective college teams provide

notification of their concussion risks and all known health effects, and they all want medical

testing to identify whether and the extent to which they suffer from post-concussion syndrome or

any other form of multiple-concussion injury from concussions sustained while participating in

NCAA sports programs. Plaintiffs will vigorously prosecute this case and "fairly and adequately

protect the interests of the" proposed Class. The central issues – the NCAA's duty to promulgate

---

[85] *Id.* at 626 n.20 (quoting *General Tel.*, 457 U.S. at 157 n.13).

[86] *Id.*

[87] 6 Alba Conte & Herbert B. Newberg, NEWBERG ON CLASS ACTIONS § 18:14 (4th ed. 2002); *Srail v. Village of Lisle*, 249 F.R.D. 544, 555 (N.D. Ill. 2008) (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006)); *Anderson v. Cornejo*, 199 F.R.D. 228, 240 (N.D. Ill. 2000). *See also Espenscheid v. DirectSat USA, LLC*, 688 F.3d 872, 876 (7th Cir. 2012) ("[a] settling plaintiff would be an adequate class representative if there were no significant conflict of interest"); *Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 429 (6th Cir. 2012); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009); *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003) (citing 7A Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE & PROC. § 1768, at 326 (2d ed. 1986)).

[88] *Valley Drug*, 350 F.3d at 1189-90.

concussion-management best practices and its refusal to do so – are common to the negligence claims of Plaintiffs and Class Members. Arrington, Owens, and Palacios, like the absent Class Members, have a strong interest in proving the NCAA's duty and breach thereof and obtaining redress. Certainly, no Class Member has an interest in not knowing whether they suffered lasting brain damage from concussions sustained during a NCAA sport, and there is no colorable argument that the NCAA's failure to promulgate and enforce concussion-management policies benefitted the Class.

Furthermore, Arrington, Owens, and Palacios have already shown their ability to handle, and willingness to participate in, significant and complex litigation on behalf of student-athletes. They have assisted in discovery and been deposed. Plaintiffs understand they brought this case as a class action and are serving as class representatives. For example, when asked during his deposition why he sought to represent other student-athletes, Arrington explained: "I want them to not go through the things that I'm going through; not be able to work, to be able to provide, to struggle, all those things that I'm going through right now."[89] The Court should conclude that these three Plaintiffs will adequately represent the Class.

The NCAA may challenge adequacy on the ground that Plaintiffs retain damages claims against the NCAA arising from their brain injuries. But to eliminate any such challenge, Arrington, Owens, and Palacios (and Kyle Solomon as well, *see infra*) hereby warrant that, if the Court certifies a Class for medical-monitoring relief, they will not seek damages in this Class litigation. Their goal herein is obtaining a class-wide ruling on negligence liability and medical-monitoring relief for all Class Members so that similarly impaired Class Members can learn the source and degree, if any, of their brain injuries.[90] Where Plaintiffs "seek only medical

---

[89] Proffer, ¶¶ 171-74.

[90] *Id.*

monitoring relief on behalf of themselves and the class, and do not advance claims for present injuries, there is no conflict of interest ...."[91]

As an essential part of certification, however, Arrington, Owens, Palacios, and Solomon respectfully ask the Court to immunize them from assertions of claim preclusion by the NCAA in subsequent damages litigation. To the extent they and other Class Members have present injuries caused by the NCAA's misconduct, the NCAA may argue they are obliged to assert all claims and remedies, including for damages, in this action. To the contrary, class actions are "one of the recognized exceptions to the rule against claim-splitting."[92] *Moore's Federal Practice* explains that a request to certify a class and the order granting certification determines the nature of the claims subject to class-action treatment and the resulting judgment is limited to those claims.[93]

Furthermore, courts do not impose on Rule 23(b)(2) absent class members the Hobson's choice to either withdraw from the litigation or forfeit their damages claims. In *Crowder v. Lash*, the Seventh Circuit joined with other circuits to rule that an earlier class action in which only declaratory and injunctive relief were sought does not preclude an absent class member from seeking damages for the same alleged misconduct.[94] The *Crowder* court ruled that an absent class member should not be barred from pursuing a damage action on the basis of his limited participation in a prior declaratory and injunctive action.[95] Other courts have ruled similarly.[96]

---

[91] *Rowe v. E.I. Dupont De Nemours & Co.*, 2008 U.S. Dist. LEXIS 103528, at *23-24 (D.N.J. Dec. 23, 2008) (quoting *In re Welding Fume Prods. Liability Litig.*, 245 F.R.D. 279, 301 (N.D. Ohio 2007)).

[92] 18 MOORE'S FEDERAL PRACTICE § 131.40[3][e][iii] (2002); *Gunnells v. Healthplan Servs.*, 348 F.3d 417, 432 (4th Cir. 2003) (quoting *Moore's Federal Practice*).

[93] 18 MOORE'S FEDERAL PRACTICE § 131.40[3][e][iii].

[94] *Crowder v. Lash*, 687 F.2d 996, 1009 (7th Cir. 1982).

[95] *Id.*

[96] *See, e.g.*, *Hiser v. Franklin*, 94 F.3d 1287, 1291 (9th Cir. 1996); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 256 F.R.D. 586, 597 (N.D. Ill. 2009); *Leib v. Rex Energy Operating Corp.*, 2008 U.S. Dist.

To eliminate any claim-preclusion threat, however, Plaintiffs ask that, if the Court is inclined to certify a class, its certification order expressly state that the class litigation only encompasses a negligence claim for medical monitoring and excludes all their individual damage claims, which are expressly reversed for subsequent individual litigation. An express reservation of this sort disposes of any later assertion of claim preclusion. The Seventh Circuit ruled that "under a generally accepted exception to the *res judicata* doctrine, a litigant's claims are not precluded if the court in an earlier action expressly reserves the litigant's right to bring those claims in a later action."[97] It likewise held in *D & K Props. Crystal Lake* that "res judicata does not apply when a cause of action has been expressly reserved for later adjudication."[98]

This "express reservation" exception is widely embraced by federal[99] and state courts,[100] including Illinois, Arkansas, and Maine, where all four Plaintiffs attended college. *Wright & Miller* states that "[a] judgment that expressly leaves open the opportunity to bring a second action on specified parts of the claim or cause of action that was advanced in the first action should

LEXIS 102847, at *26-28 (S.D. Ill. Dec. 19, 2008); *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 114-15 (E.D.N.Y. 2012); *Jahn v. ORCR, Inc.*, 92 P.3d 984, 990-91 (Colo. 2004).

[97] *Central States, Southeast & Southwest Areas Pension Fund v. Hunt Truck Lines, Inc.*, 296 F.3d 624, 629 (7th Cir. 2002).

[98] *D&K Props. Crystal Lake v. Mutual Life Ins. Co.*, 112 F.3d 257, 259-60 (7th Cir. 1997). *See also In re Energy Cooperative, Inc.*, 814 F.2d 1226, 1233 (7th Cir. 1987).

[99] *See, e.g., R&J Holding Co. v. Redevelopment Auth.*, 670 F.3d 420, 427 (3d Cir. 2011), *cert. denied*, 132 S. Ct. 2792 (2012); *In re Paige*, 610 F.3d 865, 875 (5th Cir. 2010); *Spitznas v. Boone*, 464 F.3d 1213, 1217 (10th Cir. 2006); *Mountain Pure, LLC v. Turner Holdings, LLC*, 439 F.3d 920, 925 (8th Cir. 2006); *Maher v. GSI Lumonics, Inc.*, 433 F.3d 123, 127 n.7 (1st Cir. 2005); *Browning v. Levy*, 283 F.3d 761, 774 n.5 (6th Cir. 2002) (citing *D&K Props.*); *Apparel Art Int'l v. Amertex Enters.*, 48 F.3d 576, 586 (1st Cir. 1995); *Guzowski v. Hartman*, 849 F.2d 252, 255 (6th Cir. 1988); *Stolberg v. Members of Bd. Of Trustees for the State Colleges*, 541 F.2d 890, 893 (2d Cir. 1976); *Blackwelder v. Millman*, 522 F.2d 766, 773 (4th Cir. 1975).

[100] *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 413 (Ill. 2002); *DiTrolio v. Antiles*, 662 A.2d 494, 504-05 (N.J. 1995); *Cater v. Cater*, 846 S.W.2d 173, 176 (Ark. 1993); *Ross v. Joseph J. Hoffman, Inc.*, 1989 Me. Super. LEXIS 234 (Me. Super. Ct. Nov. 13, 1989) (citing *Cianchette v. Verrier*, 151 A.2d 502, 510 (Me. 1959)).

be effective to forestall preclusion."[101] The *Restatement (2d) of Judgment* shares this view. Section 26, entitled "*Exceptions of the General Rule Concerning Splitting*," provides that claim preclusion does not bar a part of a claim first asserted in a second action by plaintiff against defendants where "[t]he court in the first action has expressly reserved the plaintiff's right to maintain the second action …."[102] Comment b to § 26 explains that there can be "special reasons that justify" splitting a claim, that accordingly "the judgment in the action ought not to have the usual consequences of extinguishing the entire claim; rather the plaintiff should be left with an opportunity to litigate in a second action that part of the claim which he justifiably omitted from the first action."

There are "special reasons" here "that justify splitting" Plaintiffs' claims via an express reservation of rights. As explained *supra* at 13, Class Members may be tragically unaware of their brain injuries, or if aware, unable to connect their injuries and debilitating symptoms to concussions or the NCAA's negligence.[103] This medical-monitoring class action is the most efficient and, likely, the best means to notify former college players and provide them diagnostic and monitoring relief. But any potential class representatives, like Plaintiffs, would already know something of their own injury and the NCAA's culpability – and thus could seek compensatory damages. But it is unreasonable to require any plaintiffs willing to represent a medical-monitoring class to forfeit their damages claims. Without an express reservation of damages claims, no plaintiff would represent this class and no class could ever be certified.

An express reservation of Plaintiffs' damages claims resolves this disabling catch-22 and thus constitutes a "special reason" that justifies splitting their claims between medical-

---

[101] 18 Wright, Miller & Cooper, FEDERAL PRACTICE AND PROCEDURE § 4413 (1981).

[102] RESTATEMENT (2D) OF JUDGMENTS § 26 ¶ 1(b) (1982).

[103] *See also* Proffer, ¶ 174 (Arrington).

monitoring relief in this action and compensatory damages in a subsequent individual lawsuit. Recognizing that, as here, such claim-preclusion concerns may impede certifying claims limited to class-appropriate relief, *Wright & Miller* advises courts to "attempt a careful integration of preclusion doctrine with recognition that the class action is an important means of effectuating the substantive policies that underlie the claims of individual members of the various classes that might plausibly be certified. In such situations, courts have multiple tools including certifying a class limited to appropriate relief" and "expressly excluding any issue-preclusion effect."[104] Plaintiffs respectfully ask the Court to employ these "tools" here.

### (2)  Plaintiffs' counsel are qualified.

Plaintiffs' Counsel satisfies the adequacy requirement. They are well-qualified lawyers experienced in successfully prosecuting medical-monitoring class actions, and collectively have recovered billions of dollars for class members in other litigation. The firms provide their résumés setting forth their class-action experience and expertise.[105] These firms are ready, willing and able to devote the resources necessary to litigate this case vigorously and to see it through to the best possible resolution.

### 2.  The proposed Class is ascertainable because membership criteria are objective and require documentation of concussion symptoms.

Plaintiffs must also show that the proposed Class is identifiable and ascertainable. Although Rule 23 does not express this requirement, the Seventh Circuit states that a "plaintiff must also show … that the class is indeed identifiable as a class."[106] That said, "[i]t is not fatal for a class definition to require some inquiry into individual records, so long as the inquiry is not

---

[104] 18 FEDERAL PRAC. & PROC. § 4413, *cited with approval in Gooch*, 672 F.3d at 429 n.16.

[105] *See* Berman Decl., Exs. 135-36. These firms are Hagens Berman Sobol Shapiro LLP; and Siprut PC.

[106] *Oshana*, 472 F.3d at 513 (citing *Alliance to End Repression v. Rochford*, 565 F.2d 975, 977 (7th Cir. 1977)).

'so daunting as to make the class definition insufficient.'"[107] Indeed, a class is identifiable if the information necessary to identify class members is available through a "ministerial review" rather than an arduous individual inquiry.[108]

The proposed class satisfies this requirement. Plaintiffs seek to certify a defined and ascertainable class of all players listed on a team roster in contact sports of football, wrestling, basketball, field hockey, ice hockey, lacrosse, or soccer, at any NCAA institution in any of the 18 jurisdictions (listed *supra* at 20 n.76) from 2004 through the present.

### 3. The proposed Class satisfies Rule 23(b)(2), because the NCAA has acted on grounds generally applicable to the entire Class, making final injunctive and declaratory relief appropriate with respect to the Class as a whole.

The Class also satisfies Rule 23(b)(2), which provides for class treatment where defendant has "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."[109] Rule 23(b)(2) requires plaintiffs to (i) allege grounds for liability generally applicable to the class and (ii) seek relief that is predominantly injunctive or declaratory, as opposed to monetary.[110]

Here, Plaintiffs' negligence claim is based on NCAA conduct that is "generally applicable to the class." The NCAA failed to fulfill its legal obligations to student-athletes uniformly across the proposed Class. Plaintiffs allege that the NCAA owed a uniform duty to every Class Member to promulgate and enforce concussion-management best practices, which the NCAA failed to do. Plaintiffs and Class Members all participated in NCAA contact sports with high concussion risks, and the NCAA's failure thus put them at heightened risk of repetitive

---

[107] *Sadler v. Midland Credit Mgmt., Inc.*, 2008 U.S. Dist. LEXIS 51198, at *10 (N.D. Ill. July 3, 2008).

[108] *Id. See also Sadler v. Midland Credit Mgmt., Inc.*, 2009 U.S. Dist. LEXIS 26771, at *5 (N.D. Ill. Mar. 31, 2009).

[109] Fed. R. Civ. P. 23(b)(2); *Kartman v. State Farm*, 634 F.3d 883, 892 (7th Cir. 2011).

[110] *See, e.g., Lemon v. International Union of Operating Eng'rs, Local No. 139*, 216 F.3d 577, 580 (7th Cir. 2000).

concussions and post-concussion syndrome. This conduct affected all Class Members alike, all of whom are or were at risk of severe harm from the NCAA's failure to act.

The second (b)(2) requirement is based on the notion that class cohesiveness breaks down when the class seeks to recover damages from individual injuries.[111] The "predominantly injunctive or declaratory" requirement hence protects the legitimate interests of potential class members who might wish to pursue their monetary claims individually.[112] This concern is absent here because Plaintiffs and the Class do not seek monetary recovery in this litigation. *See supra* at 24.

Further, there can be no doubt that the medical-monitoring program sought here is relief appropriate for Rule 23(b)(2) certification. In *Kartman*, the Seventh Circuit specifically identified a medical-monitoring program like the relief sought here as appropriate for (b)(2) certification. Appellants had analogized their requested relief (re-inspection of their damaged roofs using a specific inspection standard) to a medical-monitoring program.[113] The Court rejected the analogy and affirmed denial of (b)(2) certification for re-inspection relief.

But it distinguished between medical-monitoring relief that is injunctive from relief that "is a 'disguised request for compensatory damages.'"[114] Relief in which a court establishes a medical-monitoring program managed by court-appointed trustees – which is precisely the relief Arrington, Owens, and Palacios seek here – is properly "characterized as injunctive even if the defendants are required to pay for the program."[115] By contrast, relief seeking a court order "requiring a defendant to pay a plaintiff a sum of money for the purpose of medical monitoring is essentially an award of damages and therefore cannot be awarded in a Rule 23(b)(2)

---

[111] *Id.* at 580.

[112] *Id.* (citing *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402 (5th Cir. 1998)).

[113] 634 F.3d at 894.

[114] *Id.* at 894 n.9 (quoting *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 139 (3d Cir. 1998)).

[115] *Id.* (citing *Barnes*).

010270-11  606955 V1

proceeding."[116]

The *Manual for Complex Litigation* concurs, advising that "Rule 23(b)(2) generally applies" to a mass tort class for medical monitoring "when the relief sought is a court-supervised program for periodic medical examination and research to detect diseases attributable to the product in question."[117] Put more simply, "[t]he choice between application of Federal Rules of Procedure 23(b)(2) and (b)(3) revolves around whether the complaint is seeking predominantly money damages or equitable relief."[118] Plaintiffs' negligence claim for medical-monitoring relief accordingly should be certified under Rule 23(b)(2).

**C.     The Proposed Core-Issues Class Satisfies Rule 23(b)(3) and (c)(4) Because Resolving Common Liability Issues Will Advance Disposition of the Entire Litigation**

**1.     Under Rule 23(c)(4), courts certify issues common to class members' claims while reserving individual questions for individual determinations.**

Rule 23 also permits certifying *common issues* rather than entire claims. Rule 23(c)(4) provides that "when appropriate, an action may be brought or maintained as a class action with respect to particular issues."[119] Rule 23(c)(4) allows the Court to certify a class for liability issues only to advance disposition of the entire litigation:

> Rule 23(c)(4)(A) … may enable a court to achieve the economies of class action treatment for a portion of a case, the rest of which may either not qualify under Rule 23(a) or may be unmanageable as a class action.[120]

---

[116] *Id.*; *see also Craft v. Vanderbilt Univ.*, 174 F.R.D. 396, 406-07 (M.D. Tenn. 1996); *Yslava v. Hughes Aircraft Co.*, 845 F. Supp. 705, 713 (D. Ariz. 1993); *Day v. NLO*, 144 F.R.D. 330, 336 (S.D. Ohio 1992).

[117] MANUAL FOR COMPLEX LITIGATION § 22.74 at 427 (4th ed. 2004) (footnote omitted).

[118] *Id.* § 22.74 at 425.

[119] Fed. R. Civ. P. 23(c)(4); *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 491 (7th Cir.), *cert. denied*, 133 S. Ct. 338 (2012). *See also* Fed. R. Civ. P. 23(c)(4) advisory committee's note ("[t]his provision recognizes that an action may be maintained as to particular issues only").

[120] MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.24, at 273 (4th ed. 2004). *See also* Barbara J. Rothstein & Thomas E. Willging, MANAGING CLASS ACTION LITIGATION: A POCKET GUIDE FOR JUDGES 10 (2d ed. 2009) ("[t]he test is whether the resolution of common issues advances the litigation as a whole, as opposed to leaving a large number of issues for case-by-case adjudication").

Rule 23(c)(4) allows an action to secure "the advantages and economies of adjudication issues that are common to the entire class on a representative basis … even though other issues in the case may need to be litigated separately by each class member."[121] "[G]enuinely common issues" are appropriate to resolve "in one fell swoop" under Rule 23(c)(4):

> If there are genuinely common issues, issues identical across all the claimants, issues moreover the resolution of which is unlikely to be enhanced by repeated proceedings, then it makes good sense … to resolve those issues in one fell swoop while leaving the remaining, claimant-specific issues to individual follow-on proceedings.[122]

In *Mejdrech v. Met-Coil Systems Corp.*, for example, the Seventh Circuit affirmed the district court's class certification of two "core issues," even though "not only the amount but the fact of damage might vary from class member to class member."[123]

The Seventh Circuit repeatedly endorses this approach to class certification. It explained in *Carnegie v. Household Int'l, Inc.* that the need for individual determinations regarding relief does not undercut Rule 23(c)(4)'s utility of certifying liability issues because "separate proceedings of some character" can be used "to determine the entitlements of the individual class members to relief."[124] *Carnegie* then highlighted Rule 23's efficacy and versatility:

> Rule 23 allows district courts to devise imaginative solutions to problems created by the presence in a class action litigation of individual damages issues. Those solutions include "(1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages;

---

[121] 7AA FEDERAL PRAC. & PROC. § 1790, at 589, *quoted in Rowe v. E.I. Dupont De Nemours & Co.*, 2008 U.S. Dist. LEXIS 103528, at *66 (D.N.J. Dec. 23, 2008).

[122] *McReynolds*, 672 F.3d at 491.

[123] *Mejdrech v. Met-Coil Sys. Corp.*, 319 F.3d 910, 911 (7th Cir. 2003).

[124] *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004).

(4) creating subclasses; or (5) altering or amending the class."[125]

Reflecting this utility, other circuits also widely employ Rule 23(c)(4) certification.[126]

When Rule 23(c)(4) certification is sought for common issues, "the parties need to satisfy the class action requirements of Rule 23(a) and (b) only with respect to those … issues …."[127] Even cases that might not otherwise satisfy Rule 23's requirements thus can be certified as a class limited to selected issues that are common under Rule 23(c)(4).[128]

Here, class-wide resolution of the common liability issues under Rule 23(c)(4) on behalf of a nation-wide, 51-jurisdiction class will be the most efficient means of litigating issues "that are the same for each class member" and should not be repeatedly tried. These core issues can be most effectively and efficiently resolved in a class jury trial before this Court, with the individual issues addressed separately in other forums. This Court can efficiently resolve "in one fell swoop"[129] the core issues presented in this case under Rule 23(c)(4).

### 2. A Core-Issues class easily satisfies Rule 23(a)'s requirements.

The four Plaintiffs seek to certify a Rule 23(c)(4) core-issues class that includes all present or former students listed on a college team roster at an NCAA institution in any of the 50 states or the District of Columbia during the period 2004 through the present who participated in

---

[125] *Id.* (quoting *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 141 (2d Cir. 2001)). *See also Arreola v. Godinez*, 546 F.3d 788, 800 (7th Cir. 2008); *In re Allstate Ins. Co.*, 400 F.3d 505, 508 (7th Cir. 2005); *Allen v. Int'l Truck & Engine Corp.*, 358 F.3d 469, 472 (7th Cir. 2004). District courts within the Circuit also recognize the value of Rule 23 (c)(4) issue certification in large, complex matters. *See, e.g., Galvan v. NCO Fin. Sys.*, 2012 U.S. Dist. LEXIS 128592, at *22 (N.D. Ill. Sept. 11, 2012); *George v. Kraft Foods Global, Inc.*, 2011 U.S. Dist. LEXIS 124210, at *27-28 (N.D. Ill. Oct. 25, 2011).

[126] *See, e.g., Tardiff v. Knox Cnty.*, 365 F.3d 1, 6-7 (1st Cir. 2004); *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 225 (2d Cir. 2006); *In re VISA Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 141 (2d Cir. 2001) (Sotomayor); *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996); *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1437 n.* (2013) (Ginsberg, J, dissenting).

[127] *Nassau Cnty.*, 461 F.3d at 227; 6 NEWBERG ON CLASS ACTIONS § 18:7; 5 MOORE'S FEDERAL PRACTICE § 23.86[2]; 7AA FEDERAL PRAC. & PROC. § 1790.

[128] 6 NEWBERG ON CLASS ACTIONS § 18:7. *See also Valentino*, 97 F.3d at 1234.

[129] *See McReynolds*, 672 F.3d at 491 (quoting *Mejdrech*, 319 F.3d at 911).

the contact sports of football, wrestling, basketball, field hockey, ice hockey, lacrosse, or soccer.

This core-issues class meets Rule 23(a). First, the class is obviously large and satisfies Rule 23(a)(1)'s numerosity requirement. Commonality is also satisfied. The core issues center on the medical consensus about concussion-management best practices, whether the NCAA owed a duty to each and every Class Member to promulgate, implement and enforce these standards, and whether the NCAA breached that duty. *See* the first four liability issues listed *supra* at 19 ("Core Issues"). These four issues are common to every class member and, therefore, commonality is easily met under Fed. R. Civ. P. 23(a)(2) on liability issues.

In addition, Plaintiffs' claims are typical of the Class claims regarding the Core Issues. Each Plaintiff and Class Member's negligence claim arises from the same conduct and failure to act. Plaintiffs' negligence claims are typical for purposes of Rule 23(a)(3).

Finally, Fed. R. Civ. P. 23(a)(4)'s adequacy requirement is satisfied because the four Plaintiffs will fairly and adequately protect the Class's interests. The Core Issues involve matters that must be proven for each potential claim. Plaintiffs' interests are fully aligned with the interests of other Class Members, who must prove the same issues.

### 3.     A Core-Issues Class also satisfies Rule 23(b)(3).

All of the Core Issues are common for all Class Members. Because these issues are legal or factual issues common to each class member, common issues necessarily predominate over individual issues. Resolution of these core issues will be the same for each Class Member who faced heightened risk of post-concussion syndrome by the NCAA's failure to promulgate and enforce appropriate best-practices concussion-management standards. Further, Plaintiffs show in their trial plan and attachments that the applicable state negligence standards are similar. *See* Trial Plan at 8-12. The Court and jury can manage whatever variations may exist by grouping similar duty-and-breach jury instructions for the States. Trial of the Core Issues will not require

individualized inquiries and, accordingly, will be manageable.

Resolving these Core Issues on a class-wide basis is far superior to individualized determinations numbering in the tens of thousands. Class certification will assure that these common issues of fact are determined uniformly in one court rather than re-litigated in countless courts around the country. Class resolution of these issues will be far more efficient than indivi-dualized determinations and will eliminate concerns over inconsistent judgments. Moreover, should these facts be determined adversely to Class Members, then the litigation will be resolved in this Court without the need for further proceedings. Should the issues be resolved in Class Members' favor, this Court will have maximized the assistance it provides to courts trying individual claims. In affirming a class-certification order, the Second Circuit highlighted the value of uniformly resolving an issue that would be central in all of the individual cases:

> If the defense succeeds, the entire litigation is disposed of. If it fails, it will not be an issue in the subsequent individual trials. In that event, moreover, the ground for its rejection … might well be dispositive of relevant factual issues in those trials.[130]

Courts thus certify issues classes under Rule 23(b)(3) and (c)(4) where there are separable issues and class-wide resolution of those issues will advance the litigation. The Seventh Circuit in *Mejdrech*, for example, affirmed the district court's certification of "'the core questions, *i.e.*, whether or not and to what extent [Met-Coil] caused contamination of the area in question" in a case involving leaking storage tanks.[131] The district court had reserved for later determination the individual questions of whether defendants' class-wide misconduct caused individual class members "any legally compensable harm and if so in what dollar amount …."[132]

Here, every Class Member has an interest in proving the NCAA's common course of

---

[130] *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 145, 167 (2d Cir. 1987).

[131] *Mejdrech*, 319 F.3d at 911.

[132] *Id.*

conduct as outlined in the Fact Proffer. It would be enormously inefficient – for both the court system and Class Members – to engage in hundreds or thousands of individual trials on the same liability issues. Following trial of the Core Issues, Class Members and the NCAA will be able to rely on the duty-and-breach findings from this Court to streamline litigation of the remaining individualized issues.[133] Moreover, Class Members, in individual litigation unaided by Rule 23(c)(4), would be at substantial disadvantage trying to prosecute separate and enormously expensive actions against the well-resourced NCAA. A class action is the most fair and efficient means for Plaintiffs and Class Members to litigate against the NCAA. This Court hence should certify the Core Issues under Rule 23(b)(3) and (c)(4).

## IV.    CONCLUSION

For these reasons, Plaintiff respectfully requests that the Court certify the proposed Negligence/Medical-Monitoring Class under Rule 23(b)(2), designate Adrian Arrington, Derek Owens, and Angela Palacios as the representatives, and appoint their attorneys as class counsel.

Plaintiffs also respectfully request that the Court certify the Core Issues for class treatment under Rule 23(b)(3) and (c)(4), designate Adrian Arrington, Derek Owens, Angelica Palacios, and Kyle Solomon as representatives of this Rule 23(b)(3) and (c)(4) Core-Issues Class, and appoint their attorneys as class counsel.[134]

---

[133] *See, e.g.*, *McReynolds*, 672 F.3d at 491 (noting that while issues would remain for individual resolutions in separate trials, "it wouldn't be necessary" to re-litigate the Rule 23(c)(4) certified issues "in each of those trials"). *See also id.* at 492 ("the next stage of the litigation, should the class-wide issue be resolved in favor of the plaintiffs, will be hundreds of separate suits for backpay").

[134] As the Trial Plan explains, Plaintiffs propose that a subclass accompany each of the two classes to reflect a variation in how some states address a particular issue relating to whether the NCAA owed a duty to Plaintiffs and the Classes. *See* Trial Plan at 9-12.

Date: July 19, 2013

Respectfully submitted,

ADRIAN ARRINGTON, DEREK OWENS, ANGELICA PALACIOS, and KYLE SOLOMON, individually and on behalf of all others similarly situated


By: /s/ Steve W. Berman
          Steve W. Berman
*steve@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
206.623.7292
Fax: 206.623.0594


By: /s/ Joseph J. Siprut
Joseph J. Siprut
*jsiprut@siprut.com*
Aleksandra M. S. Vold
*avold@siprut.com*
SIPRUT PC
17 North State Street
Suite 1600
Chicago, IL 60602
312.236.0000
Fax: 312.878.1342


Elizabeth A. Fegan
*beth@hbsslaw.com*
Daniel J. Kurowski
*dank@hbsslaw.com*
Thomas Ahlering
*toma@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
1144 W. Lake Street, Suite 400
Oak Park, IL 60301
708.628.4949
Fax: 708.628.4950


*Interim Plaintiffs' Co-Lead Class Counsel*

010270-11  606955 V1

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on July 19, 2013 a true and correct copy of the foregoing document was filed electronically by CM/ECF, which caused notice to be sent to all counsel of record.

By: /s/ Steve W. Berman
Steve W. Berman

- 37 -