## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| DEREK OWENS and KYLE SOLOMON, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 11 C 6356 |
| | ) | |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, | ) | Judge John Z. Lee |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

In personal injury litigation, the parties often rely on expert witnesses. This is especially so when specialized knowledge is necessary to establish or refute whether a particular defendant breached a reasonable standard of care, causing compensable injuries.

The two plaintiffs in this case, Derek Owens and Kyle Solomon, played collegiate sports and suffered numerous concussions while doing so. They have offered a number of experts to support their contention that Defendant, the National Collegiate Athletic Association ("NCAA"), negligently failed to adopt and implement adequate concussion policies during their school years and that the two suffered and will continue to suffer injury as a result.

In response, the NCAA has presented its own rebuttal experts. And each party now seeks to exclude, in whole or in part, the opinions offered by the opposing side's

experts. For the reasons provided below, these motions are granted in part and denied in part.

## I.    Legal Standard

Federal Rule of Evidence 702 and the Supreme Court's decision in *Daubert* govern the admissibility of expert testimony. *United States v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)). Rule 702 allows the admission of opinion testimony by a witness, who possesses the requisite "knowledge, skill, experience, training, or education," to assist the trier of fact to "understand the evidence or . . . determine a fact in issue." FED. R. EVID. 702. Such a witness is permitted to testify when (1) the testimony is "based on sufficient facts or data," (2) the testimony is "the product of reliable principles and methods," and (3) the witness has "reliably applied the principles and methods to the facts of the case." *Id.* In short, the proffered expert must be qualified, and the testimony must be reliable and relevant to the issues in the case. The Supreme Court in *Daubert* and its progeny instructed the district court to act as the evidentiary gatekeeper, ensuring that Rule 702's requirements of reliability and relevance are satisfied before permitting an expert witness to offer opinion testimony at trial. *See* 509 U.S. at 589; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–49 (1999).

In considering whether to admit expert testimony, district courts typically employ a three-part framework that inquires whether: (1) the expert is qualified by knowledge, skill, experience, training, or education; (2) the reasoning or methodology underlying the expert's testimony is reliable; and (3) the expert's testimony will assist

the trier of fact in understanding the evidence or determining a factual issue. *See* FED. R. EVID. 702; *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893–94 (7th Cir. 2011). The proponent of an expert witness bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard by a preponderance of the evidence. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). And district courts have broad discretion in making this evidentiary determination. *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 810 (7th Cir. 2012).

Additionally, while "[a]n opinion is not objectionable just because it embraces an ultimate issue," FED. R. EVID. 704, expert opinions that "merely tell the jury what result to reach" are inadmissible (largely, because they are unhelpful), *id.* at 1972 advisory committee note. Moreover, "Rule 704 . . . does not provide that witnesses' opinions as to the legal implications of conduct are admissible." *United States v. Baskes*, 649 F.2d 471, 479 (7th Cir. 1980); *see also Haley v. Gross*, 86 F.3d 630, 645 (7th Cir. 1996) (suggesting that it would be "improper[ ]" for an expert witness to "tell[ ] the jury why the defendants' conduct was illegal" or "testify regarding the dictates of [the] law"). Accordingly, "expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible." *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003); *United States v. Sinclair*, 74 F.3d 753, 757 n.1 (7th Cir. 1996).

## II.    <u>Analysis</u>

### A.    NCAA's Motions to Exclude Opinions of Plaintiffs' Experts

The NCAA moves to exclude the opinion testimony offered by Dr. Robert Cantu; Dr. Tanya Rutherford Owen; Dr. Ralph Scott; Harold Bialsky; and Kristin Kucsma. Each is addressed in turn.

### 1.    Dr. Robert Cantu

Dr. Robert Cantu is the Medical Director and Director of Clinical Research for the Dr. Robert Cantu Concussion Center, as well as the Director of Sports Medicine and Chief of Neurosurgery at Emerson Hospital in Concord, Massachusetts. He also serves as, among other things, the Clinical Professor of Neurology and Neurosurgery and Co-Founder of the Center for the Study of Traumatic Encephalopathy at Boston University School of Medicine; Medical Director of the National Center for Catastrophic Sports Injury Research in Chapel Hill, North Carolina; Senior Advisor to the National Football League's Head, Neck, and Spine Committee; Member/Co-Chair of the Equipment and Rules Committee of the National Football League Players Association Health and Safety Committee; Co-Director of the Neurologic Sports Injury Center at Brigham and Women's Hospital, in Boston, Massachusetts; and a member of the NCAA Concussion Safety Advisory Group.

A prolific writer, Dr. Cantu has authored over 489 scientific publications, including thirty-four books on neurology and sports medicine, as well as book chapters, peer-reviewed papers, and educational videos. Additionally, he has worked for a number of peer-reviewed journals, serving as an associate editor of *Medicine*

*and Science in Sports and Exercise* and *Exercise and Sports Science Review*; an editorial board member of *The Physician and Sportsmedicine*, *Clinical Journal of Sports Medicine*, and *Journal of Athletic Training*; and the section head for the Sports Medicine Section of *Neurosurgery*.

Dr. Robert Cantu has offered four opinions in support of Plaintiffs' claims. First, he describes the consensus best practices for managing concussions at an institutional level in amateur sports during the relevant time period. Second, he opines that the NCAA failed to adopt those practices or require its member schools to do so. Third, he states that the NCAA's response to the concussions that Owens and Solomon incurred while playing college sports was not consistent with the consensus best practices. Fourth, he assesses the historic, current, and future medical conditions of Owens and Solomon and opines that it is more likely than not that their medical conditions resulted from the NCAA's failure to adopt or require member schools to adopt the consensus best practices.

### a. Duty and Breach of Duty of Care

As an initial matter, the NCAA argues that, because the existence of a duty is a question of law, Dr. Cantu may not offer legal conclusions about whether the NCAA owed Plaintiffs a duty of care because it would not be helpful to a jury. But, for the most part, Dr. Cantu simply observes that the NCAA has recognized its responsibility to safeguard the health of student-athletes in its constitution and other publications.

For example, Dr. Cantu states that, under its constitution, the NCAA conducts its athletic programs in a manner "designed to protect and enhance the physical and

educational well-being of student athletes." Def.'s Ex. 19, Cantu Report Owens ¶ 92, ECF No. 442.[1]  Additionally, he notes that the constitution provides that NCAA member schools have a responsibility to "protect the health of, and provide a safe environment for" student-athletes.  *Id.*  The constitution also states that the NCAA is responsible for ensuring that sports programs conform with the constitution and bylaws and enforcing member schools' compliance with their obligations.  *Id.* ¶ 91. Dr. Cantu certainly is free to consider the NCAA's own documents in formulating his opinions, and quoting from these documents, and offering an opinion as to the NCAA's duty of care are two entirely different things.

In certain instances, however, Dr. Cantu does use the words "duty" and "duty of care."[2]  Because these statements regarding the NCAA's compliance (or

---

[1]  The NCAA also contends that Dr. Cantu is not qualified to provide opinions on the NCAA's constitution, rules, and regulations.  But Dr. Cantu is not offering any opinions as to their accuracy or sufficiency.  Rather, he merely considered such materials when assessing whether the NCAA followed the best consensus practices as they related to the concussions Owens and Solomon suffered.  *See, e.g.*, Cantu Report Owens ¶¶ 90, 95, 102, 144, 147, 173, 179, 263; Def.'s Ex. 18, Cantu Report Solomon ¶¶ 90, 95, 102, 144, 147, 172, 178, 257, ECF No. 441.  And, based on his knowledge, skill, experience, training, and education regarding the management of sports-related concussions, Dr. Cantu is well qualified to offer his opinions.  Indeed, the NCAA itself has relied on six of Dr. Cantu's publications on concussion management in its 2011 NCAA Sports Medicine Handbook.  Pls.' Ex. Kurowski Decl. Ex. 3, 2011–12 NCAA SPORTS MEDICINE HANDBOOK 7, ECF No. 399-3.  In addition, he has been a member of the NCAA's Sport Science Institute Concussion Safety Advisory Group for many years.  *Id.*, Ex. 4, Cantu CV at 3, 39, 41, 49, 84, ECF No. 399-4.  To the extent that the NCAA wishes to cross-examine Dr. Cantu about his knowledge of NCAA governance, it may do so. But such an inquiry goes to the weight, not the admissibility, of his opinions.  *See, e.g.*., Def.'s Ex. Marsh Decl., Ex. 42, *Onyshko* Tr. at 1080:5–1081:3, ECF No 450 (cross-examining Dr. Cantu regarding his knowledge of how the NCAA works).

[2]  He states, for example: (1) "In my opinion, based upon review of documents, the NCAA has acknowledged internally that it has violated its duty of care owed to its student-athletes participating in NCAA athletics," Cantu Reports Owens & Solomon ¶ 33; (2) "The particular provisions I have in mind in assessing if the NCAA met its duty of care are set forth below," *id.* ¶ 90; (3) "The NCAA has consistently recognized its duty to provide a safe environment for student-athletes," *id.* ¶ 95; (4) "In assessing its duty of care," *id.* ¶ 147; (5) "its duty of care

noncompliance) with its duty are legal conclusions, these sentences or sentence fragments are stricken from Dr. Cantu's expert reports and barred from his testimony. *See Good Shepherd Manor Found.*, 323 F.3d at 564 (affirming the district court's preclusion of an expert's testimony on purely legal matters); *Baumann v. Am. Fam. Mut. Ins. Co.*, 836 F. Supp. 2d 1196, 1202 (D. Colo. 2011) (barring expert testimony about an insurer "phrased in terms of . . . legal duties or obligations"); *Scottsdale Ins. Co. v. City of Waukegan*, 689 F. Supp. 2d 1018, 1023 (N.D. Ill. 2010) (excluding expert testimony interpreting the language of an insurance contract, as well as "opinions offer[ing] conclusions about [an insurer's] duties under the law"); *see also Essex Ins. Co. v. Structural Shop, Ltd.*, No. 15 C 2806, 2017 WL 2224879, at *2–4 (N.D. Ill. May 22, 2017) (granting motion to bar defendant's expert from testifying as to plaintiff's legal duties).

---

should take into account that," *id.* ¶ 23b; (6) "of the legal standard of care," *id.* ¶ 100; (7) "and their duty of care to Derek Owens," Cantu Report Owens ¶ 34; (8) "and their duty of care to Kyle Solomon," Cantu Report Solomon ¶ 34; (9) "its duty of care and," Cantu Report Owens ¶ 173, Cantu Report Solomon ¶ 172; (10) "of its duty of care and," Cantu Report Owens ¶ 179, Cantu Report Solomon ¶ 178; (11) "their duty of care and," Cantu Report Owens ¶¶ 34–35, 263, Cantu Report Solomon ¶¶ 34–35, 257; and (12) "and contrary to the NCAA's duty of care," Cantu Report Solomon ¶ 206.

Likewise, to the extent that Dr. Cantu refers to the NCAA's "obligations" or "promises" with regard to the health of student-athletes, these statements also constitute statements of law and, therefore, are stricken. *See* Cantu Report Owens & Solomon ¶ 90 ("I reviewed the NCAA's concussion management in the context of the obligations it undertook in these documents."); *id.* ¶ 94 ("the NCAA Constitution promises that"); *id.* ¶ 97 ("The NCAA promises its athletes a safe environment"); Cantu Report Owens ¶ 173, Cantu Report Solomon ¶ 172 ("meet its obligation to"). That said, Dr. Cantu may cite and quote verbatim the NCAA's own statements as support for the proposition that the NCAA has acknowledged its concern for student-athletes' safety and has made those statements to the public.

The NCAA also objects to Dr. Cantu's opinion that the NCAA breached its duty of care. But, other than the statements noted above, Dr. Cantu's remaining opinions primarily state that the NCAA failed to follow consensus best practices for concussion management during the time that Plaintiffs played collegiate sports. And, generally speaking, that subject is fair game for expert testimony. *See Shadday v. Omni Hotels Mgmt. Corp.*, 477 F.3d 511, 514 (7th Cir. 2007) (analyzing a negligence claim and doubting that the question of reasonableness of defendant's conduct could be answered without the aid of expert testimony regarding industry standards, among other things); *Essex Ins.*, 2017 WL 2224879, at *2 (permitting an expert to "to testify that, in light of customs, practices, and standards in the insurance industry, Essex failed to issue a reservation of rights, file a declaratory action, or both, in a timely manner.").

In one instance, however, Dr. Cantu does opine that the NCAA did not exercise, or require its member institutions to exercise, "ordinary and reasonable care" with regard to Owens and Solomon. *See* Cantu Reports Owens & Solomon ¶ 144 (last full sentence). To the extent this expression is equivalent to "consensus best practices," it is fine. Otherwise, it too is a statement of law and inadmissible. *See United States v. Duncan*, 42 F.3d 97, 102 (2d Cir. 1994) (stating that an expert may not act "outside of his limited role of providing the groundwork in the form of an opinion to enable the jury to make its own informed determination."); *Essex Ins.*, 2017 WL 2224879, at *3 (holding that defendant's expert "cannot testify as to Essex's legal duties or opine that Essex violated these duties"); *Dowe v. Nat'l R.R. Passenger Corp.*, No. 01 C 5808, 2004

WL 887410, at *1 (N.D. Ill. Apr. 26, 2004) ("[A] bare conclusion that particular conduct is 'reasonable' or 'unreasonable' likely would not be particularly helpful to the jury[.]").  As such, this opinion will not aid the jury, and it is stricken.

### b.   Consensus Best Practices

Next, the NCAA seeks to bar Dr. Cantu's opinions as to what constituted consensus best practices for concussion management during the relevant time.  The NCAA first contends that best consensus practices are merely aspirational.  Based on Dr. Cantu's knowledge of these practices and his experience in advising numerous organizations regarding concussion management (including the NCAA and the National Football League ("NFL"), among others), he is well qualified to opine about what concussion management standards were recommended at the time, as well as the standards that had been adopted by various sports leagues and institutions.  If the NCAA wishes to explore the extent to which certain standards in fact were recommended and/or implemented, it may do so on cross examination.  The NCAA also may attempt to show that a particular practice was inordinately demanding and unreasonable given the circumstances (and, thus, could not form a "best consensus" practice).  But, again, such concerns go to the weight of Dr. Cantu's testimony, not its admissibility.

Next, the NCAA contends that expert testimony establishing consensus best practices are applicable only to the medical community, not institutions like the NCAA.   And, to be sure, Plaintiffs Owens and Solomon have not brought medical malpractice claims.  But this misses the point of Dr. Cantu's testimony.  His goal is

to show that well-known international and domestic sports organizations, like the NCAA, had recognized and promulgated standards on how concussions should be addressed and that the NCAA ignored them.

According to Dr. Cantu, the consensus best practices emanated from a symposium in Vienna organized by a number of international sports organizations, including the International Olympic Committee ("IOC"), the International Ice Hockey Federation ("IIHF"), and the Federation Internationale de Football Association ("FIFA"). Def.'s Ex. 16, Cantu Dep. Solomon, at 106:4–107:6, ECF No. 440. The objective of the conference was to provide recommendations to improve the safety and health of athletes who suffered concussive injuries. *Id.* at 107:11–20. To this end, the symposium tasked a group of experts, called the Concussion in Sport Group ("CISG"), to create a working document for preventing concussions, educating athletes, managing and treating concussions, and rehabilitating athletes after concussions, whether at the recreational, collegiate, or professional level. *Id.* at 108:6–12.

After the Vienna meeting in 2001, the CISG also met in Prague in 2004, in Zurich in 2008, and again in Zurich in 2012. Cantu Reports Owens & Solomon ¶¶ 106, 126–36. After each meeting, the group published consensus statements and return-to-play protocols. *Id.*

Dr. Cantu also points to other sources reflecting certain consensus best practices. For example, the NFL implemented return-to-play policies in 2007, *id.* ¶¶ 121–25, and adopted even stricter standards in 2009. *Id.* ¶¶ 137–40.

These statements and policies were created under the auspices of the IOC, IIHF, FIFA, and the NFL, none of which are strictly medical providers. What is more, to the extent that the NCAA formulated guidelines for sports medicine care and protection of student athletes' health and safety, *see generally, e.g.*, 2011–12 NCAA SPORTS MEDICINE HANDBOOK, it is required to have done so with ordinary and reasonable care.

Dr. Cantu's testimony about whether and when sports organizations adopted the consensus best practices (and what they were) will help the jury in determining key issues in this case. *See, e.g., Getty Petroleum Mktg., Inc. v. Cap. Terminal Co.*, 391 F.3d 312, 326 (1st Cir. 2004) (Lipez, J., concurring) (stating that, although "voluntary standards do not irrefutably establish the standard of care in a negligence case[,] . . . . they constitute one more piece of evidence upon which the jury could decide whether the defendant acted as a reasonably prudent person in the circumstances of the case."); *Michaels v. Mr. Heater, Inc.*, 411 F. Supp. 2d 992, 997 (W.D. Wis. 2006) ("Salzenstein's testimony regarding defendant Mr. Heater's failure to comply with voluntary industry standards is admissible, although certainly not conclusive evidence of negligence."). Accordingly, the NCAA's motion to bar Dr. Cantu's opinions on this ground is denied.

### c. Causation

The NCAA also takes issue with Dr. Cantu's opinions that the NCAA caused Plaintiffs' injuries. First, the NCAA argues that there is no reliable scientific connection between, on the one hand, NCAA's purported failure to implement the

best consensus concussion remediation policies and, on the other, Owens' post-concussion syndrome ("PCS") or Solomon's concussion treatment. In retort, Plaintiffs point to Dr. Cantu's fifty years of medical expertise as a neurologist and his myriad scientific publications—including thirty-four books on neurology and sports medicine. They observe that he is a leading spokesperson on concussion management and has an expansive knowledge of pertinent medical studies relating to concussions. In addition, he has reviewed Plaintiffs' medical records and has performed numerous evaluations of Plaintiffs themselves. A brief review of his opinions here is helpful.

Dr. Cantu explains that concussions most commonly result in the "rapid onset of cognitive impairment that is self-limited and spontaneously resolves." Cantu Reports Owens & Solomon ¶ 39. He describes the metabolic changes to the brain following a concussion. *Id.* ¶¶ 45–48. He also cites numerous peer-reviewed studies that suggest that concussions or a combination of concussions and subconcussive hits (impacts that do not produce any concussion symptoms) may lead to conditions such as second impact syndrome, PCS, and chronic traumatic encephalopathy. *Id.* ¶¶ 52–65. Based on his specialized expertise, knowledge, and experience, Dr. Cantu opines that returning to play before full recovery places athletes at risk of persistent and permanent injury. *Id.*

Additionally, Dr. Cantu states that proper concussion management is necessary to determine whether cognitive impairment after a concussion has resolved. Cantu Report Owens ¶¶ 169–72; Cantu Report Solomon ¶¶ 168–71. This includes: (1) a structured concussion protocol; (2) catastrophic injury risk education;

(3) baseline neuropsychological testing; (4) return-to-play criteria supervised by experienced medical personnel; and (5) incident-specific documentation regarding concussion management. *See* Cantu Report Owens ¶¶ 32, 36, 172, 265; Cantu Report Solomon ¶¶ 32, 36, 171, 197, 259.

In his view, during the relevant timeframes for Owens and Solomon, the NCAA did not formulate guidelines that included any of these concussion management protocols and its failure to do so caused Plaintiffs' persistent injuries. Cantu Report Owens ¶¶ 34, 185–95; Cantu Report Solomon ¶¶ 34, 184–94.

Finally, Dr. Cantu evaluated Plaintiffs' medical records, performed neurologic examinations of Plaintiffs on multiple occasions, and diagnosed them with PCS. Cantu Report Owens ¶¶ 196–264; Cantu Report Solomon ¶¶ 195–258. He notes that Owens has exhibited cognitive, behavioral, and mood deficits, Cantu Report Owens ¶ 264, and Solomon has exhibited deficits in cognitive testing, eye tracking, and balance. Cantu Report Solomon ¶ 258. Because their symptoms have persisted for over eight years, Dr. Cantu concludes that, more likely than not, they are permanent. Cantu Report Owens ¶ 265; Cantu Report Solomon ¶ 259.

Rather than raising reliability concerns, Dr. Cantu's application of his expertise in his examination of Plaintiffs and their medical histories to arrive at a scientific medical opinion is precisely the type of methodology that a physician should employ. *See, e.g.*, *Hall v. Flannery*, 840 F.3d 922, 928 (7th Cir. 2016) (holding that, in light of a pediatric neurosurgeon's twenty-five years of medical experience and

article publications, his methodology of reviewing plaintiffs' medical records, progress notes, and deposition transcripts was sufficiently reliable).

The NCAA next contends that Dr. Cantu's causation opinion must fail because he did not perform a differential diagnosis to assess whether Plaintiffs' symptoms could be caused by something other than PCS. But, here too, an expert's "failure . . . to rule out all possible causes of an injury goes to the weight, rather than the admissibility, of the opinion." *Taylor v. Union Pac. R.R. Co.*, No. 09-cv-123-GPM, 2010 WL 3724283, at *7 (S.D. Ill. Sept. 16, 2010); *see Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 182 (6th Cir. 2009) (same); *Kudabeck v. Kroger Co.*, 338 F.3d 856, 861–62 (8th Cir. 2003) (same); *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 157 (3d Cir. 1999) (same).

And, in any event, Dr. Cantu considered and dismissed certain other causes of Plaintiffs' ailments based on their medical records. *See* Cantu Report Owens ¶ 238 (brain tumor); Def.'s Ex. Marsh Decl., Ex. 17, Cantu Dep. Owens at 82:21–83:1 (brain tumor), ECF No. 441; *id.* at 28:21–23 (ADD); *see also* Cantu Report Solomon ¶¶ 238–40, 243, 245 (substance abuse); *id.* ¶ 195 (ADHD); *id.* ¶¶ 195, 224–25 (non-collegiate concussion history). Given this, the NCAA's argument that the absence of differential diagnoses undercuts Dr. Cantu's causation opinions goes to their weight, not their admissibility.[3]

---

[3]     Dr. Tanya Rutherford Owen relied on Dr. Cantu's evaluations and conclusions, and, therefore, the NCAA's arguments as to Dr. Cantu apply equally to Dr. Owen. *See Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 789 (7th Cir. 2017) (an expert may rely on the conclusions of another expert if the conclusions are themselves reliable).

Next, according to the NCAA, Dr. Cantu cannot opine with a reasonable medical degree of certainty that a particular individual, like Solomon, will develop dementia by a certain age. But this is not what Dr. Cantu does. *See* Cantu Dep. Solomon at 294:18–295:15. Rather, based on four different studies, his review of Plaintiffs' medical records, and his examination of both Plaintiffs, Dr. Cantu asserts that a person with persistent neurological symptoms following multiple traumatic brain injuries, like Plaintiffs, is at a heightened risk of developing dementia earlier compared to someone with no brain injury. *Id.* at 294:11–17; Cantu Report Owen ¶¶ 268–69 (citing, among others, studies showing that "a brain injury shortens the time for when the dementia threshold would be achieved" and depicting the synergistic and additive effects of age and traumatic brain injury compared to aging alone); Cantu Report Solomon ¶¶ 262–63 (same).

Put another way, Dr. Cantu states that, as a result of Plaintiffs' concussion-related injuries, each is "at risk for further worsening of his cognitive impairments most likely to the point of dementia as he ages" and "an earlier onset . . . than would be experienced without his history of multiple concussions and prolonged post-concussion syndrome." Cantu Report Owens ¶ 267; Cantu Report Solomon ¶ 261. Dr. Cantu's methodology in reaching his conclusion passes muster under *Daubert*. *See, e.g.*, *Booth v. Kit, Inc.*, No. CIV. 06-1219 JP/KBM, 2009 WL 4263574, at *4 (D.N.M. Mar. 9, 2009) (denying a motion to preclude a neurologist from opining as to a heightened risk of early onset dementia, when neurologist based his opinions on extensive literature and medical evaluations).

Lastly, the NCAA argues that the Court should preclude Dr. Cantu's testimony that he is unable to rule out whether Owens or Solomon will develop chronic traumatic encephalopathy ("CTE") in the future. This objection is well-taken. Dr. Cantu concedes that a clinician cannot confirm or rule out a CTE diagnosis in a living individual using current technology. Cantu Report Owens ¶ 270; Cantu Report Solomon ¶ 264. And Dr. Cantu has diagnosed both Plaintiffs with persistent PCS, not CTE. Accordingly, the Court finds that Dr. Cantu's opinion that he cannot "rule out" CTE in the future would not be helpful to the jury in any way. *See, e.g.*, *Krik v. Crane Co.*, 76 F. Supp. 3d 747, 752–53 (N.D. Ill. 2014) ("The primary basis for the 'Any Exposure' theory seems to be that Krik's experts cannot rule out that a single dose of asbestos causes injury. . . . This is not an acceptable approach for a causation expert to take."). Moreover, whatever probative value it would have had would be substantially outweighed by the prejudice such testimony would have upon the NCAA and likely would confuse the jury into believing that Plaintiffs are likely to get CTE in the future. Accordingly, the Court bars Dr. Cantu from opining that he cannot rule out that either Plaintiff will eventually develop CTE.

The NCAA's motion to bar the testimony of Dr. Cantu is granted in part and denied in part as described above.

### 2.    Dr. Tanya Owen

Plaintiff Owens has retained Dr. Owen as a vocational rehabilitation expert. Dr. Owen received a Ph.D. in Rehabilitation from the University of Arkansas and a Master of Science in Counseling Psychology from the University of Southern

Mississippi. She also has taught doctoral and masters candidates in rehabilitation counseling in health professions.

Dr. Owen is a certified life care planner, disability management specialist, and rehabilitation counselor. She has published dozens of articles on topics related to life care plans and has received numerous awards from international professional organizations for her work in life care planning and rehabilitation. For almost thirty years, Dr. Owen has developed life care plans for individuals with injuries, conducted vocational and wage-earning capacity evaluations, and performed short- and long-term care needs projections. Based on her experience and knowledge, she has provided in-court testimony more than two dozen times.

Dr. Owen has developed a life care plan for Owens. It includes a vocational evaluation, projected annual loss of earnings, and projected medical costs. As part of her analysis, Dr. Owen concludes that Owens's vocational outlook has been impacted by his delayed labor market entry. She also projects an annual loss of earnings based on his PCS, as diagnosed by Dr. Cantu. In addition, she asserts that it is more likely than not that Owens will exit the labor market sooner than he would have, had he not been disabled. Lastly, she opines that Owens is likely to incur ongoing medical costs due to his PCS and provides projected costs.

The NCAA advances several arguments to bar Dr. Owen's opinions. First, it contends that she lacks specialized medical knowledge and experience regarding individuals with PCS. But vocational experts need not have medical knowledge for the type of opinions that Dr. Owen offers; they may rely on medical records and

medical expert reports. *See Momeni-Kuric v. Metro. Prop. & Cas. Ins. Co.*, No. 3:18-CV-00197-RGJ, 2019 WL 3416677, at *3 (W.D. Ky. July 29, 2019) ("[V]ocational experts often rely on medical expert opinions in opining on an individual's employment opportunities.").

Here, Dr. Owen bases her opinions on Owens's medical records and vocational test results, Dr. Cantu's opinions regarding his persistent cognitive limitations, her evaluation of Owens's after multiple interviews, and her extensive experience in life care planning and rehabilitation for individuals with disabilities, including those with brain injuries. These are precisely the kinds of data upon which experts like Dr. Owen may rely. *See, e.g.*, *Deperrodil v. Bozovic Marine, Inc.*, 842 F.3d 352, 362 (5th Cir. 2016) (discussing medical history, interviews, work history, earnings record, treating physician's assessment); *Stevens v. Bangor & Aroostook R.R. Co.*, 97 F.3d 594, 600 (1st Cir. 1996) (discussing medical records, work history, interview, review of jobs in area); *Corrigan v. Methodist Hosp.*, 234 F. Supp. 2d 494, 500 (E.D. Pa. 2002) ("Moreover, we also find Ms. Patterson's testimony to be well within her ken as a rehabilitation expert/consultant who was charged with the development of a life care plan for the plaintiff. We cannot find that she diagnosed or otherwise identified a disease afflicting the plaintiff from her symptoms; it rather appears that she reviewed [plaintiff's] medical and treatment history . . . ."), *aff'd*, 107 F. App'x 269 (3d Cir. 2004).

Next, the NCAA challenges the reliability of Dr. Owen's methodology on various grounds: (1) she did not vet Dr. Cantu's qualifications; (2) she did not examine

each and every one of Owens's medical records; and (3) she disregarded or miscategorized certain relevant factors. However, based upon the record, the Court finds that such issues go to the weight of Dr. Owen's testimony, not its admissibility. *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 808 (7th Cir. 2013) ("The reliability of data and assumptions used in applying a methodology is tested by the adversarial process and determined by the jury . . . .").

The NCAA also takes aim at Dr. Owen's projection that Owens will exit the labor market at age forty-nine. In developing this projection, Dr. Owen relies on Owens's medical records and vocational test results, Dr. Cantu's opinions regarding Owens's persistent cognitive limitations, and her evaluation of Owens in light of her training. She also considered Dr. Cantu's opinion that Owens is at a heightened risk for worsening cognitive impairments and early onset of dementia, as well as a 2006 peer-reviewed study concluding that disabled subjects showed a fifty percent decline in employment in their forties. *See* Cantu Report Owens ¶ 267; Def.'s Ex. 3, Owen Report at 11, ECF No. 438 (citing Judith M. Mitchell et al., *The Effects of Aging on Employment of People With and Without Disabilities*, 49 REHAB. COUNSELING BULL. 157 (2006)).[4] This is sufficient to satisfy the requirements of Rule 702.

For these reasons, the NCAA's motion to bar Dr. Owen's testimony is denied.

---

[4] The NCAA also asserts that Dr. Owen's reliance on this study is misplaced because it is unclear whether any of the subjects suffered from PCS. But whether any of the disabilities discussed in the study are meaningfully different from PCS goes to the weight of her testimony.

### 3.    Dr. Ralph Scott

Owens retained Dr. Ralph Scott as a forensic economist to calculate his lost earning capacity.  Dr. Scott has a Ph.D. in economics from Tulane University and has been an economics professor at Hendrix College in Arkansas for over forty years.

The NCAA does not question Dr. Scott's qualifications, but takes umbrage with his methodology.  According to the NCAA, Dr. Scott's testimony should be barred because his conclusions are based on Dr. Owen's expert report and its conclusion that Owens suffered a three-year delay in entering the labor market.  Dr. Scott also considered Dr. Owen's opinion that Owens has experienced and will continue to experience the pay-gap between what male college graduates with disabilities earn as compared to those without disabilities.  However, "as a general matter, there is nothing objectionable about an expert relying upon the work [of] a colleague." *Gopalratnam*, 877 F.3d at 789.  And a motion to bar an economist's opinion solely because it relies on another expert's admissible opinion generally raises an issue of the testimony's weight.  *See, e.g.*, *Brown v. Smith & Wesson Corp.*, No. 4:08-CV-04065, 2011 WL 13233194, at *3 (W.D. Ark. Feb. 28, 2011) (denying a motion to bar Dr. Ralph Scott's testimony because he relied on the admissible opinions of a vocational expert).

The NCAA also contends that Dr. Scott's methodology in calculating Owens's lost earning capacity is unreliable because it is based on national statistics for the average earnings of males with a bachelor's degree published in United States Census Bureau ("U.S. Census") surveys.  Instead, the NCAA argues, Dr. Scott also should

have considered geographic and other individual-specific information when arriving at his calculations. Given the general soundness of his methodology, however, Dr. Scott's decision to use national averages versus more particularized data also goes to weight. *See Africano v. Atrium Med. Corp.*, 561 F. Supp. 3d 772, 778 (N.D. Ill. 2021) ("That [an expert] did not consider . . . all possible factors . . . goes to the weight and not the admissibility of his testimony.") (internal quotation marks and citation omitted).

Next, the NCAA faults Dr. Scott for failing to consider Owens's work history. But, according to Owens, he suffered from cognitive disabilities starting in college before he entered the work force and before he was able to develop a significant work history. Given Owens's theory of damages, the NCAA's argument that Dr. Scott should have considered Owens's work history is insufficient to prohibit his testimony at trial. *See Earl v. Bouchard Transp. Co.*, 735 F. Supp. 1167, 1172 (E.D.N.Y. 1990) ("Earning capacity is determined by what a plaintiff could have earned even if he or she never worked to that capacity in the past.") (internal quotation marks omitted); *Scanlan v. Sunbeam Prods., Inc.*, No. 3:12-CV-9-S, 2015 WL 10711206, at *22 (W.D. Ky. Sept. 1, 2015) (holding that Rule 702 and Daubert do not preclude reliance on statistical databases or demand "unrealistic specificity" where the plaintiffs "suffered injury prior to beginning their work life, such as students").

Finally, in the NCAA's view, Dr. Scott has not identified a reliable methodology for selecting the appropriate discount factors when calculating the present value of future expenses Owens will incur as a result of his injuries. Dr. Scott explains that

his objective was "to project corresponding future expenses over Owens's lifetime and then to discount future costs into present value terms." Def.'s Ex. 38, Scott Report ("Scott Report") at 1, ECF No. 448. He used a real discount factor of 1.0% for medical components of the life care plan and 2.5% for non-medical cost computations. *Id.* at 2. He calculated these discount factors based on the fact that inflation and interest rates automatically move together with investments in inflation-indexed bonds. *Id.* As a result, in Dr. Scott's view, "it is the differential between interest and inflation that is important." *Id.*; *see Doca v. Marina Mercante Nicaraguense, S.A.*, 634 F.2d 30, 37 (2d Cir. 1980) ("[T]here is a fairly constant relationship between interest and inflation rates, so that it is more reasonable to make a prediction about the relationship of both rates than about the level of interest rates alone."). To the extent that the NCAA disagrees with this approach, it may subject Dr. Scott to vigorous cross-examination at trial. *See Vanskike v. ACF Indus., Inc.*, 665 F.2d 188, 211–12 (8th Cir. 1981) ("Assumptions such as those [an] economist ma[kes that include a discount factor] go to the weight of the evidence and not its admissibility.").

For the reasons explained, the NCAA's motion to bar Dr. Scott's testimony is denied.

### 4. Harold Bialsky

Bialsky is a certified life care planner, rehabilitation counselor, and brain injury specialist. He has worked as a vocational evaluator and life care planner for twenty-six years. Solomon retained Bialsky to provide a vocational evaluation and life care plan and to estimate his future medical costs and loss of earning capacity.

Bialsky has a master's degree in rehabilitation counseling from New York University, a doctorate in chiropractic from Los Angeles College of Chiropractic, and a bachelor's degree in life sciences from Bloomfield College in New Jersey. Furthermore, he has co-written a chapter in a book on rehabilitation and neurology, *see* MICHAEL P. BARNES & HARRIET RADERMACHER, COMMUNITY REHABILITATION IN NEUROLOGY (2003), and has provided in-court expert testimony approximately seventy-five times since 2014.

In arriving at his opinions, Bialsky has considered Dr. Cantu's report, Solomon's medical records from 2005 to 2018, and multiple interviews with Solomon. As Bialsky puts it, he relied on Solomon's history, physical injuries, diagnostic testing, and evaluations, as well as his own experience, knowledge, and skill in providing vocational evaluations and life care plans.

The NCAA first asserts that Bialsky is not qualified because he is not a medical doctor. But Bialsky is not providing a medical opinion. Instead, he relies on Dr. Cantu's diagnosis and his opinion that Solomon's cognitive, behavioral, and emotional deficits are likely to be permanent. Bialsky also factors in Dr. Cantu's conclusion that Solomon's cognitive impairments will likely worsen to the point that he will require daily living assistance. As noted above, an expert can rely upon the opinions of other disclosed experts when conducting their own analysis.

The NCAA also believes that Bialsky must be an economist in order to calculate Solomon's loss of earning capacity. But numerous courts have allowed vocational evaluators without formal economic training to provide opinions on lost

earning capacity. *See, e.g.*, *Zhao v. United States*, 963 F.3d 692, 697 (7th Cir. 2020) ("Mrs. Zhao's vocational expert . . . provided a number of estimates of S.'s lost earning capacity based on different levels of education he might attain."); *Michalesko v. Office Max*, No. 4:04cv2479, 2006 WL 5186520, at *3 (M.D. Pa. Aug. 15, 2006) (finding that although vocational counselor "lack[ed] qualifications as a forensic economist . . . [or] an economic expert," his experience as a vocational specialist permitted him to testify "in the area[] of calculating annual earning capacity").[5]

Next, the NCAA argues that Bialsky's methodology is unreliable because he did not examine each and every one of Solomon's medical records. But the NCAA fails to point out any particular medical record that it thinks would have made a difference. And to the extent it can point to any, the NCAA may raise it on cross-examination.

Furthermore, the NCAA contends that, in reaching his conclusions, Bialsky improperly ignores the impact that Solomon's drug and alcohol addiction would have on his vocational future. But Bialsky indicates that he reviewed medical records that specifically addressed Solomon's substance abuse. *See* Bialsky Report at 12–13, 14, 17–19, 23–24. And given Bialsky's extensive knowledge and experience in creating life care plans for individuals, including those who may have struggled with

---

[5]     The Court finds the cases cited by the NCAA unpersuasive, either because the expert at issue was an economist, not a vocational evaluator, or because the plaintiff's damages theory was based on lost earnings, rather than the less demanding theory of lost earning capacity. *Cf. Stacy v. PPC Transp. Co.*, No. 4:11-CV-4018, 2013 WL 12171870, at *3 (W.D. Ark. Feb. 19, 2013) (stating that lost earning capacity does not require the same specificity or detail as does proof of loss of future wages because proof of specific pecuniary loss is not indispensable to recover for lost earning capacity).

addiction, the NCAA may cross-examine him regarding his consideration of such issues.

The NCAA also questions the reliability of Bialsky's assumption that Solomon will exit the work force and require some level of daily living assistance at age fifty. This is based on Dr. Cantu's opinion that Solomon is at a heightened risk of developing early onset dementia. Because Bialsky's assumption is largely premised upon Dr. Cantu's medical opinion and because Bialsky is a vocational evaluator with specializing experience with individuals with brain injuries, the Court finds that this too goes to the weight, rather than the admissibility of Bialsky's opinions.

Lastly, the NCAA asserts as unreliable Bialsky's projections regarding the educational level that Solomon would achieve but for his injuries. Bialsky first cites to peer-reviewed articles for the proposition that the number of years of schooling completed by parents is the most important factor influencing the number of years of schooling completed by a child. Bialsky Report at 28 (first citing Faizal Sharma, *Predicting the Adult Earning Capacity of Minors*, ECONOMICA (Mar. 20, 1997), https://economica.ca/predicting-the-adult-earning-capacity-of-minors/, and then citing Robert Haveman & Barbara Wolfe, *The Determinants of Children's Attainments: A Review of Methods and Findings*, 33 J. ECON. LIT. 1829 (1995)). Then, he observes that Solomon's parents obtained multiple master's degrees and a doctorate degree to estimate the educational qualifications that Solomon himself would have achieved. The Court finds that this methodology is sufficiently reliable under Rule 702 for presentment to a jury. *See, e.g.*, *Zhao*, 963 F.3d at 697 (considering

vocational expert's estimates of "lost earning capacity based on different levels of education he might attain.").

As discussed above, the Court finds that Bialsky's opinions will assist the jury in its determinations, and the NCAA's motion to exclude Bialsky's testimony is denied.

**5.    Kristin Kucsma**

Kristin Kucsma is a forensic economist, who has an ABD and master's degree in economics from Rutgers University and a bachelor's degree in economics from Seton Hall University.  She has worked as a forensic economist for sixteen years.  Prior to that, she taught economics at Drew University, Seton Hall University, Saint Peter's College, and Rutgers.  Kucsma has published several articles in peer-reviewed journals on subjects relating to forensic economics.  Solomon retained Kucsma to estimate the present value of his lost earning capacity, fringe benefits, lifetime adjusted earnings, and the cost of lifetime care.

The NCAA first faults Kucsma for relying upon the opinions of Dr. Cantu and Bialsky as part of conducting her own analysis.  Because the Court has found those opinions reliable, however, this argument fails.

Additionally, the NCAA argues that Kucsma's methodologies for arriving at three critical factors in her analysis—a 4.8% multiplier for fringe benefits, 3.9% multiplier for wage growth, and a 4% discount factor—were unreliable.[6]  As for the

---

[6]    The NCAA takes issue with Kucsma's estimate of an increase of 5% of gross earnings for job maintenance.  But Kucsma estimates a 5% *reduction* for job maintenance.  The Court assumes that the NCAA does not take issue with a reduction.

first, Kucsma states that she based the 4.8% multiplier on U.S. Department of Labor statistics detailing average employer contributions to retirement and savings plans. Def.'s Ex. 30, Kucsma Report at 8, ECF No. 444. The Court finds this methodology sufficiently reliable, and to the extent that the NCAA wishes to argue that she should have examined more local statistics, it can raise this at trial.[7]

Next, Kucsma arrived at a 3.9% multiplier for wage growth by reviewing data published by the U.S. Department of Labor and determining how much wages had increased in past years. She compared those figures with the Department's Occupational Employment Statistics across all occupations, including sales-related positions. According to Kucsma, in her professional opinion, the best way to predict future wage growth is to rely on historical data and statistics concerning all occupations." Def.'s Ex. 31, Kucsma Dep. at 270:14–17, ECF No. 445. For its part, the NCAA believes that she should have limited her review to sales-related positions and/or the solar panel industry, in which Solomon worked. But, again, questions such as this go to her testimony's weight, not admissibility.

As for Kucsma's estimate of a 4% discount rate to calculate present value, she relied on historical yields and current spot rates on high-grade, fixed-income, tax-exempt, and inflation-indexed municipal bonds, as well as financial market trends.

---

[7]     The NCAA cites *Joffe v. King & Spalding LLP*, No. 17-CV-3392 (VEC), 2019 WL 4673554, at *7–8 (S.D.N.Y. Sept. 24, 2019), where a district court precluded Kucsma from valuing fringe benefits using the same national average of all employer contributions, but the Court finds the case distinguishable. In *Joffe*, the plaintiff was a practicing attorney at a large law firm, whereas here Solomon alleges he was injured prior to entering the work force. Because it is unclear where in the United States Solomon would have worked or what career or profession he would have been able to obtain but for his PCS, the Court finds that Kucsma's reliance upon a national average is sufficiently reliable for trial.

*See id.* at 320:12–22; Kucsma Report at 15.  As Solomon points out, even NCAA's expert, Dubravka Tosic, has indicated that these are factors that she would consider when evaluating a discount rate.  *See* Pls.' Ex. 2, Tosic Dep. at 142:21–143:18, ECF No. 400.  And, contrary to the NCAA's arguments otherwise, Kucsma is entitled to rely on her extensive experience and knowledge as an economist in calculating discount rates without citing any particular treatise.  Her opinion regarding the appropriate discount rate, as well as her estimates of fringe benefits and earnings growth, will assist the jury in its determination of any damages.

The NCAA also contends that Kucsma's report relies on outdated data.  Like each and every expert report in this case, Kucsma's report states that she relied on the information available to her when drafting her report.  And she states that if the case goes to trial, she will update her calculations based on current information regarding Solomon's earnings.  Kucsma Dep. at 230:5–10.  Accordingly, this is not a reason for precluding her opinions at this time.

Finally, Kucsma's analysis provides three distinct projection of damages based on whether Solomon would have obtained a bachelor's degree, master's degree, or doctorate degree.  However, at various points in her report, she describes her conclusions as a "range of loss."  Because such phrasing inaccurately describes Kucsma's opinions, she will be prohibited from referring to her calculations as a "range" or any similar wording.

For these reasons, the NCAA's motion as to Dr. Kucsma is denied, except as to the characterization of her damages calculations as a "range."

28

**B.      Plaintiffs' Motions to Strike Opinions of the NCAA's Rebuttal Experts**

Owens and Solomon move to bar the NCAA's expert, Christopher Stankovich. In addition, Owens separately moves to strike the testimony of Dr. David Lewin, and Solomon separately moves to strike the testimony of Dr. Brent Morgan.

**1.      Dr. Christopher Stankovich**

Dr. Stankovich has a Ph.D. in clinical counseling and counseling psychology, a master's degree in clinical counseling education, and a bachelor's degree in psychology and sociology.  His doctoral dissertation examined the sport retirement transition of elite-level athletes, and he co-authored a book on the subject.  For over twenty-five years, Dr. Stankovich has provided clinical counseling to student-athletes and has taught psychology, counseling, sport management and business classes to undergraduate and graduate students.  He has authored four other books on sports psychology of high school and college athletes, and has written articles regarding high school athletics in various magazines.  The NCAA has offered him as a rebuttal witness.[8]

Plaintiffs challenge a number of Dr. Stankovich's opinions.  First, they contend that, because he does not have any medical training or expertise, he is unqualified to offer any opinion as to whether concussions Plaintiffs suffered during college caused their current injuries.  For example, Dr. Stankovich states that "[t]here is much more

---

[8]      Generally speaking, Dr. Stankovich provides three opinions: (1) a reasonable person in the position of Owens and Solomon would have a basic understanding of the risks and dangers of brain injuries in competitive college contact sports; (2) Owens and Solomon followed a normative life pattern consistent with the retirement of an elite-level athlete; (3) Owens and Solomon were not treated therapeutically using commonly accepted interventions and strategies after they retired from sports.

evidence and support for psychosocial factors impacting [Plaintiffs'] post-retirement distress than head injuries." And, to Owens in particular, he opines that "Owens had a brain tumor, further complicating any cause-effect relationship between concussions and post-sport retirement distress." Pls.' Mot. Strike Test. Christopher Stankovich, Ph.D., Ex. A, Stankovich Report Owens ("Stankovich Report Owens") at 18, ECF No. 357-1; *id.*, Ex. B, Stankovich Report Solomon ("Stankovich Report Solomon") at 20, ECF No. 357-1.

For its part, the NCAA points out that Dr. Stankovich has reviewed the depositions, deposition exhibits, and expert reports in this case and has applied his extensive expertise in assisting collegiate athletes transition to post-college life. What is more, Dr. Stankovich cites a peer-reviewed article to support his methodology of relying on such materials to become familiar with an individual's psychological distress, treatment options, and clinical evaluations. Thus, the Court finds that Dr. Stankovich is qualified to opine that there is evidence that Plaintiffs' post-retirement stress and other psychosocial factors have contributed to their cognitive limitations.

At the same time, the Court finds that Dr. Stankovich lacks the medical training and experience necessary to testify as to the degree to which those factors caused or contributed to Plaintiffs' current ailments relative to Plaintiffs' prior head traumas. His lack of medical training also precludes him from testifying as to what impact, if any, Owens's tumor "complicat[ed] any cause-effect relationship between concussions and post-sport retirement distress."

In addition to these opinions, Plaintiff anticipate that Dr. Stankovich will testify that "serious questions surround the [pharmaceutical] drug therapies that [Plaintiffs] experienced, and the side effects." Stankovich Report Owens at 19; Stankovich Report Solomon at 21. The NCAA denies that he will offer such testimony, but his expert reports suggest otherwise. For example, in his report discussing Owens, Dr. Stankovich states:

> Owens was prescribed various drugs to treat his mood state, attention, and anxiety. Drugs prescribed and used include Cymbalta and Zoloft. While these drugs are commonly prescribed, concerned critics worry about the established, serious FDA warnings of side- and/or interaction-effects that, ironically, can exacerbate problems—or even create new problems (be it from side- and/or interaction-effects with other drugs).

Stankovich Report at 18; *see, e.g.*, Def.'s Ex. 66, Stankovich Dep. at 61:15–17 (stating that he listed Plaintiffs' prescribed drugs), ECF No. 453, *id.* at 115:12–16 (discussing psychotropic medications and side effects); 116:13–16 (same); 178:10–180:1 (same); 182:23–186:15 (intimating that he cannot rule out that Plaintiffs' symptoms were side effects of the drugs they were prescribed); 236:12–242:6 (addressing Solomon's prescribed drugs and side effects).

Dr. Stankovich is not qualified to offer these opinions. As Plaintiffs point out, Dr. Stankovich is a clinical psychologist, not a medically licensed prescriber or someone who has studied the side effects of the specific prescription drugs he identifies. Furthermore, Plaintiffs correctly state that Dr. Stankovich cites a single website, http://clinical pharmacology.com, in support of this opinion, and he does not explain how his experience or expertise allowed him to arrive that these opinions.

*See* Stankovich Report Owens at 44; Stankovich Report Solomon at 46; *see also* Stankovich Dep. at 186:4–11 (admitting that he is not a prescriber and that he is speculating about the side effect potential of Cymbalta and Zoloft). As a result, Dr. Stankovich may not state or suggest that Plaintiffs' symptoms may have been caused by a side effect of the drugs they were prescribed. *See e.g.*, *Krik*, 76 F. Supp. 3d at 752–53 ("The primary basis for the 'Any Exposure' theory seems to be that Krik's experts cannot rule out that a single dose of asbestos causes injury. . . . This is not an acceptable approach for a causation expert to take.").

That said, as a clinical psychologist, Dr. Stankovich is qualified to opine that, in his experience counseling collegiate athletes, it is more difficult for a clinical psychologist to evaluate an individual and determine the causes of their mental and emotional distress, if that person is taking the types of drugs discussed above due to their side effects.

The NCAA also offers Dr. Stankovitch to testify that "student athletes should have been aware of the potential risks of playing college contact sports for many years." Stankovich Report Owens at 18; Stankovich Report Solomon at 20. According to the NCAA, Dr. Stankovich is able to provide such testimony, based upon his twenty-five years of experience in counseling student-athletes who have played contact sports and his review of Plaintiffs' medical records.

After reviewing the record, the Court finds that Dr. Stankovich is qualified to testify that, of the many college athletes he has counseled over the years, many were aware of the potential risks of playing college sports. His twenty-five years of

experience counseling collegiate athletes and helping them deal with the aftermath of college sports provides him an adequate basis for this opinion. However, he may not testify as to what a hypothetical college athlete (including Plaintiffs here) "should have known." Dr. Stankovich's professional experience does not imbue him with the ability to make what amounts to a "reasonableness" determination, and he will be prohibited from doing so.

Finally, to the extent that the NCAA would like the jury to conclude that, because Dr. Stankovich's clients were aware of concussion risks, Plaintiffs too must have been aware of such risks, the NCAA can ask the jury to make such an inference, but Dr. Stankovich will not be permitted to make that inference for them.

For these reasons, Plaintiffs' motion to bar Dr. Stankovich's testimony is granted in part and denied in part.

### 2. Dr. David Lewin

Dr. Lewin has a Ph.D. in management with a specialization in human resources management and employment relations, a master's degree in business administration with a specialization in accounting, and a bachelor's degree in accounting. He is a professor emeritus of management, human resources, and organizational behavior at the UCLA Anderson Graduate School of Management. Prior to joining UCLA, Dr. Lewin was a professor, director of the Ph.D. program, director of the Human Resources Research Center, and faculty director of the Senior Executive Program at Columbia University Graduate School of Business. He has published over thirty books, over forty chapters of books, and over seventy

professional journal articles on wage determination, labor relations, and human resource management. He is a member of the board of directors of the National Academy of Human Resources and has provided in-court expert testimony on over sixty occasions.

The NCAA has retained him to rebut the testimony of Owens's expert, Dr. Scott. "The proper function of rebuttal evidence is to contradict, impeach or defuse the impact of the evidence offered by an adverse party." *United States v. Grintjes*, 237 F.3d 876, 879 (7th Cir. 2001) (internal quotation marks omitted). A rebuttal expert "is not required to provide an alternative calculation of damages when challenging the reliability of the opinions offered by an opposing expert." *Alexander v. Take-Two Interactive Software, Inc.*, No. 18-CV-966-SMY, 2020 WL 5750033, at *3 (S.D. Ill. Sept. 26, 2020).

Dr. Lewin takes issue with Dr. Scott's: (1) reliance on Dr. Owen's opinions as to Owens's life care plan and lost earning capacity, (2) assumptions regarding Owens's past work and future economic loss; (3) assumptions when estimating lost fringe benefits; (4) methodology in selecting discount rates; and (5) failure to consider any offset in the event that Owens may be employed in the future. Owens objects, arguing that Dr. Lewin has never served as an expert witness in a personal injury case. But, given the limited nature of Dr. Lewin's rebuttal opinions, the Court finds that he is qualified to offer them.

Next, Owens contends that Dr. Lewin does not provide a reliable methodology to conclude that Dr. Scott's estimates of economic loss are invalid. But Dr. Lewin

describes the bases for his critiques of Dr. Scott. For example, he highlights Dr. Scott's failure to conduct an independent analysis of past or future economic loss, relying solely on Dr. Owen's assumptions. In addition, Dr. Lewin opines that Dr. Scott erred by not asking Owens whether he would have sought a part-time job, full-time job, or no job at all after he graduated college. Dr. Lewin also takes issue with Dr. Scott's failure to tie his estimated percentage of fringe benefits to the type of job or jobs that Owens might have in the future. Lastly, Dr. Lewin states that Dr. Scott ignored other rates of return, such as the 7.0% average annual net rate of return between 1950 and 2009, or the 11.66% average annual net rate of return between 1987 and 2016, on the Standard & Poor's 500 stock portfolio. Use of such rates would have resulted in far lower estimates of economic losses. Because the Court is satisfied that Dr. Lewin has provided a reliable methodology for these opinions, Plaintiffs' motion to strike Dr. Lewin's rebuttal testimony is denied.

### 3. Dr. Brent Morgan

This brings us to the final expert at issue. Dr. Brent Morgan has a medical degree from Ohio State University and is licensed by the medical board for the State of Georgia. He is also board certified in emergency medicine and medical toxicology. Dr. Morgan has been a professor at the Emory School of Medicine in the Department of Emergency Medicine for nine years and has taught medical students for over twenty-five years. He has served as an attending physician and medical director at various health care facilities in or near Atlanta. Dr. Morgan is presented as a rebuttal expert to challenge Dr. Cantu.

Specifically, Dr. Morgan opines that Solomon has suffered from substance abuse disorder and post-traumatic stress disorder ("PTSD") since prior to his attending college. In Dr. Morgan's view, Dr. Cantu failed to consider the full impact of Solomon's PTSD when arriving at his conclusions.

Solomon focuses on Dr. Morgan's statements regarding whether Solomon suffered from PTSD and argues that Dr. Morgan is not qualified to offer them. Dr. Morgan's opinions about Solomon's PTSD are solely based on comments by Solomon and his mother in his medical records. Pl.'s Mot. Strike Test. Brent W. Morgan, M.D. ("Pl.'s Mot. Morgan"), Ex. A, Morgan Report at 5, ECF No. 366. Dr. Morgan then compares Solomon's self-described symptoms to symptoms of PTSD, citing the Mayo Clinic's website and two articles in support. *Id.* at 4–5, 11.

Dr. Morgan admits, however, that he has never diagnosed a patient with PTSD; he refers patients to psychiatrists for a PTSD diagnosis. *Id.* at Ex. B, Morgan Dep. ("Morgan Dep.") at 124:15–22, ECF No. 366-1. Nor does he recall ever teaching medical students about PTSD, *id.* at 43:15–18, or provide any support for the notion that a physician can rely entirely upon comments made by a patient or relative in medical records for diagnosing PTSD. Dr. Morgan also concedes that he lacks any knowledge or understanding of the relationship between PTSD and traumatic brain injuries. *Id.* at 117:16–23.

Given Dr. Morgan's lack of knowledge about PTSD and his dearth of experience in diagnosing patients with PTSD, the Court finds that he is not qualified to opine as to whether Solomon suffered from PTSD or whether Solomon's cognitive, behavioral,

and emotional functioning were impacted by PTSD.[9]  Accordingly, the Court grants Solomon's motion to bar Dr. Morgan's opinions on PTSD.

## III.    <u>Conclusion</u>

For the reasons provided, the NCAA's motions to preclude certain testimony of Dr. Robert Cantu and Kristin Kucsma are granted in part and denied in part, and its motions to bar the opinions of Dr. Tanya Rutherford Owen, Dr. Ralph Scott, and Harold Bialsky are denied. Plaintiffs' joint motion to strike certain testimony of Dr. Christopher Stankovich is granted in part and denied in part, Owens's motion to strike the testimony of Dr. David Lewin is denied, and Solomon's motion to strike certain testimony of Dr. Brent Morgan is granted.

**IT IS SO ORDERED.**                    **ENTERED:  7/27/22**

_____
**JOHN Z. LEE**
**United States District Judge**

---

[9]      Dr. Morgan has taught residents at bedside and in an opioid clinic that PTSD is a potential risk factor for developing substance abuse disorder. *Id.* at 48:16–23. As such, he is qualified to offer this limited opinion.  But because the Court bars Dr. Morgan's opinion that Solomon suffered from PTSD, and because the NCAA does not assert that it will establish Solomon's diagnosis by any other means, this limited opinion is irrelevant.